# Exhibit
# A

# Managing Class Action Litigation:
# A Pocket Guide for Judges

Barbara J. Rothstein & Thomas E. Willging

Federal Judicial Center
2005

This Federal Judicial Center publication was undertaken in furtherance of the Center's
statutory mission to develop and conduct education programs for judicial branch
employees. The views expressed are those of the authors and not necessarily those
of the Federal Judicial Center.

this page left blank to facilitate two-sided printing

## Contents

Preface, v

Introduction, 1

I. Selection of counsel, 4
    A. Single-lawyer model, 4
    B. Private ordering, 4
    C. Selection by the judge, 5
    D. Empowered plaintiff model, 5
    E. Competitive bidding, 5

II. Timing and significance of class certification, 6
    A. Timing, 6
    B. Class certification, 6
    C. Defining the class, 7
    D. Multiple class actions, 7

III. Settlement review: risks and issues, 8
    A. Judge's role, 8
    B. Obtaining information about the settlement, 9
    C. Hot button indicators, 12
    D. Preliminary review of proposed settlement, 16
    E. Notice issues, 18
    F. Fairness hearing, 20

IV. Attorney fee issues, 22
    A. "Mega" cases, 22
    B. Monetary results achieved for class, 23
    C. Evaluating nonmonetary results, 23
    D. Role of government actors, 24
    E. Objectors, 24
    F. Methods of calculating fees, 24

V. Role of government actors, 25

VI. Coordination with state judges, 27

VII. Use of special masters and court-appointed experts, 28

Conclusion, 28

Bibliography, 29

About the Federal Judicial Center, 30

this page left blank to facilitate two-sided printing

## Preface

This pocket guide is designed to help federal judges manage the increased number of class action cases expected as a result of the Class Action Fairness Act of 2005. The new legislation expresses congressional confidence in the abilities of federal judges to "assure fair and prompt recoveries for class members with legitimate claims" and to provide appropriate "consideration of interstate cases of national importance under diversity jurisdiction." CAFA, sec. 2(b).

The Act also calls on the judiciary to develop and implement "best practices" for ensuring that settlements are fair to class members and that class members are the primary beneficiaries of any settlement. This guide is part of a continuing effort of the federal judiciary to achieve those goals.

Amendments to Rule 23 that went into effect in December 2003 anticipated the statutory charge, as did the Center's publication of its *Manual for Complex Litigation, Fourth* in 2004. Those involved in producing the rules and manual, particularly Judge Lee H. Rosenthal (S.D. Tex.), deserve recognition for their efforts.

A note of appreciation should also go to Judge D. Brock Hornby (D. Me.) for his detailed suggestion and outline of topics which served as a catalyst and roadmap for this publication.

I hope you find this guide useful in meeting the challenges Congress has entrusted to us in managing class action litigation.

Barbara Jacobs Rothstein
Director, Federal Judicial Center

this page left blank to facilitate two-sided printing

# Introduction

Class actions often attract a great deal of public attention.* Rulings by state and federal judges in class actions have become the subject of a highly polarized public debate. This debate has focused on perceived abuses of class action by the parties and their attorneys that have affected both defendants and class members. In the Class Action Fairness Act of 2005 (CAFA) (Pub. L. No. 109-2, 119 Stat. 4 (2005)), Congress responded to the debate by shifting many class actions to federal court and assigning new responsibilities to federal judges. This guide can assist you in discharging those responsibilities. The guide distills many of the most important practices for managing class actions found in the *Manual for Complex Litigation, Fourth* (MCL 4th) and provides cites to cases decided after publication of the MCL 4th to illustrate many points. For your convenience, cross-references to the MCL 4th are also provided in the guide.

CAFA begins with the finding that "class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties . . . ." Such claims might otherwise evade legal enforcement. Class actions may also help regulators control conduct that threatens to harm various markets. Securities and other consumer class actions serve to enforce regulatory standards designed to control or deter fraudulent marketplace conduct that might otherwise escape regulation. Members of Congress and others who assert class actions' general utility also point, however, to abuses that threaten to undermine their usefulness. Critics single out cases in which the benefits accruing to the class as a whole and to the public seem minimal.

---

*The Federal Judicial Center has devoted considerable attention to class actions in educational programs for judges and has performed extensive empirical work for the Judicial Conference's Advisory Committee on Civil Rules. The Center's *Manual for Complex Litigation, Fourth* (MCL 4th) devotes hundreds of pages to the subject in a general chapter on class actions (chapter 21) and a chapter on attorney fees (chapter 14), and discussions of class actions in mass tort (section 22.7), securities (section 31.5), and employment discrimination (section 32.42) contexts. This guide highlights some of the practices endorsed in the manual and cross-references major provisions of the manual. Other resources, including an outline and videotape of a Federal Judicial Television Network program on the Class Action Fairness Act (Rothstein et al. (2005) in the Bibliography) are available on the Center's sites on the judiciary's intranet and internet and through the Center's Information Services Office.

Class actions demand that judges play a unique role. There is no such thing as a simple class action. Every one has hidden hazards that can surface without warning. Your role includes anticipating the consequences of poorly equipped class representatives or attorneys, inadequate class settlement provisions, and overly generous fee stipulations. The high stakes of the litigation heighten your responsibility, and what's more, you cannot rely on adversaries to shape the issues that you must resolve in the class context. Indeed, you have to decide first which adversaries on the plaintiff side—class representatives and class counsel—can represent the class adequately and whom you should appoint to do so. And, once the adversaries agree on a settlement, you must decide—largely without any clash of views from class counsel, class representatives, or the defendant—whether that settlement is fair, reasonable, and adequate to satisfy the interests of the class as a whole. This guide attempts to clarify the standards that inform those decisions. It is designed to help you use accumulated judicial experience to determine when class representatives and counsel are "adequate" and whether a settlement's terms are "fair" to the class as a whole, "reasonable" in relation to the class's legitimate claims, and "adequate" to redress class members' actual losses.

Now that CAFA is on the books and Federal Rule of Civil Procedure 23 has been amended, you can expect to encounter the following class action responsibilities:

- applying CAFA's new federal jurisdiction rules, such as its $5 million amount in controversy for the class as a whole, minimum diversity of citizenship between class members and defendants, and complex set of rules regarding cases in which the primary defendants are local citizens (*see* Rothstein et al. (2005) in the Bibliography);
- ruling on remand motions;
- appointing counsel who have the professional skills, legal support staff, and financial resources needed to provide the class with adequate representation;
- managing discovery and pretrial motions practice with the object of separating meritorious claims from meritless ones while keeping expenses to a reasonable level and moving the case toward resolution;
- determining when and how to decide class certification motions;

2

- reviewing notice plans and notices to the class to ensure the best notice practicable;
- coordinating with state and federal judges the management of competing and overlapping class actions;
- evaluating the merits of proposed settlements to determine whether they are fair, reasonable, and adequate for class members; and
- assessing reasonable attorney fees for counsel for the class by ensuring that fee awards are commensurate with the value of the results to the class as a whole.

In Part I of this guide, we consider the matter of selecting counsel, and in Part II, we touch on the timing and significance of decisions about whether to certify a class. In Part III, we focus extensively on both procedural and substantive elements of reviewing a class settlement, generally the most important challenge you will face in managing class action litigation. Part IV concerns reviewing requests for attorney fees. In Part V, we discuss the role of government actors; in Part VI, coordination with state judges; and in Part VII, the use of special masters and court-appointed experts.

# I. Selection of Counsel

Attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class action device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.

There are at least five approaches to selection of counsel in class action litigation. Note that in multidistrict litigation (MDL), the transferee judge has the authority to appoint lead and liaison counsel regardless of whether class claims are involved. *See* MCL 4th § 10.22. Whatever approach you use, it is important to make clear to counsel at the outset the content and form of records you require to support applications for awards of fees and expenses or for a lodestar cross-check. *See* "Attorney Fee Issues," *infra* Part IV, and MCL 4th § 14.21. You may find it useful to instruct class counsel that all lawyers should submit fee and expense requests in a similar format—one that will be accessible by the court.

## A. Single-lawyer model

In the typical class action, the lawyer who filed the case will be the only logical choice for appointment as class counsel. That lawyer may have investigated the case independently or may have spoken with government regulators, investigative journalists, or other public information sources. In those cases, the task of selecting counsel consists of assuring yourself that the filing attorney satisfies Rule 23(g) standards, that is, has the requisite knowledge of the substantive law, class action legal experience, and financial and staff resources to represent the class adequately. That attorney, of course, must not have a conflict of interest with the class.

## B. Private ordering

In high-stakes, high-profile class action litigation, entrepreneurial plaintiff attorneys often compete to play the lead role. This competition may be heightened when the case piggybacks on a case investigated and perhaps litigated or prosecuted by a governmental entity. Nonetheless, substantial resources may be necessary to finance the expenses of the litigation. Most often, attorneys in such cases

attempt to resolve the competition by "private ordering," that is, by agreeing to divide the labor, expenses, and fees. To safeguard the interests of the class and to prevent unnecessary litigation and over-staffing, you may want to review those agreements (which will be subject to disclosure upon settlement in any event). MCL 4th § 21.272.

## C. Selection by the judge

In the absence of private ordering, you will have to select among competing counsel by reviewing submissions based on the factors identified in Rule 23(g)(1)(C). Rule 23(g)(2)(C) explicitly permits you to include in the order of appointment "provisions about the award of attorney fees or nontaxable costs." Few judges have unilaterally imposed strict limits on fees in the order of appointment. Consider, however, requesting that counsel submit ex parte or under seal a proposed budget for fees in the case. The budget would serve as an *ex ante* record of the projected time and expense the case might require; judicial review of a proposed fee award at the end of the case would still be necessary, but would most likely be easier.

## D. Empowered plaintiff model

As mentioned earlier, Rule 23(g) presents explicit criteria and a pro-cedure for appointing counsel to represent the class. For securities class actions, the Private Securities Litigation Reform Act (PSLRA) directs you to employ a special procedure for selecting an "empow-ered" lead plaintiff (presumptively one with sizable claims), who, in turn, has the right to select and retain class counsel, subject to your approval. *See In re Cendant Corp. Litigation,* 264 F.3d 201, 273–78 (3d Cir. 2001).

## E. Competitive bidding

In a very narrow set of cases, courts have used competitive bidding to select counsel. After an intensive study, a task force in the Third Circuit concluded that competitive bidding "should be an excep-tion to the rule that qualified counsel can be selected either by pri-vate ordering or by judicial selection of qualified counsel . . . ." *Third Circuit Task Force Report on Selection of Counsel,* 74 Temp. L. Rev. 689, 741 (2001). *See also* Hooper & Leary (2001) in the Bibliography.

## II. Timing and Significance of Class Certification

### A. Timing

Rule 23 once urged attorneys to file and judges to rule on class certification motions "as soon as practicable." Local rules sometimes defined "practicable" as requiring a motion to be filed within 90, 120, or 180 days of the filing of the action. As experience with Rule 23 evolved, however, judges began to rule on motions to dismiss and even motions for summary judgment before turning to class certification. That approach seems to have several advantages. You need not waste time dealing with increasingly complicated class certification issues in meritless cases. Also, should you need to decide whether a class settlement is reasonable, you can use knowledge gained through your rulings on pretrial motions. And the parties can use information from early rulings on the merits to assess their prospects of success and to bargain or act accordingly.

A 1996 Center study (Willging, Hooper & Niemic in the Bibliography) documented that district courts often ruled on merits motions before class certification. Experience had overtaken formal rules, and the rulemakers took notice. The 2003 amendments to Rule 23(c)(1) give you more flexibility by allowing you to consider class certification "at an early practicable time." Considering this change, you should feel free to ignore local rules calling for specific time limits; they appear to be inconsistent with the federal rules and, as such, obsolete. *See* MCL 4th § 21.133.

### B. Class certification

Not all cases filed as class actions settle. Likewise, not all cases filed as class actions end up being certified as class actions. The great majority are dismissed or withdrawn. The 1996 and 2005 FJC studies cited in the Bibliography found that from 20% to 40% of all cases filed as class actions were certified as such. Those certified class actions almost always settled (90% of the time in the 2005 study). The combination of rulings on the merits and on class certification gives the parties ample information for predicting the likelihood of a class recovery. This suggests that the most important actions you can take to promote settlement are to rule on dispositive motions and then, if necessary, rule on class certification.

If the parties decide to talk about settlement before any ruling

on class certification, they may urge you to certify a class for settlement purposes only—a *settlement class*—as opposed to certifying a *litigation class* for a possible trial. *See infra* section III.C.7; *see also* MCL 4th § 21.131–.132.

## C. Defining the class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled to notice in a Rule 23(b)(3) action. The definition must be precise, objective, and ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment with or who were employed by the defendant during a fixed period. *See* MCL 4th § 21.222. Your certification order should specify those excluded from the class, such as residents of particular states, persons who have filed their own actions or are members of another class, and officers and directors of the defendants.

Consider also whether the class definition captures all individuals or entities necessary for the efficient and fair resolution of common questions of fact and law in a single proceeding. If the class definition fails to include a substantial number of persons with claims similar to those of the class members, it is questionable. A broader class definition or definition of a separate class might be more appropriate. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice. *See also* MCL 4th § 21.23.

*Issues classes* are classes certified for particular issues or elements of claims or defenses. Though controversial and subject to conflicting rules in different circuits, issues classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." MCL 4th § 21.24. The test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.

## D. Multiple class actions

Finally, consider class certification in the context of duplicative or overlapping class action litigation pending in other federal and state

courts. Be sure to "obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented." MCL 4th § 21.25. Communication and administrative coordination with other judges will often be necessary. Other things being equal, federal judges should exercise federal jurisdiction over classes of nationwide scope; actions limited to single states can be carved out of any national certification.

# III. Settlement Review: Risks and Issues

Reviewing proposed settlements and awarding fees are usually the most important and challenging assignments judges face in the class action arena. Unlike settlements in other types of litigation, class action settlements are not an unmitigated blessing for judges. Rule changes, precedent, recent legislation, and elemental fairness to class members direct you not to rubber-stamp negotiated settlements on the basis of a cursory review. Current rules, particularly the 2003 amendments to Rule 23, unambiguously place you in the position of safeguarding the interests of absent class members by scrutinizing settlements approved by class counsel. Be aware that the adversarial clashes usually end with the settlement. Indeed, most settlements preclude the parties and attorneys from opposing the settlement's provisions, especially the stipulations about attorney fees. Thus, you need to take independent steps to get the information you'll undoubtedly need to review a settlement agreement.

## A. Judge's role

The judge's assigned task of approving or disapproving a class settlement presents exceptional challenges. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002).

Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, you need to critically examine the class certification elements, the proposed settlement

terms, and the procedures set out for implementing the proposed settlement. *See* MCL 4th § 21.61. You need to identify possible sources of information about the settlement and use them to obtain, for example, documents of agreements or understandings among counsel, the views and experiences of objectors, and the complete terms of the settlement. The next subsection (III.B) discusses all of those sources.

Reviewing a proposed settlement calls for you to use your traditional judging skills. The central questions relate to the merits of the claims and defenses: What are the class claims? How strong are they? What is the range of values of a successful claim? How likely is the class to succeed on each claim in further litigation, including trial? You may decide to avoid a definitive statement on the merits lest the settlement fail and the case actually comes to trial. Nonetheless, it seems absolutely necessary to obtain information and arguments from the parties about their assessment of the probabilities of success and their projection of a realistic range of possible recoveries. *Reynolds*, 288 F.3d at 284–85, discusses this approach further. While party submissions may influence your judgment about the merits, keep in mind that the parties have their own interests in supporting the settlement. You may need to look elsewhere for information that will allow you to take an independent and hard look at the merits of the claims and defenses.

## B. Obtaining information about the settlement

The key to reviewing a settlement is to obtain information about its terms, the merits of the class members' claims, and the reasons for settling those claims in exchange for the settlement's benefits to the class. We have a number of suggestions along those lines, starting with a provision from the new rule.

### 1. Rule 23(e)(2) agreements

Rule 23(e)(2) directs the parties to "file a statement identifying any agreement made in connection with the proposed settlement." Let the settling parties know that you expect them to provide the full settlement agreement as well as an informative summary of other agreements, such as settlement agreements for claims similar to those of class members; side understandings about attorney fees; and agreements about filing future cases, sealing of discovery, and the like. *See* MCL 4th § 21.631 and Committee Note to Rule 23(e)(2).

The idea is to identify documents that directly or implicitly suggest the attorneys' perceptions of the value of the class claims and that may point to funds, including attorney fees or payments to objectors, that might otherwise be available to compensate the class.

Consider directing the parties to provide additional information to aid your assessment of the settlement. Often, information about related parallel and overlapping cases, including amounts paid to individual plaintiffs or claimants, will shed light on the value of the class's claims. If prior settlements were confidential, direct the parties to provide information for you to review in camera. Pressing the parties to provide objective information about the merits and value of the underlying claims should advance the effort. Make sure the parties identify and justify any differences in treatment of various types of class members. Expert evaluations of the costs and present monetary value of all aspects of the settlement to the class may be available. What information did the parties use to exercise their own "due diligence" reviews?

### 2. Preliminary approval hearing

Holding a preliminary approval hearing will afford you another opportunity to obtain information. If you are deciding whether to certify a class at this stage, direct the parties to give you all the information and arguments needed to apply the Rule 23(a) and (b) criteria (except for manageability, which can be assumed in the settlement context). How numerous is the class? What are the common questions of law and fact, and do they predominate? Why is the class action superior to other forms of adjudication?

### 3. Class certification papers

Information gleaned from reviewing class certification papers should also inform you about any need for subclasses to represent separate interests. *See* MCL 4th § 21.23. The preliminary approval hearing is usually the last practical opportunity to create subclasses. Appointing counsel for subclasses often means sending the parties back to the negotiating table to deal with the interests of the new subclasses.

### 4. Expert appraisal

At or after the preliminary approval hearing and after reviewing the sources of information discussed above, consider whether you need an expert's appraisal of the value of nonmonetary (or deferred mon-

etary) components of the settlement. If so, this is the time to appoint an expert, special master, magistrate judge, or other judicial adjunct to evaluate the proposal before the fairness hearing (*see infra* Part VII). As a practical matter, your waiting for objections or for the settling parties' presentations at the fairness hearing will be too late. *See* MCL 4th § 21.644.

### 5. Information from objectors

Before and during the fairness hearing, you might receive written objections and testimony from objectors. Objectors might contribute to your review in various ways. Attorneys who represent competing or overlapping classes, such as those in state actions, may have useful information on the value of the underlying claims. Similarly, attorneys representing individual claimants who seek a better recovery for their alleged injuries may help you identify the strengths and weaknesses of the settlement and the trade-offs that led to the agreement. Be sure to monitor any agreements to settle the claims of these objectors. If they settle for the same per capita amount as the class, that tends to validate the settlement (assuming that other factors are equal). If they settle for more than the class members, ask the settling parties to justify the differential. A higher settlement for objectors with similar damage claims might signify that the class members did not receive full value for their claims. Institutional objectors may bring a different perspective. Watch out, though, for "'canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests.'" *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 (E.D. Pa. 2003) (quoting *Shaw v. Toshiba American Information Systems*, 91 F. Supp. 2d 942, 973 (S.D. Tex. 2000)). Rule 23 gives you authority to scrutinize as part of the overall class settlement any side agreements to "buy out" such objectors.

Generally, government bodies such as the Federal Trade Commission or state attorneys general, or nonprofit entities have class-oriented goals of ensuring that class members receive fair, reasonable, and adequate compensation for any injuries suffered. They tend to pursue those objectives by policing abuses in class action litigation. Consider giving those entities an opportunity to seek specific information through discovery when necessary. Consider also allowing them to participate actively in the fairness hearing. *See* MCL 4th § 21.643.

## C. Hot button indicators

Some settlement terms—"hot button indicators"—show their potential unfairness on their face. At the preliminary approval stage, signaling your concerns about a proposal with one or more such indicators may allow you and the parties to create a notice and hearing process that will correct any deficiencies without the need for multiple hearings. Hot button indicators include any remedy to which you cannot confidently assign a cash value.

### 1. Coupons

Determine whether the proposed coupons are transferable; whether they have a secondary market in which they can be discounted and converted to cash (*see In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 809–10 (3d Cir. 1995)); whether they compare favorably with bargains generally available to a frugal shopper (*see, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292 F. Supp. 2d 184, 186–88 (D. Me. 2003)); whether class members are likely to redeem them (*see id.*); and whether attorney fees are being calculated on the face value of the coupons. CAFA calls for judicial scrutiny of coupon settlements and restricts the use of unredeemed coupons in calculating fees for class counsel. *See* 28 U.S.C. § 1712 (2005). Coupon settlements were rare even before the passage of CAFA. They will be even less likely to occur now. Note that under the proper conditions (e.g., with transferability, a secondary market, and/or a class of repeat users of a low-cost product), coupons might serve both the class and the defendant and thereby increase the overall value of a settlement (*see, e.g., In re Mexico Money Transfer Litigation*, 267 F.3d 743, 748 (7th Cir. 2001) (finding that in-kind transferable coupons useful to a class of repeat consumers had an estimated value of 10%–15% of their face value)).

### 2. Cy pres relief ("fluid recovery")

The term "cy pres" has migrated from the trust field into the less appropriate realm of class action litigation. Literally, it means "as near as possible," and in the class action context, that means no recovery for individual class members, often because the class is so large and the recovery per class member so small that the costs of administration would exceed the benefit to individual members. Individual reimbursement for taxi fare overcharges are a classic ex-

ample. Cy pres relief must come as near as possible to the objective of the case and the interests of the class members. Question whether the class members might feasibly obtain a personal benefit. Look for evidence that "proof of individual claims would be burdensome or that distribution of damages would be costly." *Molski v. Gleich,* 318 F.3d 937, 954 (9th Cir. 2003). If individual recoveries do not seem feasible, examine the proximity or distance between the cy pres recipient's interests or activities and the particular interests and claims of the class members. *See, e.g., Powell v. Georgia-Pacific Corp.,* 119 F.3d 703 (8th Cir. 1997). When cy pres relief consists of distributing products to charitable organizations or others, press for information about whether the products in question have retained their face value or whether they might be out-of-date, duplicative, or otherwise of marginal value.

### 3. Restrictions on claims/reversion of unclaimed funds to defendants

Limits on the amount of recovery per claimant, strict eligibility criteria for claimants, or other procedural or substantive obstacles to honoring claims from class members may have the effect of reducing the apparent value of a settlement. Coupled with a provision that any unclaimed funds revert to the defendant at the end of the claims period (a provision that is generally disfavored, as discussed below), restrictions on eligibility are likely to substantially diminish the overall value of a settlement to the class. *See, e.g., Reynolds,* 288 F.3d at 283. Adding a "clear sailing" agreement (i.e., a stipulation that attorney fees based on the inflated settlement figure will not be contested) to an agreement with a reversion clause tilts the benefit of the settlement away from class members and toward class counsel. *See, e.g., Sylvester v. CIGNA Corp.,* 369 F. Supp. 2d 34, 47 (D. Me. 2005) ("the reverter clause and clear sailing clause raise a presumption of unfairness").

A reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to agree to an inflated settlement amount as a basis for counsel fees. Instead of approving a settlement with a reversion clause, consider encouraging the parties to use an alternative approach, such as prorating the total settlement amount among the class members who file claims. Prorating is a straightforward way to avoid the possibility of unclaimed funds and has become a standard practice in class settlements.

### 4. Indicia of "reverse auctions"

"Reverse auction" is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter; in other words, a reverse auction is the "sale" of a settlement to the lowest bidder among counsel for competing or overlapping classes. *See* MCL 4th § 21.61, text at n.952 and sources cited therein. Determining whether a reverse auction might have occurred requires information about all litigation, in state as well as federal courts, dealing with the subject of the dispute. Previous settlements between class counsel and defendant in unrelated cases may provide clues to the possibility of a collusive relationship.

A primary indicator of a collusive selection of settling counsel is an imbalance between the cash value of the settlement to the class as a whole and the amount of attorney fees in the agreement. For example, a settlement may include monetary and nonmonetary relief. If the attorneys receive the lion's share of the cash and the class receives primarily nonmonetary relief, including future warrants and the like, you should look for solid information to justify the imbalance. Likewise, you should scrutinize an agreement that provides that attorneys receive a noncontingent cash award and that class benefits are contingent on settlement approval and claims made. *See* MCL 4th § 21.71.

Another major indicator of a reverse auction is a difference between the apparent value of the class claims on the merits and the value of the settlement to class members. A typical element of a reverse auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement. Generally, the overpayment of the attorneys originates in an underpayment of what the class should receive based on an objective assessment of the merits of the class claims.

Sometimes, the settlement will be with an attorney who has not been involved in litigating the class claims that other attorneys have been pursuing, an especially suspicious circumstance.

### 5. Injunctive relief

Question whether injunctive relief will truly benefit class members in the case at hand. How much is the injunction worth to the class as a practical matter? What is the dollar value the relief might yield? What is the real cost to the defendant? Does the injunctive relief do more than restate the obligation that the defendant already has

under existing law or under a decree entered by a regulatory body? Are there viable damage claims that class counsel has not pursued? *See, e.g., Molski v. Gleich,* 318 F.3d at 953–54. Might an emphasis on injunctive relief and proposed certification of a Rule 23(b)(2) class amount to a tactical move to avoid the certification requirements and the notice and opt-out rights associated with a damages class under Rule 23(b)(3)? Consider whether you need independent expert advice to answer those questions (*see infra* Part VII).

### 6. Release of liability without remedy

A natural impulse on the part of settling parties is to attempt to expand the class and release claims of those on the periphery of the class, such as the spouses and children of class members, without providing any direct benefit to those individuals. At times a damages remedy may be released without any correlative payment to class members. *See, e.g., Reynolds,* 288 F.3d at 283–84. Claims not pleaded against parties that are not part of the original action (e.g., medical malpractice claims in a class action against a pharmaceutical manufacturer) are sometimes swept into the settlement. To the extent that these claims have value to class members or their families, the settlement should reflect that value. As a general rule, the release of claims by a subclass should be linked with specific remedies, such as payments to the subclass or increased payments to class members based, for example, on their family status.

### 7. Settlement class actions

"Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important." MCL 4th § 21.612. Parties frequently agree to settle class actions before a judge has decided that a class can be certified under Rule 23. The parties then jointly seek certification in the context of the settlement. Often, the parties' agreement that a class can be certified is conditioned on judicial approval of the settlement. The Supreme Court has ruled that, with the exception of one requirement, agreement of the parties does not lessen the need for a judge to determine whether all of Rule 23's certification standards have been met. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997); MCL 4th § 21.132.

You should determine during the preliminary fairness review whether the proposed class meets the standards of Rule 23(a) and (b). MCL 4th § 21.632. That way you can avoid wasting scarce judi-

cial and party resources to schedule a fairness hearing for a class that doesn't meet Rule 23 certification standards.

If you decide to certify the proposed class, be aware that courts, following the Supreme Court's lead in *Amchem*, have ruled that the settlement terms of a settlement class action need careful scrutiny. MCL 4th § 21.612. Often, such a settlement comes early in the litigation, so you may have to probe to uncover the strengths and weaknesses of the parties' claims and defenses as well as the character of their negotiations. There may be conflicts among groups within the proposed class. Question whether the claims of class members are homogeneous, and explore the possibility of creating subclasses and sending the parties back to renegotiate and take into account the differing interests of class members.

If you have doubts about any of the issues raised in this section, consider appointing an expert or special master to review and evaluate the proposed settlement. Also, consider seeking the active participation of lawyers engaged in competing or overlapping class actions involving the same subject matter. *In re Lupron Marketing and Sales Practices Litigation,* 345 F. Supp. 2d 135, 138 (D. Mass. 2004) (discussed *infra* section III.D).

## D. Preliminary review of proposed settlement

Judicial review of a proposed class settlement generally requires two hearings: one preliminary and one final. MCL 4th § 21.632. As mentioned above, if you haven't already certified a class, the preliminary approval hearing is the time to decide that issue. Preliminary review of the proposed settlement affords you an opportunity to express any concerns you may have about the "hot button issues" discussed above. You don't have the power to decide what must be in a settlement agreement, but you do have the opportunity to state your concerns about provisions—or the absence of provisions—that would make a difference in your decision about whether to approve a proposed settlement. If you have such concerns, consider allowing the parties some time to respond to them by renegotiating the settlement so that the class notice can refer as closely as possible to a final settlement. If you hold back your concerns and reject a settlement at the fairness hearing, the parties will most likely have to send new notice of any revised settlement to the class.

16

Consider seeking preliminary input into the fairness, reasonableness, and adequacy of the proposed settlement. For example, one judge permitted counsel pursuing independent state class actions against the same defendants to intervene as "an offsetting influence" to the loss of adversarial opposition from the parties. *In re Lupron,* 345 F. Supp. 2d at 138 n.5. Participation by such plaintiffs' counsel provided the judge with a unique opportunity to receive an informed assessment by nonsettling plaintiffs about the value of the case and the prospects for success at trial. Absent such an opportunity, consider asking the parties or others to provide preliminary information supporting the proposal.

Though not necessarily unfair, *conditional settlements* present a special problem to the class and the judge. Sometimes, a defendant resists settlement unless it can be assured that the number of class members opting out of the proposed settlement will not exceed a certain number that is specified but not widely disclosed. To avoid unduly delaying the settlement review, you may decide to press the parties to set a reasonable cutoff date for the defendant's decision about whether to proceed with the settlement, say thirty days after the end of the opt-out period. MCL 4th § 21.652. In any event, you should require the defendant to make an election before the fairness hearing.

Remember that your preliminary approval of the proposed settlement should not appear to be a commitment to approve the settlement in the end. Your preliminary finding is that the proposed settlement is within the range of reasonableness; that finding is not a final judgment that the proposal is fair, reasonable, and adequate as shown by evidence at the fairness hearing. Reserve that judgment and expect to be informed by counsel for the class and for the defendants (maybe in response to your pointed questions), and by class members, objectors, lawyers from similar litigation, or, perhaps, your own expert or special master. Bring an inquiring mind to the fairness hearing and, as noted above, seek out the information you need to decide whether the settlement is fair, reasonable, and adequate.

Once you are satisfied that the proposal warrants your preliminary approval, review the parties' proposed plan for notice and hearing. Generally, counsel will present the settlement proposal and a notice plan at the same time.

### E. Notice issues

*1. Notice to government regulators*

CAFA requires that within ten days after a proposed settlement is filed in court, each participating defendant must serve notice of specified settlement-related papers on (1) the U.S. Attorney General or, in the case of a depository institution, the primary federal regulatory official *and* (2) the primary state regulatory official (or, if none, the attorney general) of each state in which a class member resides. 28 U.S.C. § 1715 (2005). The idea is to encourage government regulators to participate in reviewing settlements and lend their expertise (and perhaps an adversarial note) to the fairness hearing. You may want to consider extending an express invitation to any regulatory body you have found to be effective in dealing with the subject matter in question.

The Federal Trade Commission (FTC) has extensive statutory authority and expertise in dealing with antitrust, unfair competition, and consumer protection matters. *See generally,* FTC, *Fulfilling the Original Vision: The FTC at 90* (April 2004), http://ftc.gov/os/2004/04/040402abafinal.pdf. CAFA does not specify the FTC as an agency that must receive notice, but consider adding the FTC to the notice list in consumer and trade practice litigation, including antitrust actions. The FTC has created a "Class Action Fairness Project," which channels FTC resources into reviewing proposed settlements as well as class counsel requests for attorney fees. Since defendants have made copies of—or electronic links to—the required settlement documents for other agencies, it will be no burden on them to send notice to the FTC or other consumer protection entities in appropriate cases. You may also decide to exercise your discretion to invite the FTC to participate in settlement and fee reviews as a friend of the court if the subject matter of the case makes this appropriate, but you may need to take steps to avoid delaying the proceedings, such as setting a firm deadline for government responses.

*2. Notice to the class*

Notices are usually the only way to communicate with unnamed class members and enable them to make informed decisions about whether to participate in a settlement. Your primary goals are that notice reach as many class members as possible, preferably by individual notification (*see* Rule 23(e)(1)(B) and MCL 4th § 21.312), and that the recipients notice it, recognize its connection to their

lives and self-interests, read it, and act on it. In a world in which junk mail and spam can easily drown out important messages, you may need to press the parties to look beyond the formal legal requirements and find a way to communicate the gist of a class action notice in an attention-getting and understandable format. Rule 23(c)(2)(B) commands that notices "concisely and clearly state in plain, easily understood language" the elements of class action notices.

The challenge is to give the class member a reason to read the notice. Boilerplate legal language almost never does the job. With help from linguists, communications specialists, and focus groups, the Federal Judicial Center prepared several illustrative notices. Go to www.fjc.gov and click on the "Class Action Notices Page."

The headline of the notice tells potential class members at a glance why they should—or should not—bother to read the notice. If the reader had, for example, "bought XYZ Corp. stock in 1999" he "could get a payment from a class action settlement." Or, if the reader had been "exposed to [an asbestos] product" she "may have a claim in a proposed class action settlement."

A picture of asbestos insulation products may trigger an association in the reader's mind. Those who recognize their own circumstances are likely to read on and perhaps contact a Web site or call an 800 number. Nonmembers of the class will have a good reason for adding it to the junk mail trash pile.

A short-form single-page (or shorter) notice with headlines can tell the reader how to get additional information. Formal case captions and legal terms of the settlement can be placed at the end of a Web-based notice, after plain language answers to questions the reader may have. Settlement administrators can supply scripted answers to callers' frequently asked questions and, if needed, information about how to examine the settlement on the Internet or at the courthouse.

"Plain English" may not be enough. Truly global settlements will include class members whose language is not English and who may not be citizens of an English-speaking country. Note that the FJC illustrative forms include an example of a Spanish language notice. Make sure the notice plan takes into account the cultural and language barriers to notifying class members. For example, the class actions involving assets of Holocaust victims demanded a far-reaching notice campaign to reach the many dispersed Jewish survivors as well as gays, Jehovah's Witnesses, and Romani ("gypsy") migrants.

The judge approved a "multifaceted plan" that included "worldwide publication, public relations (i.e., 'earned media'), Internet, and grass roots community outreach." *In re Holocaust Victims Assets Litigation,* 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000). As the judge was in the Holocaust victims' class actions, be alert to cultural differences that might affect the attention recipients will give to the proposed notices. A class of migrant farm workers, for example, might rely on radio more often than urban factory workers would. A class of people challenging searches and seizures as unreasonable might respond differently to official court notices than, say, people who have never been arrested.

### F. Fairness hearing

#### 1. Participation rates: opt-outs

The typical class action settlement notice will most likely yield an apathetic response, and few objectors or opt-outs. Two empirical studies in the past decade (including one conducted by the FJC) found that about one in a thousand (0.1%) class members opted out of a proposed settlement. *See* Eisenberg & Miller (2004) and Willging, Hooper & Niemic (1996) in the Bibliography. Counsel may argue that a low percentage of opt-outs demonstrates class members' agreement with the settlement, but in some types of cases that argument seems misplaced. Opt-out rates vary according to the type of case and the amount of the individual recovery. Class members are considerably more likely to opt out of mass tort, employment, and commercial litigation, where individual recoveries are generally higher, and less likely to opt out of consumer cases, where individual recoveries are generally lower.

#### 2. Participation rates: objections

Do not expect class representatives or other class members to attend the fairness hearing or file written objections. The 1996 FJC study (Willging, Hooper & Niemic in the Bibliography) found that only about a quarter to a half of the class representatives attended the fairness hearing.

The FJC study also found that in about half of the class actions, not a single member filed a written objection. Eisenberg and Miller found that objections occurred in less than one in a thousand class actions in which a published opinion was available. *See* Eisenberg & Miller (2004) in the Bibliography. Written objections documented

in the FJC study most frequently challenged the amount of the attorney fees requested. In second place was a related objection: that the settlement was inadequate to compensate class members for their losses. Next in line was the objection that the settlement favored some subgroups over others. These findings suggest that a substantial portion of the fairness hearing will focus on attorney fee issues.

### 3. Conducting the fairness hearing

It is essential to conduct a hearing even if no one other than the attorneys for the settling parties participates, because the hearing is your primary opportunity to focus on the terms of the settlement. You alone are charged with deciding whether the settlement is fair to the class members, reasonable in relation to the merits of their claims, and adequate to redress any injuries suffered. Rule 23 and the *Manual for Complex Litigation* call for the judge to "make an independent analysis of the settlement terms." MCL 4th § 21.61. Review the list of "hot button" settlement terms presented in section III.C *supra*, and be prepared to ask counsel hard questions about the value of the settlement to the class. In addition to the "hot button" items, the MCL 4th contains a checklist of fifteen more routine factors that might inform your decision about whether the settlement is superior to the primary option of continued litigation of the class claims. MCL 4th § 21.62. The manual also discusses benchmarks for applying the fifteen factors.

If objectors and unrepresented class members appear at the fairness hearing, it is important to permit them to fully voice their concerns. For class members who feel strongly enough about their injuries to appear, the fairness hearing is their "day in court." Judges in settlements involving tort claims such as the Agent Orange and silicone gel breast implant litigation held multiple days of hearings to accommodate the interests of class members. *See* MCL 4th § 21.634.

You will, of course, want to eliminate unnecessary repetition. Setting time limits is a must. Be sure to notify participants in advance about how much time they have. Note that having a group of class members gives you a chance to ask questions of all present, akin to conducting a voir dire of a jury venire. Such a group examination may be an efficient mechanism for getting a clear sense of the similarities and differences among class members' claims.

Finally, "Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements." MCL 4th § 21.635. In these times of heightened visibility of class action rulings, appellate review of settlements is not pro forma even when the court affirms the district court's findings and conclusions. *See, e.g., In re Cendant Corp. Litigation,* 264 F.3d 201 (3d Cir. 2001).

# IV. Attorney Fee Issues

As discussed in Part I *supra* ("Selection of Counsel"), Rule 23(g) requires you to appoint class counsel at an early stage of the litigation. The order appointing counsel can include express provisions about the standards and procedures you expect to use in reviewing requests for attorney fees and costs. Rule 23(g)(2)(C). At the least, you should inform counsel about whether to keep time records to support using a lodestar cross-check, as discussed below. In addition, appointing counsel gives you a natural opportunity to discuss any limits you might want to set for travel expenses, use of senior partners to do legal research, and the like. *See* MCL 4th § 14.21. Perhaps from the outset of the litigation, but at least at the fee determination stage, "the district judge must protect the class's interest by acting as a fiduciary for the class." *In re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 307 (3d Cir. 2005).

## A. "Mega" cases

In "mega" cases, be prepared to see attorney requests for truly huge amounts, up to hundreds of millions of dollars. In such cases, of course, the monetary recovery to the class typically is also in the hundreds of millions of dollars, even in the billions. *See, e.g., In re Prudential Insurance Co. of America Sales Practices Litigation,* 148 F.3d 283, 339–40 (3d Cir. 1998). In those cases, the percentage of recovery is generally far less than the typical range and may be as low as 4%. MCL 4th § 14.121. Generally, as the total recovery increases the percentage allocated to fees decreases.

## B. Monetary results achieved for class

The Committee Note to Rule 23(h) gives the following guidance for determining fees based on the creation of a monetary fund for the common benefit of the class (a "common fund": the "fundamental focus is the result actually achieved for class members"). In cases where the benefit to the class is nonmonetary, determining the final result requires looking behind the face value of nonmonetary or contingent benefits to determine their actual benefit to the class. In some cases, you might use expert valuations based on reliable, objective standards. In other cases, perhaps a majority of them, the only reliable test of benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip. *See* MCL 4th § 21.71; *see also* Class Action Fairness Act, 28 U.S.C. § 1712(a) (coupon settlements).

## C. Evaluating nonmonetary results

In cases dealing with nonmonetary benefits other than injunctive relief, consider two options, either of which links the payment of fees with the actual benefit to the class. The first approach, which appears to be more efficient, awards fees in the same coin both to the class and to counsel. For example, if the class is to be paid in the form of discount certificates, attorneys should receive their fees as a portion of the discount certificates. *See, e.g., In re Auction Houses Antitrust Litigation,* No. 00 Civ. 0648, 2001 WL 170792, at *3–*5, *15–17 (S.D.N.Y. Feb. 22, 2001). This approach gives an incentive to attorneys to help create a secondary market for the nonmonetary benefits and gives the court the efficiency of a single ruling on attorney fees.

The second approach is simply to hold back the portion of any attorney fee awards that are linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the discount certificates can be established by calculating class members' actual use. *See, e.g., Bowling v. Pfizer,* 132 F.3d 1147, 1151–52 (6th Cir. 1998). This approach has the built-in inefficiency of requiring you to review fee issues more than once and may be unfair to counsel who have financed the litigation themselves.

### D. Role of government actors

In quantifying the risk undertaken by plaintiffs' counsel in bringing a class action, scrutinize the role of government actors (*see infra* Part V). Where a government body has obtained a guilty plea, criminal conviction, or civil judgment against a defendant, class counsel in a "piggyback" class action arising out of the same set of facts face a reduced risk of loss and a reduced risk or burden of discovery and trial. A reasonable attorney fee in such cases may be the value that class counsel adds to the settlement that would have been available to the class but for the counsel's work. *See, e.g., Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993). In some cases, the government actor might participate as an intervenor or as a friend of the court in addressing the attorney fee issues. *See, e.g., In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96, 98 (D.D.C. 2002).

On the other hand, private class action litigation may pave the way for government enforcement or serve as a substantial deterrent in its own right. In such cases, take into account in awarding attorney fees any groundbreaking work of plaintiffs' counsel. *See, e.g., In re Rite Aid Corp.*, 396 F.3d at 297, 304.

### E. Objectors

Objectors may qualify for fees because of their contribution to the common fund available to the class. By reducing attorney fees, objectors often increase funds available for the common fund for the class. *See, e.g., Bowling v. Pfizer*, 922 F. Supp. 1261, 1285 (S.D. Ohio 1996). The Committee Note to Rule 23(h) expressly recognizes the benefits that objectors may provide to the class. However, be wary of self-interested professional objectors who often present rote objections to class counsel's fee requests and add little or nothing to the fee proceedings.

### F. Methods of calculating fees

Debates about whether to calculate fees based on a lodestar (reasonable number of attorney or paralegal hours multiplied by market rate) or a percentage of the value of the settlement have for the most part been resolved in favor of the percentage-of-value method. However, while most courts of appeals now permit district courts to use the percentage-of-value method (MCL 4th § 14.121), their decisions often direct district courts in their circuit to supplement the

percentage method with a lodestar cross-check to see if the hourly rate is reasonable and to provide the appellate courts with a basis for reviewing the reasonableness of the fee award. The cross-check requires "neither mathematical precision nor bean-counting"; it allows you to "rely on summaries submitted by the attorneys and [you] need not review actual billing records." *In re Rite Aid Corp.,* 396 F.3d at 306–07.

Another type of cross-check involves examining the defendants' attorney fee records as a measure of what might be a reasonable number of hours or a total payment. The MCL 4th cites the Third Circuit's 2001 Task Force on Selection of Class Counsel's recommendation that judges avoid rigid adherence to a benchmark percentage and instead tailor their fee award to the realities of the class litigation.

In mega cases, consider using a sliding scale, by which the percentage decreases as the magnitude of the fund increases. MCL 4th § 14.21, text at nn.497–99; *see In re Rite Aid Corp.,* 396 F.3d at 302–03 (discussing the pros and cons of sliding scales). Note that asking attorneys at the outset of the litigation to maintain time records will be helpful in implementing a lodestar cross-check or a full lodestar review (*see supra* Part I).

# V. Role of Government Actors

Often in consumer or commercial class action litigation, government regulators such as the Federal Trade Commission (FTC), Securities and Exchange Commission (SEC), or a state or the federal attorney general's office will lay the groundwork for class action litigation. In some instances, though, private class action litigants lay the foundation for public enforcement efforts and even criminal prosecutions. *See, e.g., In re Rite Aid Corp.,* 396 F.3d at 297.

In pursuing public goals of advancing fair competition, protecting consumers, and policing the marketplace against false and misleading information, such agencies may invest substantial resources in investigating a defendant's alleged malfeasance. For example, in *In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96, 97 (D.D.C.

2002), the FTC "expended over 25,000 hours of investigators' time, obtained production of and reviewed some 400 boxes of documents produced in response to approximately 40 subpoenas, and conducted 20 investigational hearings and over 60 interviews."

Typically, public enforcement actions result in a consent decree, but the agency may have the statutory power to order rescission of agreements and restitution or disgorgement of illegally gotten gains, as the court recognized in *First Databank*. *See also, e.g., FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 571–72 (7th Cir. 1989). When an agency action or criminal prosecution against a business or its officers is successful, a private class action may well follow on its heels. In the context of an agency action, the class action device can be a vehicle for distributing monetary relief to the class. In *First Databank*, for example, the FTC got the defendant to agree to a $16–19 million figure for the disgorgement remedy. Private plaintiffs increased the undisputed amount of the FTC's settlement by an additional $8 million, and the final disgorgement figure was "expressly declared to be 'for the purpose of settling the [private] class action lawsuits.'" *In re First Databank,* 209 F. Supp. 2d at 98. The court limited the private plaintiff attorneys' fee to a percentage of the value the attorneys added to the FTC's proposed settlement.

When a government regulator has sought a monetary remedy for a class, examine the description of the intended beneficiaries of the government's action and decide whether you should define the class to be certified in the same way. Aligning the class definition with the description of the victims in the governmental action will most likely produce efficiencies in notifying the class, reviewing the settlement, distributing the proceeds, and evaluating requests for fees. In addition, to gain the full picture on entitlement to fees, consider inviting the agency to participate in the fee proceedings as an intervenor in the class action or as a friend of the court. *See also supra* section III.E.1 for a discussion of the CAFA requirements for notifying appropriate federal and state officials about a class settlement.

## VI. Coordination with State Judges

CAFA will probably limit the need to coordinate class action litiga-
tion with state judges, because most class actions of any size and
scope will have federal jurisdiction based on minimal diversity and
will most likely be removed from state court. Coordination among
federal courts will often but not always proceed through the MDL
process, at least for major cases. After the passage of CAFA, some
overlapping class actions may be filed in state courts (for example,
in cases filed on behalf of a class of primarily in-state plaintiffs against
an in-state defendant), but federal courts lack jurisdiction only in
cases in which a primary or significant defendant is a citizen of the
forum state. The first step is to ask the parties whether competing
or overlapping proposed or certified class actions exist in other
courts. Presumably, a defendant will be aware of any other litiga-
tion against it.

Judges have developed different models, with different levels of
formality, for coordinating their efforts with their state judge coun-
terparts. Informal models include personal meetings, telephone calls,
and e-mail communications to exchange information about sched-
uling and to coordinate discovery, rulings on class certification, and
other procedural matters. In more formal contexts, judges may share
a special master with state judges, sit jointly and hear evidence and
argument on motions, or even hold a national conference or set of
meetings about the litigation. The Schwarzer et al. (1992) article in
the Bibliography and MCL 4th § 20.312–.313 provide specific ex-
amples of state–federal coordination efforts.

Generally, state judges have responded to requests for coordi-
nation in a spirit of cooperation. The key is to identify the cases and
judges and initiate communication. Coordination in areas like dis-
covery should take into account the pressure a state judge might
experience from state lawyers eager to present their cases at trial
or, at a minimum, share in any common fund that their efforts help
create. In the most formal and conflictual context, you may need to
issue an injunction to protect federal jurisdiction, usually when you
are seeking to insulate a national settlement from contrary rulings
in competing or overlapping classes in state court. *See* MCL 4th
§§ 21.42 and 20.32.

# VII. Use of Special Masters and Court-Appointed Experts

Special masters, court-appointed experts, and other judicial adjuncts with special expertise may be useful in a variety of contexts in class action litigation. Specifically, judges have appointed special masters to oversee discovery and resolve disputes in contexts where the number and complexity of documents might generate a large number of disputes. *See* MCL 4th § 11.424. Judges have also used magistrate judges, special masters, court-appointed experts, technical advisors, and other adjuncts to assist in evaluating class settlements (*see* MCL 4th § 21.651), and have appointed special masters or other adjuncts to administer settlements and participate in resolving claims via alternative dispute resolution (ADR) or other methods (*see* MCL 4th § 21.661).

Occasionally, judges have appointed special masters to devise trial plans. *See* MCL 4th § 21.141. In class actions involving disputed scientific evidence, you may wish to appoint an expert to present a perspective on disputed issues that is less adversarial than what the parties' experts present. *See, e.g.,* MCL 4th § 22.87. Federal Rules of Civil Procedure 23(h)(4) and 53(a)(1)(C) expressly authorize using special masters to review attorney fee requests. *See* MCL 4th § 21.727. In many class actions, however, the trial judge may find that the information learned in participating in pretrial matters, such as resolving discovery disputes, will greatly enhance the judge's ability to make an informed assessment of a class settlement.

# Conclusion

If this guide has served its purpose, it has helped you analyze and manage the major aspects of class action litigation. By anticipating and paying serious attention to reviewing settlements and requests for attorney fees, you should be able to fulfill your role as a fiduciary for a class whose counsel and representatives have decided to settle on a particular outcome.

# Bibliography

Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004).

Federal Judicial Center, Manual for Complex Litigation, Fourth (MCL 4th) (2004).

Deborah Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain (RAND Corp. 2000).

Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation (Federal Judicial Center 2d ed. 2005).

Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study, 209 F.R.D. 519 (Federal Judicial Center 2001).

Barbara J. Rothstein, John Beisner, Elizabeth J. Cabraser & Jay Tidmarsh, The Class Action Fairness Act of 2005: An Overview of Legal and Case Management Issues (Federal Judicial Center Broadcast, April 1, 2005) (outline and videotape available from the Center's Information Services Office).

William W Schwarzer, Nancy E. Weiss & Alan Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Va. L. Rev. 1689 (1992).

Third Circuit Task Force, *Report on Selection of Class Counsel,* 74 Temp. L. Rev. 689 (2001).

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (Federal Judicial Center 1996); *see also* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges,* 71 N.Y.U. L. Rev. 74 (1996) (later version of same report with fewer tables and figures).

Thomas E. Willging & Shannon R. Wheatman, An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation (Federal Judicial Center 2005).

**The Federal Judicial Center**

**Board**
The Chief Justice of the United States, *Chair*
Judge Bernice B. Donald, U.S. District Court for the Western District of Tennessee
Judge Terence T. Evans, U.S. Court of Appeals for the Seventh Circuit
Magistrate Judge Karen Klein, U.S. District Court for the District of North Dakota
Judge Pierre N. Leval, U.S. Court of Appeals for the Second Circuit
Judge James A. Parker, U.S. District Court for the District of New Mexico
Judge Stephen Raslavich, U.S. Bankruptcy Court for the Eastern District of
    Pennsylvania
Judge Sarah S. Vance, U.S. District Court for the Eastern District of Louisiana
Leonidas Ralph Mecham, Director of the Administrative Office of the U.S. Courts

**Director**
Judge Barbara J. Rothstein

**Deputy Director**
Russell R. Wheeler

**About the Federal Judicial Center**

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The organization of the Center reflects its primary statutory mandates. The Education Division plans and produces education and training programs for judges and court staff, including satellite broadcasts, video programs, publications, curriculum packages for in-court training, and Web-based programs and resources. The Research Division examines and evaluates current and alternative federal court practices and policies. This research assists Judicial Conference committees, who request most Center research, in developing policy recommendations. The Center's research also contributes substantially to its educational programs. The two divisions work closely with two units of the Director's Office—the Systems Innovations & Development Office and Communications Policy & Design Office—in using print, broadcast, and on-line media to deliver education and training and to disseminate the results of Center research. The Federal Judicial History Office helps courts and others study and preserve federal judicial history. The International Judicial Relations Office provides information to judicial and legal officials from foreign countries and assesses how to inform federal judicial personnel of developments in international law and other court systems that may affect their work.

# Exhibit
# B

2000 WL 1336640
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

Keith SNELL and Teresa Snell,
On Behalf of Themselves and All
others Similarly Situated, Plaintiffs,

v.

ALLIANZ LIFE INSURANCE COMPANY
OF NORTH AMERICA and Fidelity Union
Life Insurance Company, Defendants.

No. Civ. 97-2784 RLE.  |  Sept. 8, 2000.

## ORDER

ERICKSON, Magistrate J.

### I. *Introduction*

*1 This matter came before the undersigned United States
Magistrate Judge pursuant to the consent of the parties, as
authorized by the provisions of Title 28 U.S.C. § 636(c), upon
the Motions to Intervene of Class Members, and Objectors,
Leo E. Clark ("Clark"), Susan D. Deese ("Deese"), and John
P. Willis, III ("Willis"); and upon the Plaintiffs' Motion for
Final Approval of Settlement, for a Certification of the Class,
and for an Award of Attorneys' Fees and Expenses.

A Hearing on the Motions was conducted on August 22, 2000,
at which time, the Plaintiffs appeared by Melvyn I. Weiss,
John J. Stoia, Jr., Andrew W. Hutton, and Jack L. Chestnut,
Esqs.; the Defendants appeared by James F. Jorden, Roland
Goss, Paul A. Fischer, and Timothy D. Kelly, Esqs.; Clark
appeared by Charles M. Thompson and R. Stephen Griffis,
Esqs.; Deese appeared by Benjamin E. Baker, Jr., Esq.; and
Willis appeared by Richard Stratton, Esq.

For reasons which follow, we grant the Motions to Intervene,
but only for the limited purpose of taking an appeal, and we
grant the Motions for Final Approval of Settlement, for a
Certification of the Class, and for an Award of Attorneys' Fees
and Expenses. [1]

### II. *Factual and Procedural Background*

This class action was commenced on July 3, 1997, with
the filing of a Complaint in the Superior Court of the State
of California, for the County of Los Angeles. A Notice
was filed on July 31, 1997, which removed the action to
the United States District Court for the Central District of
California and, thereafter, upon the Motion of the Defendants,
the District Court transferred the action, by Order dated
December 4, 1997, to this Court. On January 28, 1999,
this Court entered an Order which allowed the Plaintiffs to
file an Amended Class Action Complaint, which dismissed
LifeUSA Insurance Company as a Defendant, and which
added certain other causes of action. The Defendants filed
their Answer to the Amended Complaint on April 8, 1999,
and, thereafter, the parties engaged in extensive discovery.

### A. *The Plaintiffs' Claims, and the Defendants' Defenses.*

The Plaintiffs' First Amended Complaint alleges that the
Defendants, either knowingly or recklessly, misrepresented:
1) that a single prepayment, or a fixed limited number and/
or amount of premium payments, would cover all out-of-
pocket premiums due on the policies sold by Defendants
throughout the Plaintiffs' lives, or for a specified period; 2)
the reasonableness of, or the failure to disclose the known
or potential variability of, interest crediting rates, policy
charges, cash values and/or benefits, as had been illustrated or
projected to the Plaintiffs; 3) the cash value and/or benefits to
be realized or paid, based upon a fixed number and/or amount
of cash payments; 4) the ability to achieve a rate of return on
premiums paid, in excess of guarantees specified in a policy
form; 5) the nature, quality, suitability, or benefits of policies
sold, including whether the policies were primarily life
insurance; 6) the financial impact on the policyowner of agent
commissions, and sales loads assessed to the policies; and,
7) the financial impact on the policyholder of surrendering,
or using loans or withdrawals of cash values, or other
accumulated values, from an existing policy issued either by
the Defendants, or by another insurance company, to purchase
the policies. In addition to these asserted misrepresentations,
the Plaintiffs have alleged that the Defendants failed to
adequately supervise, educate, and train, their nationwide
sales force of agents. The Defendants have vigorously denied
these allegations, and any other assertions of wrongdoing, and
they have interposed numerous procedural and substantive
defenses.

**B. The Categories of Class Members.**

*2 The Plaintiffs' First Amended Complaint categorized the asserted class members into the following four groupings according to the nature of the claims being made: 1) Limited Premium Payment Claims-a grouping that is comprised of persons who alleged that they were led to believe that their policy would be "fully paid up," or that their obligation to pay further premiums would "vanish," after a certain point in time, or after a certain level of premium payments; 2) Policy Performance Claims-a category that is composed of persons who alleged that they were promised that their policy would perform in a certain way, such as that the policy would have a certain cash flow, or policy account value, after a certain number of premium payments, or that policy charges would be maintained at a certain level; 3) Retirement Investment Claims-a category that contains persons who alleged that they were led to believe that their insurance policy was essentially a retirement or investment plan, and who were subsequently disappointed with the performance of that policy; and 4) Replacement Claims-a category that consists of persons who alleged that they were misled with respect to the replacement of one insurance policy with another. As we later detail, this categorization of claims has significance in that the proposed settlement relief is tailored to respond to each of these groupings of claims, and they are also employed in the Claim Review Process that has been incorporated into the settlement plan.

**C. The Parties' Settlement Negotiations.**

The settlement of class action lawsuits can be an excruciatingly laborious task. Here, the parties entered settlement discussions early in the pretrial process, but an acceptable settlement proposal eluded them, causing the negotiations to be protracted. As early as April 1, 1998, the parties were jointly requesting the Court to defer the issuance of a formal Scheduling Order for at least three additional months, during which time they would continue with their informal discovery, and document production, and would thoroughly explore settlement. See, *Minute Order of April 1, 1998* [Docket No. 33]. At a Status Conference, which was conducted on July 30, 1998, the parties again requested a deferral in the issuance of a formal Scheduling Order, in order that they could bring further focus to the settlement of this action. [3] See, *Order of July 30, 1998* [Docket No. 36].

Regularly thereafter, this Court conducted Status Conferences with counsel for the parties in order to monitor the progress of a settlement, and to assess that progress

against the prospect of further delay in the advancement of this action to Trial. See, *Stipulations and Orders of January 28, 1999, June 18, 1999, July 29, 1999, September 24, 1999, and October 28, 1999* [Docket Nos. 42, 46, 47, 48 and 49]. During the course of these Conferences, the Court was assured that a settlement was advancing, but that the actuarial computations, which were generated by the settlement proposals, were extremely complex and time-consuming. Ultimately, on March 20, 2000, this Court issued its Findings and Order, which preliminarily certified a class for settlement purposes, appointed lead counsel for the class, directed the issuance of notice to the class, and scheduled a Fairness Hearing for August 22, 2000. Consistent with the dimensions of this action, and the effort of the parties to thoroughly address all of the aspects of the accord they have reached, their Stipulation for Settlement totaled in excess of two hundred pages, exclusive of appendages.

**D. The Implementation of the Proposed Settlement.**

*3 Consistent with this Court's Preliminary Approval Order, the Defendants implemented a means to provide proper notice of the terms of the proposed settlement to the members of the Class, established a procedure by which Class members could exclude themselves from the Class, or could object to the settlement, and created a process by which Class members could solicit advice and information from knowledgeable consultants, or from Class counsel. As related by the parties:

> Allianz hired Rust Consulting ("Rust") as settlement administrator. With Rust's assistance, the class notice package was mailed, necessary remailings have been made, the publication notice has been published, separate toll free lines have been established and operated for class members and agents, and correspondence, election forms, objections and exclusion requests have been received from class members and processed.

*Memorandum of Defendants in Support of Final Approval*, at p. 7. The following three options were afforded Class members who had questions about the settlement proposal:

> First, the toll-free phone bank maintained by Rust Consulting received thousands of calls seeking

> information, and the personnel answering those phones were specifically trained by Class Counsel and by counsel for Allianz to provide accurate and consistent information about the settlement. Counsel regularly monitored these calls to ensure that the Rust personnel were providing appropriate and responsive answers to callers. Second, Allianz maintained a toll-free phone line which Class Members could call with more detailed questions about their policies. Third, Class Counsel was available for consultations with Class Members at no charge, and the Rust phone personnel transferred many calls to Class Counsel for no cost confidential consultations on an individualized basis. This combination of sources of information provided all Class Members with freely available and adequate resources to assist them in understanding the proposed settlement, their rights under the proposed settlement and their options under the proposed settlement.

*Id.*

According to the Record before us, "[m]ore than 252,400 Notice Packages were sent by first class mail to Class Members," from May 11 through 18, 2000. *Joint Affidavit of Melvyn I. Weiss and John J. Stoia, Jr. ("Joint Affidavit"),* at p. 12, ¶ 36.Notices were remailed to over 1,280 new addresses upon their return by the U.S. Postal Service. *Id.*

In addition to the individual Notice Packages, that were mailed to all of the Class Members, a Summary Notice was published, on May 30, 2000, in the national editions of *The New York Times,* and *USA Today,* and in the local editions of *The Dallas Morning News,* the *Los Angeles Times,* and the *Minneapolis Star Tribune.Id.* at ¶ 38.The Summary Notice also appeared in *The Wall Street Journal* on May 31, 2000. In addition, the parties created the "Allianz/FULICO Class Action Information Center," which was funded by the Defendants, and was jointly managed by the Defendants, and the Plaintiffs' Lead Counsel. *Id.* at 39.As averred by Class Counsel:

**\*4** The Allianz/FULICO Class Action Information Center also handles opt-out requests, Policy service questions and related administrative issues. Nationwide toll-free numbers were established for Class Member inquiries and a separate toll-free number was set up for hearing impaired Class Members. Translators for nearly every language were also available to speak to Class Members.

The Allianz/FULICO Class Action Information Center became operational on May 12, 2000 and will remain open at least through the time Claim Files are compiled. The Allianz/FULICO Class Action Information Center is open Monday through Friday, from 8:00 a.m. to 6:00 p.m. Central time, except legal holidays. The phone lines at the Allianz/FULICO Class Action Information Center were staffed by operators trained jointly by Plaintiffs' Counsel and Allianz before the Allianz/FULICO Class Action Information Center opened. The toll-free number was printed throughout the Notice, Question and Answer Brochures, publication notices, website notices and Election Forms. The Company also provided the number to its agents and instructed them to refer any Class Member inquiries to the Allianz/FULICO Class Action Information Center for questions about the Settlement. As of July 31, 2000 the trained operators handled over 12,800 telephone calls from Class Members.

*Id.* at p. 13, ¶¶ 39-40. [3]

The Record reveals that Plaintiffs' Counsel have been onsite, at the Information Center, so as to continuously monitor incoming calls to ensure that accurate, and complete, information is provided to Class Members. *Id.* at ¶ 41."As of July 31, 2000, Plaintiffs' Counsel have spoken to over 3,300 Class Members and monitored over 2,000 calls," and have also responded to correspondence from Class Members. [4] *Id.* at p. 14, ¶ 42.The expense of this out-reach program is projected to approximate $1.2 million. *Id.* at ¶ 43.

If approved, the settlement imposes a substantial and continuing obligation on Plaintiffs' Counsel to oversee the administration of the Claims Review Process ("CRP"); to monitor the Information Center as the CRP commences; to respond to calls from Class Members concerning the settlement, the CRP, and related issues; to be responsible for responding to any appeals that may be filed from the CRP; and to handle all other post-approval proceedings.

*Id.* at ¶¶ 45-46.The proposed settlement does not provide any additional compensation, to Plaintiffs' Counsel, for these significant, additional duties.

### E. *The Terms of the Proposed Settlement.*

Under the proposed settlement, the Class Members will have access to two alternative forms of relief: the Contributed Insurance Benefit ("CIB"); and the CRP. According to the parties, and the Objectors have not proven to the contrary, this form of relief structure has been adopted in the settlement of other cases involving the same types of charges that the Plaintiffs have alleged, here, against the Defendants.

**\*5** For those Class Members who choose the CIB approach, they will receive from 24 to 60 additional months of no-cost death benefits on the life of that insured Class Member based upon a percentage of the original face amount of his or her policy. "The CIB insurance coverage (death benefit) is 5% to 10% of the original amount of insurance," and "is a function of the original amount of life insurance under the Class Member's policy and the default insured's age as of the final Settlement date."*Plaintiffs' Memorandum in Support,*at p. 10.The CIB approach also makes provision for those who have predeceased the implementation date, and those who die after the Eligibility Date of April 19, 2000, but before the Implementation Date, and the settlement allows for the designation of alternate beneficiaries. Based upon the demographics of the Class, the CIB "has a value to the Class actuarially determined to provide $43.4 million."*Id.*

The Class Members do not need to return any forms in order to receive the CIB relief; they do not have to purchase anything from the Defendants, or to make any other financial commitment in order to receive the CIB; and the terms of the CIB are simple, and straightforward to apply. As characterized by the Defendants, and not meaningfully challenged by the Objectors, "[t]he provision of free insurance as the general policy relief is particularly appropriate in a case such as this, in which the Complaint alleges that class members received less insurance than they thought they were buying, or insurance which was more expensive than they thought it would be," since "[p]roviding free insurance is the best way to try to meet the alleged expectations of class members when they purchased their policies."*Memorandum of Defendants' in Support,*at p. 9.

As an alternative to the CIB, every Class Member can participate in the CRP, which provides a cost-free, simplified process to resolve any complaints they may

have relating to their purchase of an insurance policy form the Defendants. Upon the completion of a simple Claim Form by the Class Member, the Defendants must assemble the "Claim File," which includes information contained within their policy files, and any correspondence, and other materials, relating to the Claimant's policy. The Claimant's Representative, who "will be an experienced advocate, well-versed in life insurance, that will be selected and specially-trained by Plaintiffs' Lead Counsel on the Defendants' marketing programs, the policies, illustration practices, actuarial determinations and marketing techniques," and whose services will be provided to the Claimant at no-cost, will bring such other information, to the "Claim Review Team," which will consist of the Claimant's Representative, and the Company Representative.

Employing objective, predetermined criteria, each member of the Claim Review Team will score the Claimant's request for relief and, thereafter, will compare their scores and discuss the nature of the Claim, and the documents contained in the Claim File, in an attempt to reach an agreement on the extent of relief, if any, that should be provided.[5] When assigning a score to each of the claims, the Claim Review Team may, as a matter of discretion, consider a range of factors, and considerations relating to the Defendants' alleged misconduct, including such matters as worksite marketing, illustrations generated by hand-held computers, and references to the "Private Pension Plan," the "Mortgage Acceleration Plan," and the "disappearing" or "vanishing" premium concept. If the Claim Review Team is unable to agree on a score, then the Claim file automatically proceeds to an independent Arbitrator, who is chosen by the Claimant's Representative, and who reviews the Claim File, and chooses either the score presented by the Claimant's Representative, or that of the Company's Representative.

**\*6** The successful Claimant will be awarded relief designed to fully compensate for the harm suffered, and every Claimant will be awarded relief so long as the Claim has not been clearly refuted. The awarded relief will be binding on all parties, and the Defendants agree to pay all of the costs of the CRP, including the costs of the Claimant's Representative, the expense of reviewing the Claims, the cost of any relief provided, and the expenses incurred in any arbitration, inclusive of the Arbitrator's fees and costs. As do the Defendants, the Plaintiffs underscore that the relief provided by the CRP is tailored to correspond, on an individualized basis, to the Defendants' alleged wrongdoing. The Defendants have agreed to initially fund the CRP with $10 million for

cash, or cash-equivalent awards, but without any cap on the total amount of funds that could be awarded under the CRP. If the total amount of the awards is under $10 million, then the remaining funds will be distributed to the Claimants to whom awards had previously been made.

Lastly, the proposed settlement will pay Plaintiffs' Counsel a total of $6.6 million in attorneys' fees and costs. Plaintiffs' Counsel report, without contradiction, that they have expended over $340,000 in costs and expenses, and that they have spent over 11,000 hours of attorney and professional time, which has an approximate value of $3.2 million under a lodestar approach-that is, by multiplying the hours expended by the applicable hourly rate. In particular, Plaintiffs' counsel stress that the costs of their continued involvement, in the settlement process, by assisting Claimants in the CRP, or in generally advising them, will not be separately compensated, and they note that, in a past settlement of the same kind, they had estimated their post-settlement time and expenses as likely to approach $5 million when, in actuality, those fees and expenses exceeded $22 million. See, *Joint Affidavit*, at p. 12, n. 9.

### F. *Objections to the Proposed Settlement.*

If adjudged on the basis of the number of objections, or requests for exclusion from its coverage, the settlement proposal has been well-received. As of August 25, 2000, a total of 1,163 Class Members have been validated as requesting exclusion from the settlement, and objections have been filed, with the Court, by less than twenty policyowners. [6] *Affidavit of Richard H. Redfern of August 25, 2000*, at p. 2, ¶ 5. As Plaintiffs' Counsel underscore, since there are approximately 239,351 policies in the Class, the number of policyholders requesting exclusion is appreciably less than one percent of the Class, and the number advancing objections is minuscule. [7] Generically, the objections can be grouped into several categories:

1. A number of Objectors would prefer cash relief, paid immediately, as an option.

2. Several Objectors felt that CIB relief was insignificant, and that CRP was unworkable because of the time that had transpired since the allegedly unlawful acts, and the time that their claims would be reviewed.

**\*7** 3. Certain Objectors concluded that it was unfair to permit a Class Member, who should elect to pursue

CRP relief, to potentially face a zero recovery if unable to prove his or her claims, and that the CRP approach was overly burdensome.

4. Objections were expressed that the total amount of the settlement could not be ascertained from the Notice documents.

5. Objections were also filed as to the amount of attorneys fees that were being proposed by the settlement.

6. Objections have also been voiced as to the allowance of a class action settlement, under the circumstances here, given the Supreme Court's holding in *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997).

At the time of the Hearing in this matter, counsel for certain of the Objectors, who here seek intervention, were afforded an opportunity to further explicate these objections, and others, and counsel for the Defendants, and for the Class, have been afforded a full opportunity to respond both orally, and in writing.

Given this factual backdrop, we turn to the Motions pending before us.

### III. *Discussion*

#### A. *The Motions to Intervene.*

While not entirely clear, since their written materials vary from their comments at the Hearing in this matter, it appears that the proposed Intervenors are requesting leave to intervene in order to preserve their right to appeal from this Court's Order, should they deem an appeal warranted. In this Circuit, however, those who seek to intervene in a class action are recognized as having an inherent right to appeal, where intervention is allowed, or not. See, *Croyden Associates v. Alleco, Inc.*, 969 F.2d 675, 680 (8 [th] Cir.1992) ("We express the thought that intervention to allow assertion of all objections to a class settlement, with respect to the settlement itself and adequacy of the class representation, represents a preferable method of resolving such differences."), cert. denied, 507 U.S. 908 (1993); *Sanyo Mfg. Corp. v. Int'l Union Elec.*, 69 F.3d 541, 1995 WL 644955 [*] 1 (Table Decision) (8th Cir., November 3, 1995) ("We agree with the unions that Laird lacks standing to appeal because he did not first move to intervene in the district court."); [8] *Buchet v. ITT Consumer Financial Corp.*, 845 F.Supp. 684, 690

(D.Minn.1994) (recognizing that "intervention is a condition of appeal from the approval of a class action settlement"); *White v. National Football League,* 822 F.Supp. 1389, 1432 (D.Minn.1993) (allowing objectors to intervene "solely to preserve their rights to appeal any judgments entered by the court.").

In order to effectuate the prudential approach directed by our Court of Appeals, we will grant the Motions to Intervene, but solely for the purpose of allowing the Intervenors to take an appeal from any Judgment that we should subsequently enter.[9] We find nothing to support a greater or more intrusive role by those seeking intervention. While we can concede, as do the opponents to intervention, that the proposed Intervenors have "an interest relating to the property or transaction which is the subject of the action,"*Rule 24(a), Federal Rules of Civil Procedure,* we are not persuaded that the Movants are "so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest."*Id.*

*\*8 Here, the objections of the proposed Intervenors have been fully explained to the Court and, if the objections were of appreciable consequence, the Movants could elect to opt-out of the Class and pursue their own personal interests, and objections, to a finality. The Movants do not suggest that the settlement would deny them an opportunity, as non-settlers, to subsequently advance their claims against the Defendants and, absent such a showing, we do not understand how their respective interests, in vindicating any wrongs that they believe were perpetrated against them, when they purchased insurance policies from the Defendant, could be impaired or impeded by the proposed settlement. See, *Agretti v. ANR Freight Sys.,* 982 F.2d 242, 247 (7th Cir.1992) ("[C]ourts have repeatedly held that a settlement which does not prevent the later assertion of a non-settling party's claims, although it may force a second lawsuit against the dismissed parties, does not cause plain legal prejudice to the non-settling party."); *Hirshon v. Republic of Bolivia,* 979 F.Supp. 908, 912 (D.D.C.1997) ("The sole factor in determining whether * * * a nonsettling party has standing to object to a settlement agreement is whether the agreement causes him plain legal prejudice."). More importantly, the Movants have not demonstrated any such impedance or impairment, and we are not empowered to imagine one, merely to allow full intervention.

Moreover, we are convinced that, at this late date, allowing intervention so as to permit the Movants to undertake discovery, and related pretrial pursuits, would substantially prejudice the interests of the Class. Rule 24(a) makes plain that Motions to Intervene must be timely. Here we can accept that the Movants would not have had a pressing interest to intervene until they were aware of the details of the proposed settlement, but our acceptance of that fact does not dispose of the timeliness issue.[10] See, *Buchet v. ITT Consumer Financial Corp.,* supra at 689 (allowing intervention on the "eve of the final [settlement] approval hearing" because intervenors had no reason to intervene until they received notice of the Amended Settlement Agreement). In *Mille Lacs Band of Chippewa Indians v. Minnesota,* 989 F.2d 994, 998 (8th Cir.1993), the Court provided the following guidelines for determining the timeliness of a Motion to Intervene:

Whether a motion to intervene is timely is determined by considering all the circumstances of the case. No ironclad rules govern this determination. In determining timeliness, factors that bear particular consideration are the reason for the proposed intervenor's delay in seeking intervention, how far the litigation has progressed before the motion to intervene is filed, and how much prejudice the delay in seeking intervention may cause to other parties if intervention is allowed.

See also, *Jenkins by Jenkins v. State of Missouri,* 78 F.3d 1270, 1273-74 (8th Cir.1996).

*\*9 As we have detailed, the parties to this action have expended substantial time, and resources, to reach an accord that they have presented for our review and, if warranted, our approval. Given this significant investment, allowance of a full-ranged intervention would be plainly prejudicial to the party's interests. See, *Farmland Dairies v. Comm'r of the New York State Dept. of Agric.,* 847 F.2d 1038, 1044 (2nd Cir.1988); *City of Bloomington v. Westinghouse Electric Corp.,* 824 F.2d 531, 535 (7th Cir.1987) ( "[I]ntervention at this time would render worthless all of the parties' painstaking negotiations because negotiations would have to begin again and [the intervenor] would have to agree to any proposed consent decree."); *Jones v. Caddo Parish School Bd.,* 735 F.2d 923, 935 (5th Cir.1984); *United States v. City of Chicago,* 908 F.2d 197, 199 (7th Cir.1990) ( "Litigation will have no end if every time parties resolve amicably (or drop) a point of contention, someone else intervenes to keep the ball in the air."), cert. denied, 498 U.S. 1067 (1991); see also, *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1176 (8th Cir.1995), cert. denied, 517 U.S. 1156 (1996).

Lastly, we do not overlook the opponents' effort to distinguish the Court's holding in *Croyden,* as well as their ardent concern that the Movants' efforts to intervene are solely for a mercenary purpose. As the opponents urge, both *Croyden,* and the Eleventh Circuit Court of Appeals' decision in *Guthrie v. Evans,* 815 F.2d 626 (11th Cir.1987)-upon which the Court, in *Croyden,* relied-involved proposed intervenors who did not have the right to opt-out of the class while, here, the Movants do. See, *Croyden Associates v. Alleco, Inc.,* supra at 676 ("non-opt-out class"); *Guthrie v. Evans,* supra at 629 (recognizing that "opt-outs" were not available to class members in that action). Certainly, as the opponents urge, the Movants have an additional avenue to preserve their claims against the Defendants-by opting out of the Class-that were unavailable to the movants in *Croyden* and *Guthrie,* but we do nothing here other than to allow the Movants to raise their objections to the proposed settlement, if any there should remain, to our Court of Appeals, rather than to commence other litigation to preserve those objections, or to collaterally attack the proposed settlement. Of course, in denying their Motions to Intervene, the Movants would be afforded that same right of appeal. See, *Marino v. Ortiz,* 484 U.S. 301, 304 (1988) ("We think the better practice is for such a nonparty to seek intervention for purposes of appeal; denials of such motions are, of course, appealable."). In our view, *Croyden* does little more than alert Class Members, who may object to a proposed settlement, that they must seek to intervene, if they wish to preserve those objections on appeal.

The opponents' concern about the motivation of the Movants' counsel, in advancing the objections, and in seeking to intervene for appeal purposes, is more troubling. As characterized by the opponents, the Movants are represented by "professional objectors," who are a pariah to the functionality of class action lawsuits, as they maraud proposed settlements-not to assess their merits on some principled basis-but in order to extort the parties, and particularly the settling defendants, into ransoming a settlement that could otherwise be undermined by a time-consuming appeals process. The opponents' concern has been recognized in other jurisdictions. As the Court expressed, in *Shaw v. Toshiba America Information Systems, Inc.,* 91 F.Supp.2d 942, 973-74 (E.D.Tex.2000):

> \*10 While some of the objections were obviously "canned" objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful

> protests, other objections contained considerable merit with respect to this particular case.

Although it gives us pause that, as illustrative of the type of objection filed by the "professional objector," the Court identified one of the law firms who here represents a Movant, see, *id.* at 973 n. 18, we are not presented with a Record that demonstrates a pressing need for our preservation of the Court processes, as a result of class action marauders. Time will tell. [11]

As we subsequently detail, in our considered view, the Movants have raised objections which inform that, in the parlance, they are "gnawing on a bone." This is not a hastily contrived settlement. Great expense, and careful thought, have led to its formulation by lawyers who have exceptional skill, and expertise, in such class action matters. While observers, who peer from outside the settlement process, can second-guess one detail, or another, the objections advanced here, by the Movants in particular, do not rise above the querulous. If, as the opponents fear, the Movants proceed, so as to euchre a tribute in exchange for a settlement, the Courts will not be powerless to act, and to act forcefully, so as to maintain the integrity of the judicial process, as well as the efficacy of the class action mechanism.

Accordingly, given the precedents of this Circuit, we grant the Motions to Intervene, but solely to allow the Intervenors to maintain an appeal, if that should be their choice. No other intervention would be appropriate. [12]

## B. *The Motion for Certification of a Class.*

In our Preliminary Approval Order of March 20, 2000, we certified the following Class for purposes of issuing a Notice of the proposed settlement, and of implementing the settlement proposal's outreach program:

Class to consist of all persons or entities who have, as of the Eligibility Date (as defined in the Settlement Agreement), or who had at the time of the Policy's termination (where termination was prior to the Eligibility Date), or who had at the time of the Policy's absolute assignment to an insurance company under Internal Revenue Code § 1035 (where assignment occurred prior to the Eligibility Date), an ownership interest in NTrust II, NTrust IV, NTrust Pref, Legend, UL 1500, UL 3000, or Interest Sensitive Life (a .k.a. "ISL") life insurance policies issued by Allianz or FULICO ("Policies") during the period January 1, 1984

through December 31, 1996 ("Class Period"). "Policies" does not include: (a) annuities issued by the Defendants; (b) term life insurance issued by the Defendants; (c) an insurance policy canceled (with refund of premium paid, if any) in accordance with a state's "first look" or "right-to-examine" law or an insurance policy rescinded by Allianz or FULICO with a return of all premiums paid; and (d) any other whole life, universal life or other insurance policy issued by Defendants. The Class does not include the following persons or entities (unless and to the extent the persons or entities are Class Members by virtue of their ownership interest in another Policy) (a) who had, at the time of the insured's death, an ownership interest in the Policy where the insured died prior to the Eligibility Date while the Policy was in-force and a death benefit was paid or is payable; (b) who, while represented by counsel, signed a document that releases Allianz or FULICO ("Defendants") from any further claims concerning the Policy; (c) whose rights and claims respecting the Policy have been finally adjudicated in a court of law; (d) who are or were officers (vice president or above) or in-house counsel of one or both of the Defendants, or the spouse or other immediate family member thereof; (e) persons and entities who are excluded from the Class pursuant to Section VII of the Settlement Agreement; or (f) any insurance company that has or had an ownership interest in the Policy pursuant to an absolute assignment effected as part of an Internal Revenue Code § 1035 exchange.

**\*11** The pertinent Eligibility Date is April 19, 2000. Necessarily, we again consider the propriety of certifying the foregoing Class.

"A district court has a duty to assure that a class once certified continues to be certifiable under Fed.R.Civ.P. 23(a)."*Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1144 (8 th Cir.1999), citing *Hervey v. City of Little Rock,* 787 F.2d 1223, 1227 (8 th Cir.1986). We turn, therefore, to the prerequisites of Rule 23(a), which provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is to numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and

> (4) the representative parties will fairly and adequately protect the interests of the class.

See also, *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982).

Of course, the Plaintiffs bear the burden of satisfying these pre-requisites, see *General Telephone Co. v. Falcon,* supra at 161, and our analysis of whether that burden has been satisfied is attuned to the fact that the requirements of Rule 23(a) are intended to protect the named, and unnamed parties, as well as any unknown potential class members. *Hervey v. City of Little Rock,* supra at 1227.

As to the element of numerosity, there can be little dispute but that a class of over 230,000 members is sufficiently numerous to warrant a class action approach. See, e.g., *Parkhill v. Minnesota Mutual Life Ins. Co.,* 188 F.R.D. 332, 337-38 (D.Minn.1999) (finding class of 290,000 policyholders sufficiently numerous for Rule 23 purposes); *In re Hartford Sales Practices Litigation,* 192 F.R.D. 592, 602-03 (D.Minn.1999) (finding an "extremely large" number of policyholders adequate for numerosity purposes). Undoubtedly, the large number of members in the Class before us would render joinder "impracticable." Therefore, we find the numerosity requirement has been satisfied.

"As a general rule, the commonality requirement imposes a very light burden on plaintiff seeking to certify a class and is easily satisfied," and "to satisfy the commonality requirement under Rule 23(a), a party need simply show that 'the legal question linking the class members is substantially related to the resolution of the litigation." ' *In re Hartford Sales Practices Litigation,* supra at 603, quoting *DeBoer v. Mellon Mortgage Co.,* supra at 1174.Stated otherwise, "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions." ' *Petrovic v. Amoco Oil Co.,* supra at 1148, quoting 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1769 at 367 (2 nd ed.1986).

**\*12** Here, the Plaintiffs' represent that "the focus of the litigation is [Defendants'] common course of conduct in developing and implementing standardized product performance assumptions to be disseminated through its nationwide sales force, and then manipulating

interest crediting rates that applied companywide to all policyowners." *Plaintiffs' Memorandum in Support*,at p. 31-32.The Plaintiffs' First Amended Complaint identifies thirty-nine issues of fact and law, or of mixed fact and law, which are common to the Class Members. See, *First Amended Complaint* [Docket No. 43] ¶ 140 at pp. 61-67.As have the Courts which have previously confronted this question, we find that these uniform issues are adequate to satisfy the commonality requirements of Rule 23(a). See, *In re Prudential Sales Ins. Co. America Sales Litigation*, 148 F.3d 283, 309-10 (3 rd Cir.1998), cert. denied, 525 U.S. 1114 (1999); *In re Hartford Sales Practices Litigation*, supra at 603; *Parkhill v. Minnesota Mutual Life Ins. Co.*, supra at 338.

"Typicality under Rule 23(a)(3) means that there are 'other members of the class who have the same or similar grievances as the plaintiff.'*Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1540 (8 th Cir.1996)."Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."*Id.*, citing *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8 th Cir.1977), cert. denied, 434 U.S. 856 (1977). As the Court observed in *DeBoer v. Mellon Mortgage Co.*, supra at 1174,"[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff," and here that burden has been fully satisfied. While the policies that the Class Members held may not be entirely identical-as several different policy forms have been alleged-the theories underlying the Class claims involve a common nucleus of fact and law.

In addition, we find no inherent conflicts between the interests of the representative Plaintiffs, and of the Class Members. "In order to satisfy the adequacy requirements, the Plaintiffs must show 'that (1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously, and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." ' *In re Hartford Sales Practices Litigation*, supra at 604, quoting *In re Potash Antitrust Litigation*, 159 F.R.D. 682, 692 (D.Minn.1995). No one has suggested that the named Plaintiffs, or their attorneys, would not vigorously promote the interests of the Class, although the Objectors raise some question, as to whether the named Plaintiffs can adequately represent claims, which arise from the alleged practices of the Defendants, to which they were not personally exposed. [13] Unfortunately

for this argument, the assertion is purely conclusory and, on this Record, we have no responsible basis to infer that any Class-wide claim is at odds with a claim held by the named Plaintiffs. Accordingly, we conclude that the Plaintiffs have borne their burden of satisfying the pre-requisites of Rule 23(a), and we turn our analysis to the requirements of Rule 23(b)(3), Federal Rules of Civil Procedure.

**\*13** Rule 23(b)(3) provides as follows:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In addressing the predominancy issue, we are mindful that two Courts within this District have denied class certification, on this precise question, which involved some of the same genre of claims that are involved here. See, *In re Hartford Sales Practices Litigation*, supra; *Parkhill v. Minnesota Mut. Life Ins. Co.*, supra.

Both of those cases, however, considered the issue in a different context, as neither Court was confronted with a settlement proposal which, under Rule 23(e), Federal Rules of Civil Procedure, requires "the approval of the court." We do not raise this distinction to suggest that a different standard of review should apply-for it does not-but to highlight the fact that the certification question, which was before those Courts, was hotly contested and, as a result, the Record presented by the respective parties was markedly different than that which confronts us here. Both Courts acknowledged that the issue of predominance was fact-driven, and that no "bright-line" could govern its disposition. See, *In re Hartford Sales Practices Litigation*, supra at 604; *Parkhill v. Minnesota Mut. Life Ins. Co.*, supra

at 340.Illustrative of that fact is the extent to which the Court, in *Parkhill*, relied upon Affidavits which highlighted individualized factual determinations which fragmentized any commonality that would otherwise be presented by the class issues. See, *Parkhill v. Minnesota Mut. Life Ins. Co.,* supra at 340-41.We have been presented with no such Affidavits, and the allegations of the First Amended Complaint, as we have previously detailed, reflect an alleged course of conduct, on the part of the Defendants, which has accentuated the uniformity of the Defendant's dealings with prospective insureds, and has minimized any individualized claims of fraud or misrepresentation. Accordingly, the Record we confront is distinctly different from that presented in *Parkhill* and, because the allegations of the pleadings, in *Hartford,* were not fully recited, we are unable to definitively address whether the Court, there, would have reached the same absence of predominance finding, if it were faced with the pleadings we are obliged to here consider.

\*14 When presented with the same mix of claims, as have been raised in this action, the Court of Appeals for the Third Circuit was persuaded that common issues predominated over individualized claims, and the Court affirmed the certification of a class, much larger than that involved here, for settlement purposes. In so holding, the Court reasoned as follows:

As the Supreme Court noted in Amchem, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws * * * [e]ven mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement."Amchem, 521 U.S. at ——, 117 S.Ct. at 2250 (citing Adv. Comm. Notes, 28 U.S.C.App., p. 697). This case, involving a common scheme to defraud millions of life insurance policy holders, falls within that category. The district court's opinion sets forth a litany of common issues which the class must demonstrate in order to prevail. See supra § IV.B.1 and n. 47-48. While individual questions may arise during the course of this litigation, we agree with the district court that the presence of individual questions does not per se rule out a finding of predominance. In particular, the "presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate."Eisenberg v. Gagnon, 766 F.2d 770, 786 (3 rd Cir.1985).

*In re Prudential Ins. Co. America Sales Litigation,* supra at 314-15.

Given the similarity of allegations, as contained in the First Amended Complaint, with those addressed in *In re Prudential,* we conclude that, under these circumstances, the Plaintiffs have met the predominance requirement of Rule 23(b)(3). Necessarily, our finding is limited to the Record before us, and we draw no bright-line demarcation which, generically, would be applicable, in future lawsuits, without regard to the specific content of the pertinent pleadings.

With respect to the other considerations enumerated in Rule 23(b)(3), we have been presented with no showing that the presentation of individualized claims, in separate proceedings, would be superior to the vehicle of a class action. In apparent recognition of that fact, the settlement proposal does allow a cost-free mechanism for the resolution of separate claims, which would allow them to be fully litigated, notwithstanding the relatively modest recoveries that those claims would likely generate. We think this provision speaks eloquently to the unlikelihood that any policy-holder would endure the cost of litigating a claim, in his or her own Court action, with the unlikely prospect of any generous recovery.

We are not aware of any litigation, elsewhere, that would tend to undermine the certification being requested by the Class, and this District would appear to be a uniquely appropriate forum for the resolution of the policyowners' claims. The Defendants are either incorporated under Minnesota law and do business here, or they are wholly-owned subsidiaries of Minnesota corporations. The propriety of Minnesota, as the forum District, is amply corroborated by the independent decision of the United States District Court, for the Central District of California, which transferred this action to this venue. [14]

\*15 Lastly, we are aware of the concern, by certain of the Intervenors, that the Class, which is proposed for certification, runs afoul of the Supreme Court's pronouncements in *Amchem Products, Inc. v. Windsor,* supra, because the Class is not sufficiently "cohesive," and therefore, in their view, should be divided into subclasses. The same argument was raised, and rejected, in *Petrovic v. Amoco Oil Co.,* supra at 1145-46, as follows:

Amchem, 521 U.S. at 601-02, 117 S.Ct. 2231, and Ortiz [v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295] at 2305 [ (1999) ], each involved a situation in which the parties agreed upon a class definition and a settlement before formally initiating litigation, and then presented the district court with the complaint, proposed class, and proposed settlement. The difficulty inherent in such a situation is

that the district court "lack[s] the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."Amchem, 521 at 620, 117 S.Ct. 2231. In our case, however, the parties engaged in more than three years of extensive discovery and preparation for trial, and the class was certified under Fed. R.Civ.P. 23(b)(3) many months before the parties reached the settlement. Indeed, the settlement was reached on the eve of trial.

The difficulties associated with settlements like those in Amchem and Ortiz-the possibility of "collusion between class counsel and the defendant * * * [and] the need for additional protections when the settlement is not negotiated by a court designated class representative," Hanlon v. Chrysler Corporation, 150 F.3d 1011, 1026 (9 th Cir.1998)-are therefore not present here.

If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person (i.e., a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would).

We also do not believe, as the objectors suggest, that the stark conflicts of interest that the Supreme Court discerned in Amchem and Ortiz are present here. In those cases the Court found that a conflict existed between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size). See Amchem, 521 U.S. at 626, 117 S.Ct. 2231, and Ortiz, 119 S.Ct. at 2319-20. We note that the injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured. Our case, on the other hand, involves a discrete and identified class that has suffered a harm the extent of which has largely been ascertained.

**\*16** We think the very same may be said here and, considering the Record before us as a whole, we believe,

as the Court did in *In re Prudential Ins. Co. America Sales Litigation*, supra at 317, quoting *Amchem Products, Inc. v. Windsor*, supra at 621, that the "proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives."

In sum, having closely examined the factors that must be satisfied, even for settlement-only classes, we find and conclude that the proposed Class should be certified, and we grant the Plaintiff's Motion in that respect.

## C. *The Motions for Final Approval of Settlement, and for an Award of Attorneys' Fees.*

To be approved, under Rule 23, a class action settlement agreement must be "fair, reasonable, and adequate." *Petrovic v. Amoco Oil Co.*, supra at 1148, citing *In re Flight Trans. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8 th Cir.1984), cert. denied, 469 U.S. 1207 (1985); see also, *DeBoer v. Mellon Mortg. Co .*, supra at 1176."To determine whether a settlement satisfies these standards, the Court must consider: the merits of the plaintiff's case, weighed against the terms of the settlement; the defendant's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement."*In re Airline Ticket Comm'n Antitrust Litig.*, 953 F.Supp. 280, 282 (D.Minn.1997), quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8 th Cir.1988). Of these, "[t]he most important consideration * * * is " 'the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." " ' *Petrovic v. Amoco Oil Co.*, supra at 1150, quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8 th Cir.1975), cert. denied, 423 U.S. 864 (1975).

As is always the case, settlements bring a certainty to the resolution of disputes that a Trial cannot, until the Trial, and any subsequent appeals, are concluded. Fairly appraised, the Plaintiffs' claims are ineluctably subject to a number of procedural and substantive defenses which would be formidable, if not legally insurmountable, as to significant portions of the Class. As the Defendants emphasize, they do not admit liability, and they regard their defenses, based upon the applicable statutes of limitations, as well as the considerable substantive hurdles to a finding of liability, to be insuperable. No one, including the Intervenors, so much as intimates to the contrary. The expense of proving the Class Members' claims would be an extremely costly endeavor, and the ultimate resolution of the action, following a Trial and all possible appeals, could well extend into the distant future,

particularly if Trial-error were found, such as to warrant a re-trial, and renewed appeal. Such temporal realities counsel a careful examination of any resolution that incurs less, unavoidable, delay. The delay in implementing this proposed settlement would be inappreciable.

**\*17** We have no reason to believe that the Defendants are not financially able to bear any resultant Verdict-if one were forth-coming-but the Record has not been fully developed in that respect. We are certain, however, that the Defendants' have sufficient wherewithal to mount the form of arduous defense that their papers predict. The prospect of intractable litigation, when the amounts in controversy, as considered on an individual basis, are fairly modest, counsels an amicable resolution of this dispute.

The proposed settlement assures that all Class Members, if that should be their election, will receive a recovery under the CIB or, if they believe that they have compelling claims that warrant greater relief, they may resort to the CRP, where full compensatory damages are recoverable, without any cap to the totality of the Class claims. Under this mechanism, one Class Member does not compete with others such that one Members recovery from the Class pool will lessen the potential recovery by others. Of course, the CRP requires proof, and the probative weight of the proof will dramatically affect the recovery that could be claimed. If, as would appear to be likely, the passage of time, or a statute of limitation, would diminish the potential of a recovery, the Class Member is not without relief, as he or she need only apply under the CIB program. We think the settlement mechanism is both fair and workable, and it entails no further legal expense on the part of Class Members.

Of course, resolving this case, amicably, has not been without its detractors. As we have previously observed, however, the opposition that has been generated is both scant, and insubstantial. While the "amount of opposition to the settlement" is one factor to consider, the relative absence of objection is not dispositive. Nevertheless we may not ignore the near absence of objection, and the absence of substantial opposition to a proposed settlement may be considered as supporting approval of that accord. *DeBoer v. Mellon*, supra at 1178 ("The fact that only a handful of class members objected to the settlement similarly weighs in its favor."). More importantly, however, we find the opposition to the proposed settlement to be token, at best.

Some of the Movants, and Objectors, take exception to the amount of compensation that would be awarded under the CIB, or they would prefer cash payments, as opposed to additional insurance coverage for a designated period of time. As the Court observed, in *In re Airline Ticket Comm'n Antitrust Litig.*, supra at 282:

> A settlement sum is, in virtually every case, less than the claimed loss. A settlement is, necessarily, a compromise between plaintiffs, who did not win their case, and defendants, who did not lose theirs. These settlements, like all others, reflect each side's considered view of the risks of an adverse judgment and the value of buying peace. The Court finds the parties' views in this regard to be reasonable.

**\*18** So do we. While at least one of the Movants takes exception to the prospect that a Class Member, who elects to proceed with the CRP, as opposed to accepting CIB relief, could ultimately receive no recovery-suggesting to that Movant, that the CIB relief should be a floor, and that Class Members should be allowed to proceed with the CRP process in addition to the CIB relief-such a proposal is wholly unrealistic. [15] As the Defendants emphasize, without contradiction from the Plaintiffs, many of the Class Members have claims which could be unprovable, due to the passage of substantial periods of time since the claim accrued, or because they would be barred, in all probability, by an applicable statute of limitations. [16] In contrast to the Movant's charitable approach, few choices in life are without some consequence, and we doubt that any settlement could persist-at least with comparable benefits for all Class Members-if the Movant's approach were accepted. We exist in the real world, and not in a realm in which every decision is guaranteed a benefit.

Several other technical objections have been filed, including that the CRP is burdensome, or that it should allow *denovo* review upon appeal to an Arbitrator. The alternative dispute mechanism has been well-considered, but it, like any other human endeavor, is not immune to criticism. Nonetheless, we find the amendments proposed by the Objectors provide no superiority in benefits, to the Class Members, than the approach that the parties have agreed-upon. The CRP providently incorporates a cost-free opportunity for a Class Member to litigate his or her claim, with the assistance of

legal representation that is provided at the expense of the Defendants. Even if we were to assume, for these purposes, that a Class Member would have to carefully read the settlement proposal, so as to understand his or her right to pursue the CRP approach, we would not expect less of any litigant. Under the proposal here, if a Class Member has questions about any aspect of the settlement agreement, inclusive of the CRP, or about the advisability of following one avenue of relief as opposed to another, the Class Member has ready access to an ombudsman, who is appropriately trained, and who is available by telephone, at no cost to the Class Member, in order to address the Class Member's individually-tailored issues and concerns. If yet unsatisfied, the Class Member can directly inquire of Class Counsel-again without incurring any expense. We find this mode of outreach, as coupled with alternative dispute resolution, to be commendable and, in the context of other class settlements, to be enviable.

Nor do we find any superior benefit to be provided by allowing an Arbitrator, who is selected by Class Counsel, and funded by the Defendants, to have full authority to decide an issue, without regard to the positions taken by the respective parties. Arbitrations are frequently employed with "high-low" parameters, because the parties are desirous of some degree of certainty in the result to be reached. Since the Arbitrator's ultimate decision is final, we see nothing unacceptable in the procedures that the parties have formulated for the resolution of CRP disputes.

**\*19** In sum, we have closely examined the concerns of the Objectors, and of the Intervenors, and we find them substantively wanting. We are obligated to consider a settlement in the context of contested litigation, whose result is uncertain-seldom, if ever, is a settlement the equivalent, as the Objectors seem to imply, of a "wish list" tendered by the victorious litigant. While the Movants understandably want more from the settlement, they offer no assurance that, under the circumstances presented, a greater recovery could be secured at Trial. Having settled, through Court-assisted mediation, far more complex class action matters than the one presented here, we find the settlement agreement consistent with an exercise of good business judgment by all concerned.

Finally, we must consider the propriety of the Plaintiffs' request for attorneys' fees and costs in the amount of $6.6 million. Given the liberal access, that Plaintiffs' Counsel has extended to the Class Members, and that allows the Class Members to consult, without cost, with Class Counsel on

any matter relevant to the implementation of this settlement, and given the effort that Class Counsel expended in securing the settlement agreement, that we now review, we are fully satisfied that the requested award of attorneys' fees is both reasonable, and deserving. Class Counsel have secured a favorable recovery for the Class Members, and they should be commensurately rewarded for that recovery. Our acceptance of the fee request is facilitated by the fact that the fee amount was independently negotiated by the settling parties, and comes from a source that does not impact upon the total settlement fund that is available to the Class. The Intervenors, and Objectors, do not so much as suggest, let alone establish, that the fee award has detracted, in any measurable way, from the relief the Class can expect from the settlement that we now approve.

While the requested attorneys' fees exceed the value of the attorneys' time, as computed by a lodestar approach, we find the request reasonable in view of the benefits afforded the Class by the settlement that Class Counsel have secured. Class Counsel funded the prosecution of the Plaintiffs' claims, and expended thousands of hours of legal effort, which could otherwise have been billed to litigation that competes with this one for counsels' time. As a percentage of the total value of the settlement secured, the amount of the requested fees is strikingly small, at least in the milieu of class action lawsuits. Realistically, counsel assumed responsibility for litigating claims that less dedicated attorneys would have ignored, or abandoned, and the fees and costs being requested are, in all things, reasonable. We are also impressed by the fact that Class counsel assume the risk of being obligated, under the Settlement Agreement, to provide legal services, without recompense, for as long as they are needed, in the settlement process, by the Class.

**\*20** Therefore, given the entirety of the Record before us, we grant the Motion to Approve the Settlement, and we award the attorneys' fees, and costs, that have been requested by the Class.

NOW, THEREFORE, It is-

ORDERED:

1. That the Motions to Intervene of Leo E. Clark [Docket No. 171], Susan D. Deese [Docket No. 240], and John P. Willis, III [Docket No. 251], are GRANTED, but solely for the purpose of instituting an appeal from the Orders of this

Court, which resolve the Class Settlement issues, and any Judgment entered thereon.

2. That the Motions for Final Approval of Settlement, for Certification of the Class, and for an Award of Attorneys' Fees are GRANTED, and Plaintiffs' are awarded attorneys' fees and costs in the amount of $6.6 million.

2. That the Court will separately enter an Order Approving Class Action Settlement, which will address, and resolve, any remaining ministerial issues.

3. That Final Judgment shall be entered, consistent with our disposition of this action.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1336640

Footnotes

1    By letter dated July 28, 2000, the Chairman of the Judicial Panel on Multidistrict Litigation advised this Court that a Motion to Transfer, pursuant to Title 28 U.S.C. § 1407, was pending before the Panel, but that, under Panel Rule 1.5, we were "free" to rule on any Motion pending before us, or we could wait until the Panel's ruling. The letter went on to suggest, as follows:

You may want to take into account whether the motion before you involves issues unique to your action, or, on the other hand, raises issues likely to arise in other actions in the transferee district should we order transfer.

At the commencement of the Hearing, we quoted the foregoing, and requested the advices of all counsel as to their views on whether the Motions before this Court should now be heard. Counsel related that they were involved in the referenced "actions in the transferee district," and they saw no reason to defer a ruling at this time. Our independent review satisfies us that the issues involved in the Motions now before this Court are unique to this action and, consequently, we see no purpose in delaying our ruling.

2    The Record reflects that the Defendants informally produced some 240,000 documents to the Plaintiffs and, apparently in recognition of the need to facilitate settlement discussions, the parties agreed to allow direct communications between their respective actuarial consultants. In addition to the document productions, the Defendants produced, at the Plaintiffs' request, "substantial additional demographic information for expert evaluation and consideration."*Joint Affidavit of Melvyn I. Weiss and John J. Stoia, Jr.,*at p. 6, ¶ 18.Following what appears to have been a forthright exchange of views on the liability and damages issues, counsel for the parties set about, in the months of 1999, to create a settlement mechanism which would fairly address the interests of all of the class members. As averred by class counsel, "[t]here were many times when it appeared that a settlement would not be consummated" but, by December of 1999, "the parties had resolved their differences and had agreed to all the material terms of the Settlement, other than the issue of attorneys' fees and expenses."*Id.* at p. 7, ¶ 23.Without contradiction in this Record, class counsel attest that "[t]he parties engaged in weeks of arms-length negotiations on the remaining issue of fees and expenses," which "will be paid separately from the relief being distributed to the Class."*Id.* at p. 8, ¶ 23.

3    Subsequent to the Hearing, Rust has informed the Court that, "[a]s of the close of business on August 22, 2000, the Center had answered over 13,363 calls, including one call to the line for the hearing-impaired."*Affidavit of Richard H. Redfern of August 25, 2000,*at p. 1, ¶ 3.

4    Following the Hearing in this matter, Rust updated its earlier statistics, and advised that, "through the date of the Fairness Hearing, Plaintiff's Counsel has handled 4,587 policyowner calls for assistance."*Affidavit of Richard H. Redfern of August 25, 2000,*at p. 2, ¶ 4.

5    The agreed-upon scoring criteria are as follows:

A score of "4" means: (a) Documentation exists supporting the substance of the Claim; (b) the Agent admits he or she made a Misrepresentation; (c) the Applicant received a sales illustration that was altered to delete disclosures relating to Rates and charges or premium payments; or (d) the Agent executed the Applicant's signature or any Transaction Document without first obtaining consent of the Applicant or Policyowner.

A score of "3" means Documentation supporting the substance of the Claim does not exist, and the Agent does not admit he or she made a Misrepresentation; but the information in the Claim File, considered as a whole, indicates by clear and convincing evidence that the Claim is valid.

A score of "2" means Documentation supporting the substance of the Claim does not exist, and the Agent does not admit he or she made a Misrepresentation; but:

the information in the Claim File, considered as a whole, supports the Claim; or

for a Replacement Claim, the Claim File indicates that a Replacement occurred and the Company does not demonstrate that the Replacement was in the Applicant's best interest at the time the Applicant applied for the Policy, based on information available to the Company at the time of the Replacement.

A score of "1" means the information in the Claim File, considered as a whole, does not clearly refute the Claim.

A score of "0" means the information in the Claim File, considered as a whole, clearly refutes the Claimant's Claim and establishes that the Claim is without substance or foundation.

*Stipulation, Exh. A, § II.C.*

6    We note that, of these objections, one was based on religious grounds, one expressed no objection except a concern that the litigation might be wasting the Court's time, two voiced complaints about issues not involved in the settlement, and one objection-filed by a husband and wife-would be subsequently withdrawn upon the receipt of election forms for selecting either CIB or CRP relief.

7    By our computation, if the number of opt-outs is 1,758, as was tabulated at the time of the Hearing, or was 1,163, as represented after the close of the Hearing, then the percentage of Class Members, who were requesting exclusion from the Class, would be either 0.73% or 0.49% respectively, and the number of objectors would not exceed 0.01% of the Class.

8    See, *Anastasoff v. United States of America,* 223 F.3d 898, 2000 WL 1182813 `6 (8 th Cir., August 22, 2000), invalidating 8 th Cir. Rule 28A(I), which authorizes the issuance of unpublished opinions as nonprecedential, and extending precedential weight to a prior, unpublished opinion.

9    The opponents to intervention suggest that Deese's Motion to Intervene was untimely filed and, therefore, should be rejected out of course. We are satisfied that the Motion was not untimely filed, since it bears a docketing date, by our Clerk of Court, of July 18, 2000. Similarly, we reject the technical objections as to certain of the moving papers, that were filed by the proposed Intervenors, noting that the Motions did not comport with the applicable Rules of Civil Procedure. Our rejection should not be construed as condoning the proposed Intervenors' resort to a less than complaint approach to the filing of Motions in this District. Rather, it is a necessary result of our effort to effectuate our Court of Appeals' concern that, doing otherwise, could reek substantial judicial inefficiency by encouraging individualized collateral attacks on the same issues we here resolve. Were our analysis solely governed by the precepts of Rule 24, Federal Rules of Civil Procedure, we would be compelled to deny the Motions to Intervene on their merits.

10   We are mindful of the suggestion, by certain of the Movants, that they did not have unfettered access to the discovery documents that undergird certain aspects of the settlement proposal. As best as we can tell, counsel for certain of the Movants traveled to the offices of Class Counsel for a very brief visit, and then reviewed the available documents in a most cursory fashion. Counsel for one of the other Movants suggests that his efforts to advise his client, concerning the advisability of the proposed settlement, was thwarted by Class Counsel's dilatory response to his letter inquiries. We are not so persuaded. While we can understand counsel's reluctance to incur expense in traveling to a location where the documents were available for review, and then spending the requisite time to properly consider the documentary evidence, we find no showing here that counsel for the Movants were denied an opportunity to pursue such a document review, if that had been their intention.

11   The opponents to intervention make much of the fact that certain of the Movants' attorneys have now, and in the past, solicited objections to proposed class settlements, through aggressive advertising campaigns, and that counsel for the Movants all practice in the same general geographic area. We are aware of no applicable prohibition on lawyer advertising, where the purpose of that promotion is to assist the public in properly understanding a settlement proposal. We take Movants' counsel at their word, as *prohocvice* officers of this Court, that their conduct here is wholly professional, and not parasitic. If our reliance has been misplaced, we have abundant recourse.

12   Having allowed a limited intervention, we need not consider the Movants' arguments for permissive intervention, as a greater scope of intervention, under Rule 24(b), Federal Rules of Civil Procedure, is rejected for the reasons we have detailed under Rule 24(a).

13   Under closely paralleling circumstances, the Court of Appeals for the Third Circuit recognized that the named plaintiffs, in that litigation, were adequate to represent the interests of those who, finitely, had factual claims which were distinct from theirs. As the Court reasoned:

As discussed, the crux of this class action is the allegation that Prudential engaged in a scheme to defraud policyholders by means of company-wide deceptive sales practices. The named parties, like the members of the class, would need to establish this scheme in order to succeed on any of the claims in the Second Amended Consolidated Complaint. Even those class members with "other" claims share in the common task of demonstrating

the existence and implementation of this scheme. Consequently, we believe the proposed class satisfied the adequacy of representation requirement of Rule 23(a).

*In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 313 (3 <sup>rd</sup> Cir.1998), cert. denied, 525 U.S. 1114 (1999). No one has offered any cogent reason to depart from the analysis, and holding, in *In re Prudential*.

14    With respect to the issue of manageability, we draw our guidance from the following observation of the Supreme Court, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997):

Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.

Here, the trial of the parties' respective claims would be challenging, indeed, but it would not be managerially insurmountable.

15    In one objection, the concern is raised that, under one scenario, the CIB relief would only be awarded if the Class Member should die, thereby activating the insurance coverage. Under the life insurance at issue here, however, that is the precise benefit for which coverage was originally secured. Other Objectors have complained that the total value of the settlement package had not been disclosed in the settlement Notice. While true, we do not understand how that omission could prejudice any specific Class Member, who was at liberty to elect to remain in the Class, or to opt-out, and who could select the avenue of relief that best suited his or her needs, based upon the specific disclosures in the Notice, and the attached documentation. Whether the total value of the settlement is adequate, and whether the attorneys' fees being requested are consonant with that value, are questions far removed from the Class Members decision as to whether the proffered relief should meet his or her needs.

We can understand how certain Objectors would not comprehend the full liability exposure to which the Defendants are actuarially exposed-as a result of their extending additional coverage for determined periods of time, but that misapprehension does not diminish the real value of the settlement proposal. Here the Plaintiffs have demonstrated, as corroborated by the experts of the Defendant, that the value of the settlement can be properly estimated at approximately $53.4 million dollars, with $43.4 million being attributable to the CIB relief, and a minimum of $10 million arising from the CRP program. We conclude that the settlement has real value, and that it provides a real benefit to those Class Members who elect to participate in its coverage. The settlement, in our judgment, is fair and adequate.

Lastly, in various *proforma* objections, criticisms are directed at the adequacy, or clarity, of the Notice sent to Class Members. We find the Notice suitable in informing the Class of the essentials of the settlement proposal and, in particular, we note that any further information was available to the Class by virtue of a commendably comprehensive outreach program.

16    Notably, the Defendants have waived the limitations period for purposes of the CRP, a significant benefit to Class Members that, by every appearance, would not be otherwise available to them.

---

End of Document                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

2007 WL 4225486
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In re AOL TIME WARNER ERISA LITIGATION.

No. 02 Cv. 8853(SWK). | Nov. 28, 2007.

## MEMORANDUM OPINION

SHIRLEY WOHL KRAM, District Judge.

*1 On September 27, 2006, the Court issued an opinion approving a $100 million class action settlement (the "Settlement") reached in litigation brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") by participants in AOL Time Warner, Inc.'s ("AOLTW")[1] 401(k) defined contribution plans. *See In re AOL Time Warner ERISA Litig.*, 02 Cv. 8853(SWK), 2006 WL 2789862 (S.D.N.Y. Sept. 27, 2006) (the *"Settlement Approval Opinion"* ). Then, on October 26, 2007, the Court issued a memorandum opinion adopting the Report and Recommendation ("R & R") of Special Master David Pikus regarding attorney's fees for class counsel and granting incentive awards to each of the three named plaintiffs. *See In re AOL Time Warner ERISA Litig.*, 02 Cv. 8853(SWK), 2007 WL 3145111 (S.D.N.Y. Oct. 26, 2007) (the *"Award Opinion"* ). The Court approved the Settlement and the various awards over the objection of four class members (the "Objectors"). Counsel for the Objectors ("Objectors' Counsel")[2] now seek an award of attorney's fees from the common fund created in connection with the Settlement (the "Settlement Fund"). For the reasons that follow, the Court denies the motion.

## I. BACKGROUND

Familiarity with the factual and procedural history of this case is presumed. *See Award Opinion*, 2007 WL 3145111; *Settlement Approval Opinion*, 2006 WL 2789862; *In re AOL Time Warner ERISA Litig.*, 02 Cv. 8853(SWK), 2005 WL 563166 (S.D.N.Y. Mar. 10, 2005) (granting in part and denying in part defendants' motion to dismiss). The facts relevant to the instant motion are as follows: In June 2006, Objectors' Counsel filed an objection to the Settlement and the request for attorney's fees and incentive

awards, in connection with the July 19, 2006 hearing on final approval of the Settlement (the "Fairness Hearing"). (*See generally* Objection to Class Action Settlement and Request for Attorney's Fees and Case Contribution Awards ("Objection").)

The Objectors opposed the requests for attorney's fees and incentive awards on several grounds. They characterized the requested attorney's fees as excessive because they believed "that the case involved very little discovery, no trial preparation, and little risk that it 'would not settle for a substantial sum, especially after the settlement in the securities action.' " (R & R 50 (quoting Objection 4-5).) The Objectors also argued that the fee percentage requested by class counsel was too high. (*See*R & R 50.) With respect to the request for incentive awards, the Objectors argued that (1) such an award is "inherently corrupting" and induces named plaintiffs to accept suboptimal settlements to the detriment of the class; (2) the Private Securities Litigation Reform Act of 1995 ("PSLRA") limits awards for named plaintiffs to "lost wages and out of pocket expenses incurred in a case"; and (3) the requested $20,000-per named plaintiff awards were grossly out of proportion with the amount that each absent class member stands to recover under the settlement. *See Award Opinion*, 2007 WL at 3145111, at *3 n. 10 (citing Objection 6-7).

*2 Both the R & R and the *Award Opinion* addressed the Objectors' arguments. *See Award Opinion*, 2007 WL 3145111, at *3 n. 10; R & R 49-51. The awards approved by the Court were lower than those requested by class counsel and the named plaintiffs. *See Award Opinion* (approving incentive awards of $1,000; $1,000; and $500 to three named plaintiffs); R & R 1 (recommending attorney's fees and expenses award lower than that originally requested by class counsel).

Objectors' Counsel now seek an award of $20,558 "as compensation for the time they devoted to the representation of their objector clients in this matter, and the substantial savings to the class that resulted from those objections."(Motion for Award of Attorney's Fees ("Objectors' Mot.") 4.) The attorneys arrived at the requested figure by enhancing their lodestar of $10,279 by a multiplier of two. (Objectors' Mot. 3.) Objectors' Counsel cite their clients' status as the sole objectors to the Settlement and the Court's ultimate reduction of the requested awards as evidence of their contribution to the Court's decision. (*See* Objectors' Mot. 1-4.) Objectors' Counsel's motion for

attorney's fees is unopposed. (Pls.' Letter, Nov. 19, 2007 (stating that class counsel "take no position" on the motion).)

## II. DISCUSSION

### A. Legal Standard

Because "objectors have a valuable and important role to perform in policing class action settlements,"*see In re Indep. Energy Holdings PLC Sec. Litig.*, 00 Cv. 6689(SAS), 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003) (citing *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir.1974)), "they are entitled to ... compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts,"*White*, 500 F.2d at 828. "Ordinarily, the trial judge has broad discretion in deciding whether, and in what amount, attorneys' fees should be awarded, since he is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery."*Id.* (citation omitted).

When deciding whether to award attorney's fees to counsel for objectors, courts in this circuit have not required a showing that "the objectors obtained an economic benefit for the class," or even that the objection influenced the court's prior decision. *See, e.g., In re Visa Check/Mastermoney Antitrust Litig.*, 96 Cv. 5238(JG), 2004 U.S. Dist. LEXIS 8737, at *14-*15 (E.D.N.Y. Apr. 2, 2004), *adopted by*2004 U.S. Dist. LEXIS 8729 (E.D.N.Y. Apr. 27, 2004); *In re Indep. Energy Holdings*, 2003 WL 22801724, at *1 ("Although this Court would likely have reached the same result, with or without the objectors' comments, some of the viewpoints and facts highlighted by the objectors certainly assisted the Court in making an appropriate fee award. Because the overall settlement was improved by their efforts, objectors' counsel are entitled to an award of fees."); *Frankenstein v. McCrory Corp.*, 425 F.Supp. 762, 767 (S.D.N.Y.1977). Rather, some courts have rewarded objectors' counsel for advancing non-frivolous arguments and "transform[ing] the settlement hearing into a truly adversarial proceeding."*Frankenstein*, 425 F.Supp. at 767. Nevertheless, the issue remains a matter of the trial judge's discretion, and courts have refused award requests when "[o]bjectors' efforts have not been shown appreciably to have benefitted [sic] the class" and the court did not rely on the objectors' arguments in reaching its conclusion. *See, e.g., In re Excess Value Ins. Coverage Litig.*, MDL No. 1339, M-21-84 (RMB), 2005 U.S. Dist. LEXIS 45104, at *37-*38 (S.D.N.Y. Nov. 3, 2006), *aff'd by McCoy v. UPS*, 222 Fed. Appx. 87 (2d Cir.2007). Furthermore, courts have declined requests for attorney's fees when objectors'

arguments "clouded rather than sharpened the issues."*In re Anchor Sec. Litig.*, 88 Cv. 3024, 1991 WL 53651, at *2 (E.D.N.Y. Apr. 8, 1991).

### B. Objectors' Counsel Are Not Entitled to an Award from the Settlement Fund

*3 After reviewing Objectors' Counsel's participation in this case, the Court concludes that they are not entitled to a fee award from the Settlement Fund. The attorneys submitted an eight-page objection to the Settlement and the requested awards in preparation for the Fairness Hearing. (*See generally* Objection.) Mr. Tsai's statements at the hearing, in which he essentially summarized the contents of the Objection, span approximately one transcript page. (*See* Tr. 3-4, July 19, 2006.) Participation of this kind is insufficient to "transform[ ] the settlement hearing into a truly adversarial proceeding."*Frankenstein*, 425 F.Supp. at 767.

Next, although the Court responded to the Objectors' arguments when adopting the R & R and approving the named plaintiffs' incentive awards, *see Award Opinion*, 2007 WL 3145111, at *3 n. 10, it would have reached the same result notwithstanding the Objectors' participation. Indeed, none of the numerous cases cited by the Court in its discussion of incentive awards were provided by Objectors' Counsel. Similarly, although the Special Master rightly addressed the Objection in the R & R (*see*R & R 49-51), it is likely that he would have reached the same conclusions based on his own, comprehensive review of the named plaintiffs' attorneys' fee request and the applicable case law. *See Award Opinion*, 2007 WL 3145111, at *1 n. 4 (noting Special Master's "especially thorough" evaluation).[3]

While some courts have approved compensation for objectors' counsel even when the objections were not particularly influential, *see, e.g., In re Visa Check*, 2004 U.S. Dist. LEXIS 8737, at *14-*15; *In re Indep. Energy Holdings*, 2003 WL 22801724, at *1; *Frankenstein*, 425 F.Supp. at 767, such an award is not warranted where, as here, the Objection contained arguments counterproductive to the resolution of the litigation. In this case, the Objection contained several arguments that were irrelevant or simply incorrect. First, Objectors' Counsel opened the objection to the requested incentive awards by referencing the indictment of Milberg Weiss LLP and arguing that class counsel "are in effect asking the Court to become complicit in a disclosed kickback scheme ...." (Objection 6.) Yet Objectors' Counsel offer *no* evidence whatsoever to bolster their assertions, exposing the

argument as nothing more than a weak attempt to impute one unrelated firm's alleged illegalities to class counsel. Additionally, Objectors' Counsel attempted to support their arguments against the requested incentive awards with cases arising under the PSLRA, despite the fact that the statute is inapposite in ERISA cases. *See Award Opinion,* 2007 WL 3145111, at *3 n. 10 (citations omitted). Because these arguments "clouded rather than sharpened the issues," *In re Anchor Sec. Litig.,* 1991 WL 53651, at *2, Objectors' Counsel are not entitled to compensation for making them.[4] Thus, for the foregoing reasons, the Court concludes that an attorney's fees award for Objectors' Counsel derived from the Settlement Fund is not justified in this case.

### III. CONCLUSION

**\*4** Objectors' Counsel's motion for attorney's fees is hereby denied.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 4225486

### Footnotes

1   Although Defendant AOLTW has changed its name to Time Warner, Inc., for clarity, the Court will continue to refer to the merged entity as AOLTW.

2   The instant motion was filed by Objectors' Counsel Stephen Tsai, Esq. and John J. Pentz, Esq. Except where specifically noted, the Court refers to the two attorneys collectively.

3   It appears that, at one point during his review, the Special Master encouraged Objectors' Counsel to provide additional input by inviting them to a meeting with the attorneys for the named plaintiffs. Mr. Tsai, however, elected not to attend. (*See* R & R 6.)

4   As the Court concludes that Objectors' Counsel are not entitled to compensation from the Settlement Fund, it need not address the portion of motion addressing the calculation of the requested award. Nonetheless, the Court notes that Objectors' Counsel have failed to demonstrate both that the hourly rates used in their calculation are reasonable, *see In re Visa Check,* 2004 U.S. Dist. LEXIS 8737, at *23 ("The burden is on the applicant to produce satisfactory evidence in addition to the attorney's own affidavits showing that the requested rates are at the prevailing market level.") (internal quotation marks and citations omitted), and that a multiplier is warranted, *see In re Bolar Pharm. Co., Inc. Sec. Litig.,* 966 F.2d 731, 732 (2d Cir.1992) (remanding case when district court "made no findings and gave no rationale at all as to why a ... multiplier was used"). Given that Objectors' Counsel argued so vociferously against \$20,000 awards for each of the named plaintiffs, one would expect that they would take pains to justify compensation that would result in a similar deduction from the Settlement Fund.

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.