**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHEILA ALLEN, individually and on behalf of all others similarly situated, | Case No. 13-cv-08285 |
| Plaintiff, | Assigned to the Honorable Rebecca R. Pallmeyer |
| v. | |
| JP MORGAN CHASE BANK, N.A., | Magistrate Judge Schenkier |
| Defendant. | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO OBJECTIONS TO SETTLEMENT

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    POSITIVE FEEDBACK SUPPORTS FINAL APPROVAL ............................. 2

III.   THE OBJECTIONS LACK MERIT AND SHOULD BE OVERRULED ..................... 3

       A.     The $10,200,000.00 Settlement Fund is an Excellent Result for the Class ........... 3

              1.     The Amount of the Settlement is Outstanding, Particularly When
                     Balanced Against the Risks ................................................................. 3

              2.     The Settlement Payment Amount per Class Member is On the
                     High End of TCPA Class Recoveries ....................................................... 5

       B.     Basing Class Members' Awards on Number of Calls Was Not Feasible ............. 6

       C.     The Objectors Arguments Demonstrate a Lack of Apprehension ......................... 9

       D.     The *Cy Pres* Distribution, if Any, is Appropriate ................................................ 11

       E.     The Cass Representative Service Award is Reasonable ..................................... 11

       F.     The Claim Period Approved by the Court is Fair and Reasonable ..................... 15

       G.     An Order for Injunctive Relief is not Necessary ................................................ 17

       H.     The Attorney Fee Request is Well-Supported by Established Law ..................... 17

              1.     Class Counsel's Fee Request Comports with the Seventh Circuit's
                     Well-Established Market Approach ....................................................... 17

              2.     One Third of the Common Fund is Consistent with the Typical
                     Market Price in the Seventh Circuit for this Settlement ......................... 18

              3.     A Lodestar Cross-check is neither Required nor Necessary ................... 19

              4.     The Risk Involved Supports the Fee Request ......................................... 23

              5.     The Requested Fee is Appropriate, and Excludes the
                     Administrative and Notice Costs from the Settlement Fund .................. 24

              6.     No "Clear Sailing" Provision ................................................................. 25

       I.     The Remaining Objections are Counterproductive to Resolution and
              Provide no Basis to Decline to Approve the Settlement ..................................... 25

IV.    THE SERIAL OBJECTORS LACK CREDIBILTY ....................................... 26

       A.     Mr. Thut and Mr. Bandas .................................................................................. 27

       B.     Mr. Fortman ...................................................................................................... 28

       C.     Mr. Vullings ....................................................................................................... 28

V.     CONCLUSION .......................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Alliance One Receivables Mgmt., Inc.*, No. 3:08-cv-00248-JAH-WVG (S.D. Cal. Sept. 28, 2012) ........................................................................................................................... 5

*Aliano v. Joe Caputo & Sons -Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ................................................................................................................ 9

*Am. Int'l Group, Inc. v. Ace Ina Holdings, Inc.*, 1:07-cv-2898; 1:09-cv-2026, 2012 U.S. Dist. LEXIS 25265 (N.D. Ill. Feb. 28, 2012) ................................................................................. 13

*Amadeck v. Capital One Fin. Corp.* 80 F. Supp. 3d 781 (N.D. Ill. 2015) ............................ passim

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.,* 34 F.3d 560 (7th Cir. 1994) .. 20

*Armstrong v. Bd. of School Dirs.,* 616 F.2d 305 (7th Cir. 1980) ..................................................... 4

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) ............................................................................................................................. 27

*Beesley v. Int'l Paper Co.*, No. 06-cv-703, 2014 U.S. Dist. LEXIS 12037 (S.D. Ill. Jan. 31, 2014) ........................................................................................................................................... 19

*Boise v. ACE USA, Inc.*, 2015 U.S. Dist. LEXIS 87200 (S.D. Fla. July 6, 2015) ....................... 25

*Brown v. DIRECTV, LLC*, No. 12-cv- 08382, 2013 U.S. Dist. LEXIS 90894 (C.D. Cal. June 26, 2013) ............................................................................................................................................. 24

*Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182 (S.D. Cal. 2013) ..................................... 24

*CE Design Ltd. v. Cy's Crab House N., Inc.*, No.1:07-cv-05456 (N.D. Ill. Oct. 27, 2011) .......... 14

*Chapman v. First Index, Inc.*, No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556 (N.D. Ill. March 4, 2014) ............................................................................................................................................... 8

*Connor v. JPMorgan Chase Bank, N.A.*, No. 10 CV 01284 GPC BGS (S.D. Cal. Feb. 5, 2015).. 5

*Cook v. Niedert,* 142 F. 3d 1004 (7th Cir. 1998) ................................................................... 13, 14

*Delgado v. US Bankcorp*, 12-cv-10313 (C.D. Cal. Jan. 17, 2013) ............................................... 24

*Dennis v. Kellogg Co.,* No. 09-cv-1786-L (WMc), 2013 U.S. Dist. LEXIS 163118 (S.D. Cal. Nov. 14, 2013) ............................................................................................................................. 27

*Desai v. ADT Sec. Servs., Inc.*, No. 1:11-cv-01925 (N.D. Ill. June 21, 2013) ............................. 14

*Droegemueller v. Petroleum Development Corp.*, 2009 WL 961539 (D. Colo. Apr. 7, 2009) .... 15

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ............................................. 4

*Elkins v. Medco Health Solutions, Inc.*, No. 12-cv-2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014) ...................................................................................................................... 23

*Evans v. Aetna Inc.*, No. 13- cv-01039 (E.D. Wisc. Nov. 20, 2013) ........................................... 24

*Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560 (7th Cir. 1994) ................................................. 20

*G.M. Sign, Inc. v. Brinks Manufacturing Company*, No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084 (N.D. Ill. March 4, 2014) ........................................................................................................ 8

*Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill. 1996) ........................................................... 22, 23

*Gautreaux v. Pierce,* 690 F.2d 616 (7th Cir. 1982) ...................................................................... 16

*George v. Kraft Foods Global, Inc.,* 2012 U.S. Dist. LEXIS 166816 (N.D. Ill. June 26, 2012).. 13

*Greene v. DirecTV, Inc*., No. 10-C-117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) ............................................................................................................................................... 24

*Hanley v. Fifth Third Bank*, No. 1:12-cv-01612 (N.D. Ill. Dec. 23, 2013) ................................. 14

*Hudson v. Sharp Healthcare*, No. 13-cv-1807 (S.D. Cal. June 25, 2014).................................... 23

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ............ 4

*In re Comdisco Sec. Litig.,* 150 F. Supp. 2d 943 (N.D. Ill. 2001) ................................................ 20

*In re Continental Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ....................................... 13, 22

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.,* No. 09 C 7670; MDL 2103, 2011 U.S. Dist. LEXIS 157910 (N.D. Ill. Nov. 30, 2011) ....................................................... 23

*In re Law Office of Jonathan E. Fortman, LLC*, No. 4:13MC00042, 2013 U.S. Dist. LEXIS 13903 (E.D. Mo. Feb. 1, 2013) .................................................................................................. 27

*In re Lawnmower Engine Horsepower Marketing & Sales Prac. Litig.,* No. 08-md-01999 (E.D. Wis.)............................................................................................................................................. 28

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ........................... 3, 11

*In re Pre-Filled Propane Tank Marketing & Sales Prac. Litig.,* No. 09-md-02086 (W.D. Mo. Nov. 20, 2012) ............................................................................................................................ 28

*In re Sw. Airlines Voucher Litig*., No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735 (N.D. Ill. Dec. 6, 2013) .................................................................................................................................... 2, 13

*In re Synthroid Mktg. Litig*., 264 F.3d 712 (7th Cir. 2001) ......................................................... 22

*In re Synthroid Mktg. Litig*., 325 F.3d 974 (7th Cir. 2003) ......................................................... 19

*In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 07-md-1827 (N.D. Cal.) ................................. 28

*Ira Holtzman, C.P.A., & Associates Ltd. v. Turza*, 728 F.3d 682 (7th Cir. 2013) ........................ 12

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)................................................................................. 2, 4

*Kolinek v. Walgreens Co*., No. 13-CV-04806 (N.D. Illinois)....................................................... 29

*Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) ......................................................................................................... 5

*Maleksaeedi v. Am. Express Centurion Bank*, No. 11-cv-790 (S.D. Cal., Feb. 12, 2013) ........... 24

*Malta v. Fed. Home Loan Mortg. Corp.,* No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) ............................................................................................................... 5

*Martin v. Caterpillar Inc.,* No. 09-cv-1009, 2010 U.S. Dist. LEXIS 145111 (C.D. Ill. Sept. 10, 2010) .......................................................................................................................................... 22

*Martin v. Dun & Bradstreet, Inc.*, 2014 U.S. Dist. LEXIS 184193 (N.D. Ill. Jan. 16, 2014) ...... 14

*Martin v. Wells Fargo Bank, N.A.*, 12-cv-06030 (N.D. Cal. Apr. 4, 2014).................................... 23

*McDaniel v. Qwest Communs. Corp.,* No. 5 C 1008, 2011 U.S. Dist. LEXIS 154591 (N.D. Ill. Aug. 29, 2011) .......................................................................................................................... 22

*McDonough v. Toys "R" Us, Inc.,* 80 F. Supp. 3d 626 (E.D. Pa. 2015) ........................................ 29

*Moore v. Chase Bank USA, N.A.*, No. 12-cv-10316 (C.D. Cal. Jan. 9, 2013) .............................. 24

*Nolte v. Cigna Corp.*, No: 2:07-cv-2046, 2013 U.S. Dist. LEXIS 184622 (N.D. Ill. Oct. 15, 2013) ................................................................................................................................................ 19

*Palmer v. Sprint Nextel Corp.*, No. 09-cv-01211 (W.D. Wash. Oct. 21, 2011) ............................ 5

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014).................................................................... 19

*Provo v. Rady Children's Hosp. San Diego,* 2015 U.S. Dist. LEXIS 100491 (S.D. Cal. July 29, 2015) ........................................................................................................................................ 25

*Redman v. Radioshack Corp.*, No. 14-1470, 2014 U.S. App. LEXIS 18181 (7th Cir. 2014) ...... 25

*Rose v. Bank of America Corp.,* No. 11-cv-02390 (N.D. Cal. Apr. 1, 2014) ........................... 5, 21

*Sauby v. City of Fargo*, No. 3:07-cv-10, 2009 WL 2168942 (D. N. Dakota, Jul. 16, 2009)........ 15

*Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013) ..................................................................................................................................... 8

*Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560 (N.D. Ill. 2011)............................................ 2, 4

*Steinfeld v. Discover Fin. Servs.*, No. C 12-01118 (N.D. Cal. Mar. 10, 2014)........................ 5, 21

*Steinhoff v. Star Tribune Media Co., LLC*, No. 13-cv-1750, 2014 U.S. Dist. LEXIS 38293 (D. Minn. Mar. 24, 2014)................................................................................................................ 23

*Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, (D.C. Cir. 1993) ................................................. 22

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir. 2006)........................... 4

*Tennille v. Western Union Co.*, No. 09-cv-00938-MSK-KMT, 2013 WL 6920449 (D. Col. Dec. 31, 2013) .................................................................................................................................. 14

*Vollmer v. Selden,* 350 F.3d 656 (7th Cir. 2003) ........................................................................ 27

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349 (Nov. 22, 2010) 20

*Williams v. Gen. Elec. Capital Auto Lease,* No. 94 C 7410, 1995 U.S. Dist. LEXIS 19179 (N.D. Ill. Dec. 20, 1995) ...................................................................................................................... 23

**Other Authorities**

Albert Conte and Herbert B. Newberg, 4 NEWBERG ON CLASS ACTIONS (4th ed.)............ 13

*An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010)................................................................................................................................. 17

Elisabeth M. Sperle, *Here Today, Possibly Gone Tomorrow: An Examination of Incentive Awards and Conflicts of Interest in Class Action Litigation*, 23 Geo. J. Legal Ethics 873, 877 (2010).................................................................................................................................. 15

McLaughlin on Class Actions (10th ed.) ...................................................................................... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The proposed Class Settlement is comprised of payment of $10,200,000.00 by JP Morgan Chase Bank, N.A. ("Chase") into a non-reversionary Settlement Fund ("Settlement"). Upon Court approval, this fund will be distributed *pro rata* to members of the Class, and no money will revert back to Chase. The Settlement is an excellent result as each claimant is expected to receive $70.25, which is the product of more than a year of disputed litigation, extensive discovery efforts, and hard-fought settlement negotiations, including a day-long mediation before the Honorable Wayne R. Anderson (ret.) and an additional month of settlement negotiations between Class Counsel, and an experienced class action defense team who represent Chase[1]. *Declaration of Keith J. Keogh* at DKT. 59-1, ¶¶ 25-29 ("*Keogh Decl.*"); *Declaration of Alejandro Caffarelli* at DKT. 59-2, ¶¶ 20-23 ("*Caffarelli Decl.*").

The response by the class has been overwhelmingly positive. 84,727 Class Members have submitted claims to recover under the Settlement. Of those, only four (4)[2] timely objected; two of whom, Janet Jabrani and Candysse Carlsen, subsequently withdrew their objections. DKT. 75, 80. Forty Class Members timely elected to opt-out of the Settlement. *See Declaration of Jeffrey Gyomber* concerning Claims and Opt-outs, DKT. 81 ("*Gyomber Decl.*"). Such an infinitesimal number of objections – only 0.000192% of a Class of 2,078,559 members –

---

[1] Class counsel is comprised of experienced attorneys who are well-versed in the litigation, certification, trial and settlement of nationwide class actions, including TCPA cases such as this one. *Keogh Decl.,* ¶¶ 4-13, 15-16, 19, 20-23; *Caffarelli Decl.,* ¶¶ 5-10.

[2] The Class administror did receive two additional objections that were not filed as required and just generically state that they object. *Gyomber Decl.* ¶ 21. Class Counsel contacted Ms. Huff who avered that she misread the notice and believed a statement of objection was required with the claim form.  Even at 6 objections, that is only .00028% of the class.

demonstrates that the vast majority of the Class Members approve of the Settlement. This is a glowing factor in support of a finding that the Settlement is fair, reasonable and adequate.

Moreover, as discussed below, every one of the objectors (including the withdrawn objections) who filed their objections are represented by counsel known to be "professional" objectors. These professional objectors have proffered boilerplate objections, including objections that are inapplicable to *this* Settlement. Further, these professional objectors ignore the fact that Class Counsel's work garnered an outstanding result for the Class, notwithstanding the very real risks of facing an adverse ruling at the class certification stage, or on the merits, which would have resulted in a compromised recovery limited to a few individuals. *Keogh Decl.,* ¶¶ 30-34, 37; *Caffarelli Decl.,* ¶¶ 17-18, 24-27, 30.

Plaintiff respectfully requests that the Court overrule each objection and requests that the Court grant final approval of the Settlement.

## II. POSITIVE FEEDBACK SUPPORTS FINAL APPROVAL

Courts typically infer that a settlement is fair, adequate, and reasonable when few class members object to it. *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (affirming final approval of settlement where 13% of the class submitted written objections); In *Amadeck v. Capital One Fin. Corp.* 80 F. Supp. 3d 781, 792 (N.D. Ill. 2015) ("*In re Cap. One*"). The Court noted that only .0032% of class members opted out, and there were only 14 objectors, one of which was also represented by Mr. Bandas, who again files the similar boilerplate objections that have repeatedly been rejected by courts. *See also In re Sw. Airlines Voucher Litig*., No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *21 (N.D. Ill. Dec. 6, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement"); *Schulte,* 805 F. Supp. 2d at 584 (N.D. Ill. 2011) (affirming approval of far smaller TCPA

settlement where 342 class members excluded themselves and 15 class members objected) (citing *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections is strong circumstantial evidence in favor of the settlement"), *aff'd.*, 267 F.3d 743 (7th Cir. 2001)); *see also* 2 McLaughlin on Class Actions § 6:10 (10th ed.) ("Courts have generally assumed that 'silence constitutes tacit consent to the agreement,' so that the absence of objectors or receipt of a relatively small number of objections and opt-outs supports the conclusion that the settlement is adequate.") (citation omitted).

Response from the Class has been overwhelmingly positive. The *de minimis* number of class members who opted out or objected through professional objectors presents compelling evidence that the Class supports this Settlement. Likewise, notice was sent to the Attorneys General of each state, and not one of them raised an objection to the settlement.

## III.  THE OBJECTIONS LACK MERIT AND SHOULD BE OVERRULED

### A.  The $10,200,000.00 Settlement Fund is an Excellent Result for the Class

The monetary relief in this Settlement is a true common fund, comprised of $10,200.00 in non-reversionary cash that will be distributed (net of fees and costs) to claiming Class Members.

#### 1. The Amount of the Settlement is Outstanding, Particularly When Balanced Against the Risks

In this Circuit, "the most important factor relevant to the fairness of a class action settlement is … the strength of the plaintiff's case on the merits balanced against the amount offered in settlement." *In re Cap. One,* 80 F. Supp. 3d at 784 (citations and internal quotations omitted). Here, some objectors argue that Class Members are not receiving enough money.[3]

---

[3] *See* DKT. 63, Objection of Janet Jabrani and Robert Burack; DKT. 66, Objection of Candysse Carlsen; DKT. 68, Objection of Enzo Sberna.

These objectors complain that more money should have been obtained, without acknowledging the substantial risks involved in the litigation, the potential for years of delay, the potential that the class would not have been certified, or that a court could find that the entire case should be dismissed under for lack of Article III standing, resulting in no money at all. It is well-established, however, that since "the essence of settlement is compromise . . . courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (quoting *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) and *Isby*, 75 F.3d at 1200) (internal quotations omitted); s*ee also Armstrong v. Bd. of School Dirs.,* 616 F.2d 305, 315 (7th Cir. 1980) ("Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel."); *Fifth Third Bank,* 805 F.Supp. 2d at 584 ("[S]imply because the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair.") (quotations and citation omitted).

The risks in this case were significant, and in light of the same, the Settlement is particularly exceptional for the Class. *Keogh Decl.*, ¶¶ 30-34, 37; *see also Caffarelli Decl.*, ¶¶ 17-18, 24-27, 30.[4] Some objectors complain that more money should have been obtained based upon the remedies provided under the TCPA. Ironically, none of the objectors could establish any basis for the value of their claim; and after questioning, its clear that the value of their claim is less than they will get from this settlement, which undercuts their argument that the settlement is insufficient.

---

[4] As noted by the Court in *In re Cap One¸* "the opinion of competent counsel is relevant in determining whether a class action settlement is fair, reasonable and adequate under Rule 23." *Id* at 792, *citing Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006). The Court acknowledged that Class Counsel, which included the undersigned, was comprised of experienced litigators, especially in the TCPA context. *Id.*

## 2. The Settlement Payment Amount per Class Member is On the High End of TCPA Class Recoveries

The estimated payment to claimants of over $70 exceeds many other TCPA class settlements. *See e.g., Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) (approving $12.2 million settlement to benefit 47 million class members); *Malta v. Fed. Home Loan Mortg. Corp.,* No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving $17.1 million settlement to 5,887,508 class members; final approval granted at Dkt. No. 91); *Connor v. JPMorgan Chase Bank, N.A.*, No. 10 CV 01284 GPC BGS (S.D. Cal. Feb. 5, 2015)[5] (entering final approval of settlement providing slightly less than 2.5 million accounts for $11,268,058); *In re Cap One,* 80 F. Supp. 3d at 789-90 (stating $34.60 per claimant is not insignificant given the risk that Plaintiff will get nothing through continued litigation; and granting final approval were each class member would be awarded $39.66), *citing Rose v. Bank of America Corp.,* No. 11-cv-02390, Dkt. No. 86-1 at ¶ 7 (N.D. Cal. Apr. 1, 2014) (payments estimated to be between $20 and $40; actual payments between $55 and $60 for each claimant who received credit card or mortgage calls); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118, Dkt. No. 96 at ¶ 6 (N.D. Cal. Mar. 10, 2014) (payments estimated to be between $20 and $40; actual payments were $46.98); *Adams v. Alliance One Receivables Mgmt., Inc*., No. 3:08-cv-00248-JAH-WVG, Dkt. No. 137 (S.D. Cal. Sept. 28, 2012) (approving $9 million settlement to benefit 6,696,743 class members with class members receiving $40 each); *Palmer v. Sprint Nextel Corp.*, No. 09-cv-01211, Dkt. Nos. 84 & 91 (W.D. Wash. Oct. 21, 2011) (approving $5.5 million settlement to benefit 18.1 million class members).

---

[5] *Connor v. JPMorgan Chase Bank, N.A.*, No. 10 CV 01284 GPC BGS, Final Judgment and Order of Dismissal, Dkt No. 160 (S.D. Cal. Feb. 5, 2015).

The relief available to each Settlement Class Member here easily surpasses the potential per-class-member benefit conferred in many other TCPA class settlements that have received final approval.

### B. Basing Class Members' Awards on Number of Calls Was Not Feasible

Similarly some objectors argue that Class Members should be able to make a claim under the Settlement for each call received.[6] Determining the number of calls made to each individual Class Member and then determining whether, when, and in what manner those individuals may have provided Chase with consent to make such calls would not only be difficult, but extremely costly.[7] In fact, the administrative function of such a process would consume a significant portion of the recovery, decreasing the amount each Class Member who submitted a claim would receive. Accordingly, the parties concluded that allocating such relief, regardless of the number of calls made to each Class Member, is reasonable, fair, and efficient. It is also in keeping with the structure of numerous other TCPA settlements that have been approved as set forth above. Those cases specifically rejected the same arguments raised by objectors with some of them being represented by the same attorneys who have appeared in this case. Moreover, these objectors fail to appreciate the implication of such a proposition. As Judge Holderman aptly noted in *In re Cap. One,* the amount required to satisfy the available statutory damages in a case such is this is "unrealistic and would ultimately result in class members finding their place in line among [the defendant]'s unsecured creditors in a bankruptcy proceeding. *In re Cap. One,* 80 F. Supp. 3d at 793.

In fact, the claims of the objectors themselves demonstrate that an evaluation involving a per call analysis is not feasible. As noted above, Chase has persuasively demonstrated that each

---

[6] DKT. 63 (Burack & Jabrani) and DKT. 68 (Sberna).

[7] Mr. Burack testified he did not know how many calls he received, and further stated "it wasn't a concern." Deposition of Robert Burack, *Exh. 1*, 37: 6-14 ("*Burack Depo.*").

objector provided consent and signed an arbitration agreement.[8] Yet, the objectors may disagree.[9] Regardless who is correct, that type of analysis is not feasible. The Settlement Agreement affords all potential Class Members the opportunity to make a claim for monetary relief, and on the same terms. Moreover, if any Class Member believes he or she was entitled to more money, that Class Member could opt out and pursue an individual action.

Thus, objectors' subjective and speculative belief that this case could have settled for more money lacks merit. And, critically, to the extent any Class Member believed that the payout was insufficient, he or she could simply opt out and pursue an individual action. Ironically, prior to class notice being sent, some of the objectors were not even aware of the TCPA, and had no intention of ever pursuing a claim.[10] Further, even after being made aware, at least one objector agreed it would not make sense to pursue a claim for a handful of calls when the TCPA is not fee shifting.[11] Likewise, none of these objectors' counsel have ever successfully litigated their own TCPA class actions, nor demonstrated that obtaining larger recovery is as easy as they contend.

Along these lines, the objectors fail to acknowledge that the TCPA is not fee shifting and even if successful in obtaining $500 a call, expenses and fees would have to be paid out of that $500. Further, attempting to obtain anything approaching that number for all Class Members on the merits would entail substantial risk and delay, which outweighs the potential benefits. First, Chase contends that many of the class members, including the objectors, are subject to

---

[8] Mr. Sberna testified he provided Chase with his telephone number. Deposition of Enzo A. Sberna, *Exh. 2,* 77: 5-12 ("*Sberna Depo*"); He further testified he didn't know if an arbitration clause was part of the agreement. *Sberna Depo Trans,* 102: 12-15. Mr. Burack did not realize if he provided his cell phone number, this constitutes consent under the TCPA. *Burack Depo,* 27: 3-9.

[9] Of course, the objectors had no clue whether they provided the number, or the number of calls, or when they received any such calls. *Sberna Depo,* 77: 5-12; *Burack Depo,* 14: 1-7.

[10] *Burack Depo,* 9:17-24.

[11] *Id.,* 36: 19-22.

arbitration agreement or class action waiver. Second, Class Members face the factual defense of consent, as Chase fervidly contends that it had prior express consent to make the subject calls[12]. Any one of these defenses would have a serious impact on the value of that objector's TCPA claim, which means that if this case were to proceed to trial, it is highly likely that each objector would end up with less money, if any, than what they would receive under the settlement.

The additional issue is whether consent in this case presents an individual question; this would likely result in much contention at the certification stage, with Chase likely arguing the Class cannot satisfy the predominance and ascertainability requirements. *Keogh Decl.,* ¶ 34. There is no consensus among the courts on this issue, thus presenting risk to the Class Members. *Chapman v. First Index, Inc.,* No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556, at *6-7 (N.D. Ill. March 4, 2014) (citing cases). For example, in *Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, at *49 (N.D. Ill. Jan. 4, 2013), the court granted class certification and rejected the defendant's argument that questions of consent caused individual issues to predominate, noting that the defendant had not offered evidence tending to show that any particular class member consented to the faxes at issue, whereas in *G.M. Sign, Inc. v. Brinks Manufacturing Company*, No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084, at *7-10 (N.D. Ill. March 4, 2014), the court declined to certify a class, finding that the defendant offered evidence illustrating that consent could not be shown with common proof. Additionally, Class Members face the argument of whether Chase's telephone system was in fact an automatic telephone dialing system as defined by the TCPA. [13] Furthermore, the implication of the Federal

---

[12] Sbnera freely admits that he provided Chase his cell number on the loan application as well as when he set up his autopay. *Sberna Depo,* 77: 10-12; 78: 17-25. Under the FCC 2008 Order, Chase would have consent to call him, which undercuts his arguments that the value of his claim is worth more than he will get as part of the settlement.

[13] Mr. Burack testified he did not know if the calls he received were pre-recorded or not. *Burack*

Communication Commission's ("FCC") 2015 Order regarding reassigned telephone numbers, and how this issue will be interpreted by the courts, presents significant risk to the Class. These issues present a clear—and case dispositive—risk that this Settlement avoids.[14] *See Keogh Decl.,* ¶¶ 30-34; *see also, Caffarelli Decl.,* ¶¶ 17-18, 24-27.

Furthermore, at least some courts view awards of aggregate, statutory damages with skepticism and either refuse to certify a class or reduce such awards—even after a plaintiff has prevailed on the merits—on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons - Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323, at *13 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature.").

### C. The Objectors Arguments Demonstrate a Lack of Apprehension

Based on the number of claims, claimants would receive over $70 after costs and attorney fees are deducted. Yet, many arguments advanced by the objectors demonstrate a lack of understanding of the case, the value of TCPA claims or the Settlement. For example, Mr. Sberna claims that "the pay-out structure demonstrates it is only good for the Defendant."[15] This is illogical. None of the Settlement Fund will revert back Chase.

Mr. Sberna's complaint that the settlement does not affect any balance allegedly owed to Chase lacks merit. The remedy (debt forgiveness) that Mr. Sberna seems to demand is not within the purview of remedies provided under the TCPA. The TCPA claim is wholly independent on

---

*Depo,* 16: 16-18.

[14] *See* DKT. 55, p. 18 and 59, p.7, which is incorporated herein by reference for more extensive argument on some of the risks posed to the Class by advancing litigation.

[15] DKT.68, p. 4.

any underlying debt. Moreover, many of the Class Members did not have a balanced owed; some received calls for accounts they never had, while the alleged debt for others may have since been paid off or discharged in bankruptcy. An attempt to ascertain answers to these types question for each of Class Members is not feasible, and would result in additional administrative costs that would deplete the Settlement Fund. Moreover, most individuals would prefer to receive a cash payment than an offset of a speculative debt. If Mr. Sberna believes his *pro rata* share is insufficient and he could obtain more, he had the option to opt out of the Settlement and pursue an independent cause of action. If Mr. Sberna was successful, he could use any additional recovery to pay his debts (again, offset of debt is not a TCPA remedy). Of course, since he appears to have provided his cell number, it is unlikely that he would prevail in any such claim.

Illustrating an equal misunderstanding of the case and the Settlement, Ms. Carlsen argued, before she withdrew her objection that she cannot "determine fairness" because Class Counsel has not indicated the class size. Yet the notice advised her to visit the class settlement website for additional details. The website contained, amongst other documents, the Motion for Preliminary Approval, which provides the estimated class size before duplicates were removed of 2.2 million,. *See* www.auto**tcpa**settlement.com. The specific number is 2,078,559. *Gyomber Decl.,* ¶ 6. Further, both the Motion for Preliminary Approval and the Class Notice indicate that the estimated payment per Class Member is $45-55.00. DKT. 55, p. 21. However, since that time, the number of claims submitted – 84,727 – suggests class members will receive a higher potential *pro rata* payment of as much as $70.25. , *Gyomber Decl.*

Notably, while in one sentence Ms. Carlsen seems to complain the Settlement may be too low, in the next, she *complains* that "Claimants will receive a windfall" if fewer than estimated submit a claim. She effectively argues against her interests. Moreover, answers to Ms. Carlsen's

myriad of questions set out in her objections are explicitly addressed in Plaintiff's Motion for Preliminary Approval. DKT. 55, p. 6; DKT. 57 to which she was directed to for additional information along with the other documents.

### D.  The *Cy Pres* Distribution, if Any, is Appropriate

Certain objectors fault the parties for not identifying a *cy pres* recipient in the Settlement Agreement. The parties do not believe a *cy pres* is likely because there will be a second distribution of any uncashed checks to the persons who cashed their checks unless the amount of uncashed checks is small enough that it is not economically feasible to do so. Plaintiff further notes that *cy pres* recipients need not always be identified prior to final approval in this district. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1031-32 ( (finally approving a settlement that identifies a *cy pres* fund that is "to be distributed to charitable or public interest organizations that serve Mexican or Mexican-American causes," but not actually naming the recipient).  In any event, the parties were not able to agree on a suitable *cy pres*. Plaintiff would suggest the Court approve any funds to the National Consumer Law Center earmarked to work with the FCC to protect consumer protections under the TCPA. In the last year alone, NCLC led a coalition of consumer groups and argued against petitions filed by the banker's associations and debt collectors to weaken consumer TCPA protections. Plaintiff submits that money earmarked for this purpose is directly aligned with the class' interests.

### E.  The Cass Representative Service Award is Reasonable

The Settlement Agreement does not provide for a penny to be given to Plaintiff.  Instead, like fees, Plaintiff is required to petition the Court for a service award.  As such, there is no actual or potential danger that Plaintiff negotiated a higher award for herself at the expense of the

class as argued by one objector. In fact the opposite is true as she rejected a Rule 68 offer that was larger than the award she currently seeks.

Service awards are strongly supported by public policy, and have been endorsed by courts as compensation for named class representatives' services and sacrifices for the benefit of those similarly situated. In light of the particular facts of this case, a service award in the amount of $25,000.00 is warranted based upon the time, work, hardship and dedication that Ms. Allen has invested in bringing this case and pursuing it to fruition. Moreover, the facts surrounding her own claim justify this award. Specifically, Plaintiff allegedly received dozens of calls to her cellular telephone although she was not a customer of Chase.

In fact, the Seventh Circuit was critical of a $7,500 incentive award in a TCPA case as being too small where the plaintiff's individual claim exceeded the incentive award. *Ira Holtzman, C.P.A, & Associates Ltd. v. Turza*, 728 F.3d 682, 690 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1318 (2014). In *Turza*, the court described that award as a *dis*incentive award. In this case, Ms. Allen alleged she had 80 pre-recorded calls from Chase, which would equal $40,000, not considering any potential trebling for any of those calls that occurred after she put Chase on notice that it was calling her cell phone when she did not have a Chase account. Accordingly, Class Counsel respectfully requests that the Court approve a service award of $25,000.

In addition to lending her name to this matter, and thus subjecting herself to public attention, Plaintiff was actively engaged in this Action. *Caffarelli Decl.*, ¶ 19. Among other things, she: (1) provided information to Class counsel for the complaints and other filings; (2) reviewed pleadings and other documents including the complaints; (3) communicated on a regular basis with Class counsel and kept herself informed of progress in the litigation and settlement negotiations; (4) participated in discovery; (5) reviewed and approved the proposed

settlements and (5) rejected a sizable individual offer when she has a large number of calls from Chase in favor of prosecuting the case for the class. (*Id.*) Ms. Allen's dedication to this action is notable, particularly given Courts have approved service awards on the basis that Named Plaintiffs in class actions take risks and perform services for the benefit of the Class. *See* Albert Conte and Herbert B. Newberg, 4 NEWBERG ON CLASS ACTIONS, §11.38 (4th ed.).

Any one-size-fits-all approach could have the potential to undermine the willingness of class representatives to step forward and shoulder the burdens attendant with representing in a class action fellow victims of an unlawful practice, especially where the value of individual claims are small. Indeed, "since without the named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' non-legal but essential case specific expenses." *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992). Since *In re Cont'l I*, service awards for named plaintiffs in class actions have been regularly granted and upheld in this Circuit. *See Cook v. Niedert,* 142 F. 3d 1004 (7th Cir. 1998).

The amount requested here is a tiny fraction of the Settlement Fund, and in line with other incentive awards frequently approved by federal courts in Illinois and elsewhere. *See, e.g., Cook,* 142 F.3d at 1016 (upholding award of $25,000 to class representative); *In re Sw. Airlines Voucher Litig.*, Case No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *32 (N.D. Ill. Aug. 26, 2013) ($15,000 each to two named plaintiffs for a total of $30,000); *Am. Int'l Group, Inc. v. Ace Ina Holdings, Inc.*, 1:07-cv-2898; 1:09-cv-2026, 2012 U.S. Dist. LEXIS 25265, at *59 (N.D. Ill. Feb. 28, 2012) (a $25,000 incentive award is a reasonable one); *George v. Kraft Foods Global, Inc.,* 2012 U.S. Dist. LEXIS 166816, *8 (N.D. Ill. June 26, 2012) (awarding $15,000 each to four named plaintiffs for a total of $60,000). It is also in line with many of the service awards

frequently awarded in TCPA cases. *See Martin v. Dun & Bradstreet, Inc.*, 2014 U.S. Dist. LEXIS 184193, *8-9 (N.D. Ill. Jan. 16, 2014) (Martin, J.) (Dkt. No. 63) (awarding $20,000 incentive award to named plaintiff); *Hanley v. Fifth Third Bank*, No. 1:12-cv-01612 (N.D. Ill. Dec. 23, 2013) (Castillo, J.) (Dkt. No. 86) (awarding named plaintiff a $25,000 incentive award); *Desai v. ADT Sec. Servs., Inc.*, No. 1:11-cv-01925 (N.D. Ill. June 21, 2013) (Bucklo, J.) (Dkt. No. 243) (approving incentive awards of $30,000 each to two named plaintiffs); *CE Design Ltd. v. Cy's Crab House N., Inc.*, No.1:07-cv-05456 (N.D. Ill. Oct. 27, 2011) (Kennelly, J.) (Dkt. No. 424) ($25,000 incentive award to named plaintiff).

Finally, lowering the award would not materially increase the amount of money a claimant would receive, but instead only serve to punish Plaintiff for sticking with the class, to her detriment.

Given the importance of encouraging individuals to step forward and vindicate the rights of others, service awards are designed to make the class representatives whole by compensating them for the efforts, expenditures, and risks they undertake on behalf of the class. Without the prospect of such awards, many individuals would be unwilling to step forward and shoulder the responsibilities of representing fellow victims of an unlawful practice. As one court stated:

> The purpose of incentive awards for class representatives is to encourage people with significant claims to pursue actions on behalf of others similarly situated. Numerous courts have recognized that incentive awards are an efficient and productive way of encouraging members of a class to become class representatives, and in rewarding individual efforts taken on behalf of the class.

*Tennille v. Western Union Co.*, No. 09-cv-00938-MSK-KMT, 2013 WL 6920449, at *2 (D. Col. Dec. 31, 2013) (internal quotations and citations omitted); *See also, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (ERISA).

14

Without individuals who are willing to step forward and represent a class, the public policy goals of class actions will be undermined as fewer individuals would be willing to serve the greater good by investing their personal time and resources and expose themselves to the potential risks and harms for doing so. Indeed, "[r]ecent case law seems to reflect a judicial attitude that encouraging participation in class actions suits is a societal good, and if a fee is needed in order to ensure more people are willing to 'take the plunge' by service as the named plaintiff in a class action lawsuit, then incentive awards can be justified." Elisabeth M. Sperle, *Here Today, Possibly Gone Tomorrow: An Examination of Incentive Awards and Conflicts of Interest in Class Action Litigation*, 23 Geo. J. Legal Ethics 873, 877 (2010).

As a matter of public policy, class representatives should be rewarded for the personal sacrifices they made to vindicate the rights of others. Courts have recognized that serving as a named class representative requires personal sacrifice. *See*, *e.g.*, *Sauby v. City of Fargo*, No. 3:07-cv-10, 2009 WL 2168942, at *2 (D. N. Dakota, Jul. 16, 2009) citing *Droegemueller v. Petroleum Development Corp.*, 2009 WL 961539 (D. Colo. Apr. 7, 2009) ; *see also* Elisabeth M. Sperle, *Here Today, Possibly Gone Tomorrow: An Examination of Incentive Awards and Conflicts of Interest in Class Action Litigation*, 23 Geo. J. Legal Ethics 873, 880-81 (2010) (identifying personal sacrifice, opportunity costs, personal burdens and risk of retaliation for named class representatives).

### F.  The Claim Period Approved by the Court is Fair and Reasonable

The notice process in this case was similar to that praised by Judge Holderman in *In re Cap One,* stating "[s]ubmitting a claim in this court's experienced view, was exceedingly easy for the class members." 80 F. Supp. 3d at 793-794. In that case, like this one, emails were sent to all class members with a valid email address. All others were sent a postcard notice at the last

known address. There was a settlement website and a free informational telephone service. *See id; also see Gyomber Decl.*, ¶¶ 7-8. The objectors apparently did not have a problem figuring out how to submit and actually submitting objections within this window.

Without any sound rationale, Mr. Sberna complains that 60 days is insufficient time to file a notice. He argues in his motion that 120 days would be reasonable. But providing such an exaggerated window not only creates unnecessary delay, and encourages needless procrastination, but it increases the probability class members will lose important claim information, and needlessly increases the administration costs that would further deplete the Settlement Fund.

In any event, this Court previously approved sixty day notice period, it complies with CAFA and is nearly three times longer than a defendant has to draft a responsive pleading to a Complaint, indisputably a much more cumbersome task than completing a simple claim form. The Circuit has also found much shorter times are reasonable. *Gautreaux v. Pierce,* 690 F.2d 616, 632 n.17 (7th Cir. 1982) (we are unpersuaded that the 21-day notice period and the descriptive summary in the notice were inadequate under Federal Rule of Civil Procedure 23(c)(2)). Finally, the idea that the time frame was shortened so that Class Counsel can be paid more quickly is baseless. From inception to Final Approval, this case was anything but rushed. Preliminary Approval was in March and Final Approval was set for late October to insure ample time to prepare notice and process notice and objections prior to final approval. Such a lengthy amount of time demonstrates that the notice procedures were much more than adequate. In addition, it is routine for the parties to request the Court to allow late claims. Because the number of late claims to date will not materially impact the pro rata share of any timely claimant, the parties request the Court allow late claims up to the date of the Final Approval Hearing.

### G.  An Order for Injunctive Relief is not Necessary

Without any indication of what type of relief she believes is amiss, Ms. Carlsen objects based upon the absence of injunctive relief. Such relief is necessary where there is a risk of the defendant committing the alleged of offense again in the future. Here, Chase has clearly indicated it will revise its practices to act in accordance with the TCPA. The substantial Settlement will likewise serve as a deterrent for this defendant and others.

### H.  The Attorney Fee Request is Well-Supported by Established Law

The professional objections also complain about the amount of attorneys' fees requested or the method of calculation thereof. None of these objections has merit and conflict with Seventh Circuit law. Moreover, the Court's approval of the Settlement is not contingent upon its approval of fees in the amount requested, and therefore should not delay final approval.

### 1.  Class Counsel's Fee Request Comports with the Seventh Circuit's Well-Established Market Approach

With this brief, Plaintiff submits the expert opinions submitted in *In Re Capital One* of two prominent and esteemed academics in the field of attorney fee jurisprudence: Professors Brian Fitzpatrick and David Rosenberg ("*Fitzpatrick Decl.*" and *"Rosenberg Decl."*). *Exhibits 3 and 4,* respectively. These experts opinions are directly on point as to why Class Counsel's fees, as requested here, are appropriate under the Seventh Circuit's market approach; and why awarding fees based on counsel's lodestar, or undertaking a lodestar "crosscheck," is inherently antithetical to that approach.

Professor Fitzpatrick is a Professor of Law at Vanderbilt University and the author of an article published in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010). This article is the most comprehensive examination of federal class action settlements and attorneys' fees ever

published and has been widely-cited by a number of courts, scholars, and testifying experts. In sum, Professor Fitzpatrick opines that (1) the percentage method, and not the lodestar method, best approximates the market for legal services, as contingency fee arrangements are typically chosen where, as here, there is no fee-shifting provision under the TCPA and it would be difficult for the plaintiff to closely monitor the work of her attorneys. It aligns her interests with those of her attorneys; (2) the lodestar "crosscheck" is antithetical to the Seventh Circuit's market-based approach because such a crosscheck may discourage plaintiff's attorneys from obtaining the best recovery from the defendant; (3) the fee Class Counsel request here is consistent with the market for legal services in TCPA cases and this District; and (4) the fee should be calculated as a percentage of the entire common fund rather than only a part of it, because obtaining money for settlement administrative costs has a deterrent effect on defendants.

Professor Rosenberg is the Lee S. Kreindler Professor of law and Harvard Law School. He was an early proponent of, and contributor to, modern legal scholarship focusing on a functional approach to the law, sometimes known as "Law and Economics." In sum, Professor Rosenberg opines that in cases such as this involving a non-reversionary cash fund, the percentage method is far superior to the lodestar method, either alone or as a cross-check, for purposes of evaluating *ex ante* what a reasonable fee would be. In particular, the percentage method promotes social welfare by deterring violations of the law, incentivizes optimal investment in maximizing class recovery, and minimizes social costs for the class members, counsel, and the court.

### 2. One Third of the Common Fund is Consistent with the Typical Market Price in the Seventh Circuit for this Settlement

Three of the objectors argue that an award based on one-third of the common fund is too high. As detailed in Class Counsel's Motion for Attorneys' Fees, a fee based on one-third of a

common fund *plus* expenses is typically awarded in TCPA class actions in this District. DKT. 59, p.10-13 (citing multiple cases). Moreover, objectors ignore the fact that Class Counsel do *not* seek reimbursement of their costs on top of the one-third, and thus the amount requested in fees is actually *less* than one-third of the total settlement. The Seventh Circuit recently held that "in consumer class actions, where the percentage of class members who file claims is often quite low . . . the presumption should . . . be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014). The requested fee herein is well below that ceiling.

Two objectors, Ms. Jabrani (withdrawn objection) and Mr. Burack, intimate that this Court should apply an award of 25% of the common fund. Yet, while 25% may be the "benchmark" in a few Ninth Circuit cases cited by the objectors, it is not and never has been the benchmark in this Circuit, nor the nation as a whole. Recently the court in *In re Cap. One*, analyzed a large number of TCPA class settlements outside of the Seventh Circuit and determined that application of a modified *Synthroid II* structure that was risk adjusted would provide a fee of 36% for the first $10 million. 80 F. Supp. 3d at 807. *See also In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*").

### 3. A Lodestar Cross-check is neither Required nor Necessary

This Circuit does not require a lodestar analysis or cross-check is in this common fund case. *See Beesley v. Int'l Paper Co.*, No. 06-cv-703, 2014 U.S. Dist. LEXIS 12037, at *10-11 (S.D. Ill. Jan. 31, 2014) (citations omitted)*; Nolte v. Cigna Corp.*, No: 2:07-cv-2046, 2013 U.S. Dist. LEXIS 184622, at *11 (N.D. Ill. Oct. 15, 2013) ("The use of a lodestar cross-check has fallen into disfavor.") *Citing Synthroid II*, 325 F.3d at 979-80 ("The client cares about the

outcome alone" and class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced."); *Schulte*, 805 F. Supp. 2d at 598 n.27 (recognizing  irrelevance of lodestar cross-check while nevertheless approving fee request with lodestar risk multiplier of 2.5); *Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *10 (N.D. Ill. 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive.")); *In re Comdisco Sec. Litig.,* 150 F. Supp. 2d 943, 948 n.10 (N.D. Ill. 2001) ("To view the matter through the lens of free market principles, [lodestar analysis] (with or without a multiplier) is truly unjustified as a matter of logical analysis.").  Accordingly, it is appropriate to award one-third of the fund as fees here, without undertaking a lodestar cross-check.

Three of the objectors suggest that a lode-star method should be used. Ms. Carlsen (who has since withdrawn her objections) specifies this is in the event that less than 10% of the Class submits a claim form. This arbitrary position does not make sense since all of the settlement will be paid out. Meanwhile, these objectors cite to *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.* for support. In that case, far from declaring lodestar to be the preferred method, the Seventh Circuit reiterated what has long been true in this Circuit, stating only that "we do not believe that the lodestar approach is so flawed that it should be abandoned… the decision … remains in the discretion of the district court." *Id,* 34 F.3d 560, 566 (7th Cir. 1994), *citing Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 566 (7th Cir. 1994). Notably, although making no mention of it in their written objection, Objectors Jabrani (withdrawn) and Burack attach the affidavit of Todd Henderson that was used in the Capital One case. This district has encountered Mr. Henderson's opinions and approach before, and specifically stated "[u]nfortunately for Professor Henderson, his model is not among the methods accepted by the Seventh Circuit"

when analyzing attorney fees. *In re Cap. One,* 80 F. Supp. 3d at 808. In fact, Mr. Henderson believes that if you are successful in unrelated cases, your risk is less, so fees in the next case should be less. Conversely, if you did horrible in the past, your fees should be higher to compensate for the past loss. In other words, the better attorneys are paid less, and mediocre attorneys are rewarded. This is not the *ex ante* market approach required by the Seventh Circuit.

A few of the objectors point to the attorney fee order in *Rose v. Bank of Am. Corp.*, No. 11-cv-02390, Dkt. No. 108 (N.D. Cal. Aug. 29, 2014), in which Judge Davila reduced the requested fee of 25% of the fund (which is the Ninth Circuit benchmark) to less than 7.5% of the fund after applying a lodestar analysis. Respectfully, Class Counsel submit that this order represents a radical departure from the typical fees awarded in the Ninth Circuit for TCPA class action cases. *See, e.g., Steinfeld v. Discover Fin. Servs.,* No. C 12-01118, 2014 U.S. Dist. LEXIS 48540 (N.D. Cal. Mar. 31, 2014) (awarding the requested 25% of the fund).

The fairest and most efficient way to calculate a reasonable fee where, as here, contingency fee litigation has produced a non-reversionary cash fund, is to award class counsel a percentage of the total fund. There is an important policy reason behind choosing to apply the pure percentage of the fund method, rather than the lodestar-crosscheck method, in common fund cases such as this one:

> Consider the following example. Suppose plaintiff entered into a contract with their attorneys that said the attorneys would receive 30% of any recovery or three times the attorneys' lodestar, whichever is lesser. Under such an arrangement, attorneys are completely indifferent between settling a case for three times their lodestar and any amount greater than that. For example, once attorneys have incurred $1 million in lodestar, they would be completely indifferent between settling a case for $10 million and settling it for $30 million. As the Seventh Circuit explained with regard to the megafund practice, "[p]rivate parties would never contract for such an arrangement."

*Fitzpatrick Decl.*, ¶ 11 (*quoting In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)); *see also Rosenberg Decl.,* ¶¶ 7-8, 9- 15, 16 ("Paying class counsel by the hour, as with any other lawyer, creates a risk, at best, of diluting incentives to invest optimally and efficiently, and, at worst, of outright fraudulent overbilling or churning."); Newberg on Class Actions § 14:6 (4th Ed. 2002). *See also Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996), *aff'd* 160 F.3d 361 (7th Cir. 1998) (explaining that "the percentage of the fund method provides a more effective way of determining whether the hours expended were reasonable" because "courts can expect attorneys to make cost-efficient decisions about whether certain expenses are worth the win").

In addition, the percentage of the fund method comports with the legal marketplace, where counsel's success is frequently measured in terms of the results counsel achieved. *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993) (in common fund cases "the monetary amount of the victory is often the true measure of [counsel's] success"). By assessing the amount of the fee in terms of the amount of the benefit conferred on the class, the percentage method "more accurately reflects the economics of litigation practice" which, "given the uncertainties and hazards of litigation, must necessarily be result-oriented." *Id.* at 1269.

It also comports with the established practice in the private legal market to reward attorneys for taking the risk of nonpayment by paying them a premium for successfully resolving contingency fee cases. *See McDaniel v. Qwest Communs. Corp.,* No. 5 C 1008, 2011 U.S. Dist. LEXIS 154591, at *11 (N.D. Ill. Aug. 29, 2011) ("Risk cannot be overlooked, for it is considerable even in a relatively simple class case. As Judge Posner recognized, '[t]he lawyers for the class receive no fee if the suit fails.'") (quoting *In re Continental Illinois Sec. Litig.*, 962 F.2d at 569; *Martin v. Caterpillar Inc.,* No. 09-cv-1009, 2010 U.S. Dist. LEXIS 145111, at *5 (C.D. Ill. Sept. 10, 2010) ("As observed by the Seventh Circuit in *Gaskill v Gordon*, 160 F.3d

361 (7th Cir. 1998), 'it is common place to award the lawyers for the class a percentage of the fund in recognition of the fact that most suits for damages in this country are handled in the plaintiff's side on a contingency fee basis.'"). Finally, it preserves the Court's resources by saving the time it would take to review billing records. *Gaskill,* 942 F. Supp. at 386.

For these reasons, even though courts in the Seventh Circuit have the discretion to elect either the percentage of the fund or the lodestar methods in determining reasonable fees, the percentage of the fund method is utilized far more often and is appropriate here. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.,* No. 09 C 7670; MDL 2103, 2011 U.S. Dist. LEXIS 157910, at *9 (N.D. Ill. Nov. 30, 2011) (rejecting objector's request to review billing hours, noting that "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class") (quoting *Williams v. Gen. Elec. Capital Auto Lease,* No. 94 C 7410, 1995 U.S. Dist. LEXIS 19179, at *29 (N.D. Ill. Dec. 20, 1995) (citations omitted)).

### 4. The Risk Involved Supports the Fee Request

Ms. Carlsen also contends that the "results achieved" do support the requested fees. Class Counsel submits that the result achieved, which exceed many other TCPA class settlements as set forth *supra,* was excellent. *Keogh Decl.,* ¶ 37; *Caffarelli Decl.,* ¶ 30.

TCPA class actions by no means guarantee favorable outcomes for the class.[16] The risks such as the prior pending FCC petitions, the current appeals of the FCC 2015 order, an adverse

---

[16] *See, e.g., Hudson v. Sharp Healthcare*, No. 13-cv-1807, Dkt. No. 56 (S.D. Cal. June 25, 2014) (granting summary judgment against Plaintiff in TCPA class case); *Elkins v. Medco Health Solutions, Inc.*, No. 12-cv-2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014) (same); *Martin v. Wells Fargo Bank, N.A.*, 12-cv-06030, Dkt. No. 94 (N.D. Cal. Apr. 4, 2014) (dismissing case with prejudice); *Steinhoff v. Star Tribune Media Co., LLC*, No. 13-cv-1750, 2014 U.S. Dist. LEXIS 38293 (D. Minn. Mar. 24, 2014) (granting defendant's motion for

ruling in *Robins v Spokeo*, potential denial of class certification, and potential for non-recovery of damages are significant. The Settlement was achieved only after hard fought litigation, and protracted settlement negotiations. Ms. Carlsen's contentions are unfounded.[17]

### 5. The Requested Fee is Appropriate, and Excludes the Administrative and Notice Costs from the Settlement Fund

Objector Burack and Sberna contend that the requested attorneys' fees must be calculated after the administrative/notice costs are deducted, which are not true objections because such calculation is consistent with Class Counsel's Memorandum in Support of Motion for Attorneys' Fees. (DKT. 59). As noted above, that is why the fee motion states the final fee requested would not be known until the final costs are known. The notice states the *maximum* Class Counsel would seek, and states that Class Counsel may seek *up to* $3,399,966.00. *Id.* In other words, Class Counsel has never sought to include a percentage of fees that included administration costs.

In any event, the requested fee is well less than the 36% that Judge Holderman found appropriate in TCPA class actions of this size. *See In re Cap. One,* 80 F. Supp. 3d at 807. Here, *after* deducting the notice and administration costs of $800,000 the requested fee of one third

---

judgment on the pleadings on the issues of prior express consent); *Evans v. Aetna Inc.*, No. 13-cv-01039 (E.D. Wisc. Nov. 20, 2013) (dismissing case), *Brown v. DIRECTV, LLC*, No. 12-cv-08382, 2013 U.S. Dist. LEXIS 90894 (C.D. Cal. June 26, 2013) (compelling claims to arbitration on an individual basis); *Cayanan v. Citi Holdings, Inc*., 928 F. Supp. 2d 1182, 1208 (S.D. Cal. 2013) (same); *Maleksaeedi v. Am. Express Centurion Bank*, No. 11-cv-790, Dkt. No. 32 (S.D. Cal., Feb. 12, 2013) (same); *Delgado v. US Bankcorp*, 12-cv-10313, Dkt. No. 12 (C.D. Cal. Jan. 17, 2013) (dismissing case); *Moore v. Chase Bank USA, N.A*., No. 12-cv-10316, Dkt. No. 10 (C.D. Cal. Jan. 9, 2013) (dismissing case); *Greene v. DirecTV, Inc*., No. 10-C-117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) (granting summary judgment against Plaintiff ).

[17] Class Counsel outlined the risk undertaken in this case in their memorandum in support of attorneys' fees and service awards (DKT. 59).

after administration costs equals $3,102,000, inclusive of class counsels costs. This is consistent with *Redman v. Radioshack Corp.*, No. 14-1470, 2014 U.S. App. LEXIS 18181 (7th Cir. 2014).

### 6. No "Clear Sailing" Provision

This Settlement does not include a "clear sailing" provision for attorney's fees. Instead, the agreement provides Class Counsel will petition for fees and Chase is free to object to fees if it so chooses to do so. This is a non-issue.

### I. The Remaining Objections are Counterproductive to Resolution and Provide no Basis to Decline to Approve the Settlement

The remaining objections are equally without merit. Ms. Carlsen complains that the settlement is unfair because it waives Class Members' FDCPA claims. There is no FDCPA class, nor any waiver thereof. The FDCPA does not apply to Chase collecting its own debts. Further, the release is limited to claims arising out of the TCPA calls at issue. Ms. Carlsen's objection reflects a lack of understanding of the Settlement (at best) or simply the advancement of boilerplate objections manufactured by her attorney.

Ms. Carlsen also asks the Court to stay approval pending the decision in *Spokeo v. Robins.* Were the *Spokeo* decision to be adverse, this could completely eviscerate her claim. Hence, Ms. Carlsen's argument is contrary to her interests, and the interests of the Class, making it illogical and without merit as an objection. Indeed, the proponents of *Spokeo* have argued that the Supreme Court should wipe out statutory damages under the TCPA. In fact, some courts have stayed cases pending *Spokeo*[18], which should further illustrate the risks of no settlement.

---

[18] *E.g., Boise v. ACE USA, Inc*., 2015 U.S. Dist. LEXIS 87200, *2 (S.D. Fla. July 6, 2015) (staying TCPA claim pending decision in *Spokeo*).

Mr. Sberna argues that the language of the release is invalid because it releases parties without consideration. This demonstrates a lack of understanding of the release language. Only parties that received calls as averred are class members. So to the extent that a co-obligator received calls, they would release their claims that arise under the TCPA calls at issue. If they were never called, they don't have any claim arising under the TCPA calls to release. There is no dispute that was the intent of the parties as evidenced by the class definition that limits the class to persons who were called. Likewise, the reference to texts was inadvertent and the class is limited to persons who were called by Chase.

## IV. THE SERIAL OBJECTORS LACK CREDIBILTY

Class Counsel recognize that objectors can provide genuine assistance to the parties, the Court, and other class members by identifying problems in a proposed settlement. At times, however, "serial" or "professional" objectors or their counsel file objections solely to advance their own ideological agenda or to extract payments for themselves from the parties or counsel by threatening years of delay associated with unmeritorious settlement objections and subsequent appeals.[19] Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements. The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal). Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors and their counsel. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf the appeal

---

[19] Notably, here, Mr. Burack also testified he did not have a loan with Chase, contrary to Chase's account. *Burack Depo,* 15: 17-19. This not only raises a question requiring individual inquiry with respect to Mr. Burack, it also casts doubt as to his credibility.

is purportedly raised, gains nothing. *Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, *3-4 (D.Mass. Aug. 22, 2006); *see also Vollmer v. Selden,* 350 F.3d 656, 660 (7th Cir. 2003) (improper to file objection to "cause expensive delay in the hope of getting paid to go away"). Accordingly, "when assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *Dennis v. Kellogg Co.,* No. 09-cv-1786-L (WMc), 2013 U.S. Dist. LEXIS 163118, at *11 n.2 (S.D. Cal. Nov. 14, 2013); *In re Law Office of Jonathan E. Fortman, LLC*, No. 4:13MC00042, 2013 U.S. Dist. LEXIS 13903, at *3 (E.D. Mo. Feb. 1, 2013) (same).

Here, all four objectors are represented by highly sophisticated counsel, the two remaining of whom have been previously identified by courts across the Unites States as "serial," "professional," or otherwise vexatious objectors. As a result, the Court should therefore view these objections and counsel's motives with skepticism.

### A. Mr. Thut and Mr. Bandas

In a 2013 study by the Federal Judicial Center, Mr. Bandas (who is identified as Mr. Thut's co-counsel) (DKT 63) was identified as one of the country's most prolific objectors' counsel, with his name appearing over 100 times in a study of three judicial circuits. *See* http://www.fjc.gov/public/pdf.nsf/lookup/class-actionobjector-appeals-leary-fjc-2013.pdf/$file/class-action-objector-appeals-leary-fjc-2013.pdf. Mr. Bandas and Mr. Thut were also profiled in a recent article about serial objectors in Reuters, which described Mr. Bandas' attempt to obtain $400,000 from one law firm in order to withdraw his objections, as well as U.S. District Court Judge James Robart's order barring Bandas from practicing in the Western District of Washington for bad faith conduct. *See* http://blogs.reuters.com/alisonfrankel/2015/06/29/a-

27

new-way-for-class-action-firms-to-combat-serial-objectors/.  Likewise, in a recent article, Mr. Thut shamelessly states that class counsel could have an appeal by his client dismissed to "lock in" class counsel's attorney fees if only he would settle with Mr. Thut and Mr. Bandas.  *See* A new Way For Class Action Firms To Combat Serial Objectors by Allison Frankel published by Reuters, June 29, 2015 and attached hereto as *Exhibit 5*.  *See also* www.serialobjector.com.

### B.  Mr. Fortman

Objector Sberna's counsel, Jonathan Fortman, Steve Miller, and John Kress also have a lengthy history of objecting to settlements, appealing settlement approval when their objections are overruled, and then voluntarily dismissing the appeals without having gained anything beneficial for the class.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 07-md-1827, Dkt. Nos. 7807 & 9096 (N.D. Cal.) (Fortman, Miller, and Kress appealed the court's order overruling their objection, which they voluntarily dismissed over a year later without having obtained anything for the class); *In re Pre-Filled Propane Tank Marketing & Sales Prac. Litig.,* No. 09-md-02086, Dkt. No. 311 (W.D. Mo. Nov. 20, 2012) (Miller and Fortman filed notices of appeal of a final approval order overruling their objections, which they later agreed to voluntarily dismiss without having gained any benefit for the class); *In re Lawnmower Engine Horsepower Marketing & Sales Prac. Litig.,* No. 08-md-01999, Dkt. Nos. 481 & 486 (E.D. Wis.) (Fortman, Kress, and Miller filed notices of appeal on September 14, 2010, which they voluntarily dismissed in February 2011 without having gained any benefit for the class).

### C.  Mr. Vullings

As for Ms. Carlson's (Mr. Vullings') actual objections, they show a misunderstanding of this case and class actions in general, and, as the court observed in *In re AOL Time Warner*

*ERISA Litig.*, 02 CV. 8853 (SWK), at *3, contain "arguments counterproductive to the resolution of the litigation" or otherwise "irrelevant or simply incorrect."

Although newer to the serial objector game, Mr. Vullings has entered objections in other cases as well, including *McDonough v. Toys "R" Us, Inc*., 80 F. Supp. 3d 626 (E.D. Pa. 2015); *Kolinek v. Walgreens Co*., No. 13-CV-04806 Dkt. Entry Nos 119 and 134. (N.D. Illinois) (attached as Exh. G. to *Plf. Mtn. to Consolidate Deadlines and For Leave to Conduct Lim. Disc.*, DKT. 70-4).

## V.    CONCLUSION

The objections to the settlement are without merit, and do not warrant rejecting this class action settlement. The settlement exceeds many other TCPA class actions that have been approved and is well within the parameters for settlement approval in the Seventh Circuit.


Dated: October 7, 2015

Respectfully Submitted,


By: */s/ Keith J. Keogh*
_____

Keith J. Keogh
Timothy Sostrin
Michael Hilicki
Keogh Law, Ltd.
55 W. Monroe St., Ste. 3390
Chicago, IL 60603
P: 312.726.1092

Alejandro Cafferelli, #06239078
Lorraine T. Peeters, #06290434
Caffarelli & Associates Ltd.
214 South Michigan Ave., Ste. 300
Chicago, IL 60604
Telephone: 312-763-6880
Email: acaffarelli@caffarelli.com