# EXCERPTED EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHEILA ALLEN, individually )
and on behalf of all others)
similarly situated,        )
                           )
         Plaintiff,        )
                           )
   -vs-                    ) No. 13 CV 08285
                           )
JP MORGAN CHASE BANK, N.A.,)
                           )
         Defendant.        )

The deposition of ROBERT BURACK, called by the Plaintiff for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Aneesha L. Williams, Certified Shorthand Reporter, for the County of Cook and State of Illinois, at 55 West Monroe, Suite 3390, Chicago, Illinois, commencing at the hour of 1:00 p.m., and ending at 2:35 p.m. on the 30th day of September, A.D., 2015.

Page 2

```
 1   APPEARANCES:
 2
       KEOGH LAW, LTD., by
 3       MR. KEITH J. KEOGH
         55 West Monroe Boulevard, Suite 3390
 4       Chicago, Illinois 60606
         (312) 726-1092
 5       keith@keoghlaw.com
           On behalf of the Plaintiff;
 6
 7
       MR. WADE HOWARD
 8       1001 Fennin Street, Suite 1800
         Houston, Texas 77002
 9       (713) 651-2886
         wthoward@liskow.com
10
           On behalf of the Objector,
11         Robert Burack;
12
       STROOCK & STROOCK & LAVAN, LLP, by
13       MR. HAKOP STEPANYAN
         2029 Century Park East, 16th Floor
14       Los Angeles, California 90067
         (310) 556-5800
15       hstepanyan@stroock.com
```

Page 3

```
 1              I N D E X
 2   WITNESS                    PAGE
 3   ROBERT BURACK
 4
     EXAMINATION
 5
       BY MR. KEOGH ............. 4
 6
       BY MR. STEPANYAN ......... 66
 7

            EXHIBITS

     ROBERT BURACK
12   DEPOSITION EXHIBIT    MARKED FOR ID
13   No. 1 ................. 49
14   No. 2 ................. 52
15   No. 3 ................. 59
```

Page 4

```
 1            (Witness sworn.)
 2            ROBERT BURACK,
 3   called as a witness herein, having been first
 4   duly sworn, was examined and testified as
 5   follows:
 6            EXAMINATION
 7   BY MR. KEOGH:
 8       Q. Sir, can you please state and spell
 9   your name for the record?
10       A. Robert Burack, B-U-R-A-C-K.
11       Q. Mr. Burack, have you ever been
12   deposed before?
13       A. Yes.
14       Q. When was the last time?
15       A. Six months ago.
16       Q. So you're familiar with the
17   scenario where I ask you questions and I need
18   an audible answer because the court reporter
19   is going to take it down, correct?
20       A. Yes.
21       Q. But if you answer, I'll assume you
22   understood it. Is that fair?
23       A. Yes.
24       Q. If you don't understand a question
```

Page 5

```
 1   if I talk too fast, ask me to rephrase it,
 2   slow down, and I will. Is that fair?
 3       A. Yes.
 4       Q. Can you give me your present
 5   address?
 6       A. 1514 Waverly Lane, W-A-V-E-R-L-Y,
 7   Lane, Highland Park, Illinois, 60035.
 8       Q. How long have you resided at that
 9   address?
10       A. Approximately, six years.
11       Q. Do you have any plans to move any
12   time soon?
13       A. No.
14       Q. Are you taking any medications or
15   under the influence of any narcotic that
16   would impair your ability to testify today?
17       A. No.
18       Q. Another standard background
19   question. Have you ever been convicted of a
20   crime involving dishonesty or a felony?
21       A. No.
22       Q. And what is your current
23   occupation?
24       A. Home care management.
```

Page 6

1     Q. What do you mean by that?
2     A. I help manage a home care company.
3     Q. And home care, is that like a
4 nursing facility or --
5     A. Caregivers.
6     Q. And what is your position in that?
7     A. Management.
8     Q. Do you have any ownership interest?
9     A. No.
10     Q. What's the name of the company?
11     A. Freedom Home Care.
12     Q. And how long have you been so
13 employed?
14     A. I'm not paid.
15     Q. Then do you have other compensation
16 besides getting paid?
17     A. No.
18     Q. So you don't have ownership, you're
19 management, but you don't get paid?
20     A. Correct.
21     Q. Then why do you do it?
22     A. For my wife.
23     Q. And what's her position in the
24 company?

Page 7

1     A. Owner.
2     Q. What's the name of the company?
3     A. Freedom Home Care.
4     Q. And what's the address for Freedom
5 Home Care?
6     A. 1749 Green Bay Road, Highland Park,
7 Illinois.
8     Q. How many employees does it have?
9     A. Clarify that.
10     Q. How many employees does Freedom
11 Home Care have?
12     A. At 1749 Green Bay Road.
13     Q. Anywhere.
14     A. Anywhere. Full-time?
15     Q. Either part-time, full-time.
16     A. 150, approximately.
17     Q. Is it classified as a
18 minority-owned, woman-owned company?
19     A. I don't think so.
20     MR. KEOGH: For the people on the phone,
21 can you identify yourself for the court
22 reporter?
23     MR. STEPANYAN: Sure. My name is Hak
24 Stepanyan. I'm with Stroock, Stroock & Lavan

Page 8

1 on behalf of J.P. Morgan Chase.
2 BY MR. KEOGH:
3     Q. Now, Mr. Burack, what is your
4 understanding of what the lawsuit Allen
5 versus Chase is about?
6     A. There were unsolicited -- There was
7 robo calls made to people that probably owed
8 money or probably foreclosed, many people
9 that probably did owe money to Chase Bank
10 that had auto loans.
11     Q. You can go on.
12     A. And they're not supposed to contact
13 people through the robo system of calling
14 people.
15     Q. Okay. And do you understand that's
16 a claim under the Telephone Consumer
17 Protection Act?
18     A. I think I've heard that before.
19     Q. Have you heard of that before this
20 lawsuit?
21     A. I think so.
22     Q. Do you know so or do you think so?
23     A. I think so.
24     Q. Have you ever sued anybody or made

Page 9

1 a claim under the Telephone Consumer
2 Protection Act before?
3     A. Not that I'm aware of.
4     Q. Have you ever gotten robo calls
5 before on your cell phone?
6     A. Yes.
7     Q. Why didn't you sue those companies
8 under the TCPA, which is short for Telephone
9 Consumer Protection Act?
10     A. I'm not aware of it.
11     Q. Not aware of what?
12     A. TCPA.
13     Q. So you didn't sue people in the
14 past because you were unaware of the TCPA?
15     A. I just don't go around just suing
16 people to sue people.
17     Q. If you wouldn't have gotten a class
18 notice from Chase in this case, would you
19 have ever filed a claim against Chase under
20 the TCPA?
21     A. For this instance you're saying?
22     Q. Yes, for the calls you received
23 from Chase.
24     A. I don't know. I don't think so.

Page 14

1  Q. How many times do you contend Chase
2  called your cell phone?
3  A. First of all, the number I gave
4  you, it could be that number or either the
5  previous number. I don't recall the number
6  right now, so I'm not positive about that
7  number, just to answer your general question.
8  Q. So let's clarify. Thank you.
9  You're not sure if they called this
10 number, but you had another number and --
11 A. Over the past 5, 10 years, I've hd
12 two or three numbers.
13 Q. Do you recall what the other
14 numbers are?
15 A. I'm blank right now.
16 Q. And is it fair to say that you
17 think Chase called one of those numbers?
18 A. Yes.
19 Q. You're just not sure which one,
20 right?
21 A. Correct.
22 Q. How many times did they call any of
23 your cell phone numbers?
24 A. It's a guess. It wasn't recent,

Page 15

1  like 2015. This was earlier, years ago.
2  maybe a dozen times. It's a guess.
3  Q. Okay. So a dozen times years ago.
4  And how do you believe Chase got your cell
5  phone number to call?
6  A. No idea.
7  Q. Do you recall giving Chase that
8  number and telling them it's a good number to
9  call?
10 A. No.
11 Q. Do you recall one way or the other,
12 or you just don't know?
13 A. I don't recall giving them my
14 number for them to call me.
15 Q. What's your home phone number?
16 A. (847) 748-8443.
17 Q. And did you have an auto loan with
18 Chase?
19 A. I don't think so.
20 Q. What accounts, if any, did you have
21 with Chase?
22 A. You mean, like, loans?
23 Q. We'll start there, yes.
24 A. The only thing related to Chase I

Page 16

1  can think of is was when Chase bought out --
2  Was it Washington Mutual or something like
3  that? Which was a mortgage, no consumer
4  loan, like, an auto or a line of credit, that
5  I'm aware of. It could have been something
6  else, but I'm not aware of it right now.
7  Q. Well, these maybe a dozen -- I
8  understand that was an estimate, so I'm not
9  going to hold you to 1,000. But whatever
10 number of calls were to your cell phone, walk
11 me through those calls. What did they say?
12 What did they ask for, if anything?
13 A. I don't know, and most of it I
14 probably just erased. They were just
15 annoying.
16 Q. Well, do you know was it a person
17 on the line, or was it a prerecorded message?
18 A. I don't recall.
19 Q. Why was it annoying?
20 A. Well, you don't owe money and
21 somebody keeps calling you, it becomes a
22 little annoying.
23 Q. Well, do you know were they calling
24 you for money or were they calling you for

Page 17

1  surveys or do you have any idea?
2  A. I thought it was regarding a debt,
3  but I'm not positive.
4  Q. Is that based upon your
5  understanding of the lawsuit or based upon
6  your memory of what the calls were?
7  A. Just memory.
8  Q. Did you ever call Chase and
9  complain about these calls?
10 A. I'm not sure.
11 Q. Did your wife have any auto loans
12 with Chase?
13 A. Not that I'm aware of.
14 Q. I forgot one of my background
15 questions.
16 Have you ever filed bankruptcy?
17 A. It was for divorce in 19, I don't
18 know, 80 something, maybe. I was a kid.
19 Q. I actually think bankruptcy is a
20 great thing for people who really need a
21 fresh start, so you don't need to justify it.
22 Moving on, back to the TCPA, do you
23 understand that if you provided your cell
24 phone number to Chase, they're allowed to

Page 26

1 questions to ask this person.
2 THE COURT: You can. Ask him his
3 understanding of the law, again, to the
4 reasons I indicated earlier. I know that
5 this is privileged. You wouldn't ask in any
6 way what did your lawyer tell you about this.
7 You wouldn't ask that question. You would
8 ask what is your understanding of the law.
9 MR. KEOGH: And that's what I asked.
10 THE COURT: Again, I don't have a
11 problem with that question. I don't think it
12 invades the privilege.
13 MR. KEOGH: Thank you.
14 THE COURT: All right. Thanks.
15 MR. KEOGH: Thank you. Sorry to bother
16 you.
17 MR. HOWARD: Thanks, Your Honor.
18 BY MR. KEOGH:
19 Q. Now know where I'm going with this
20 one.
21 What is your understanding of the
22 TCPA?
23 A. I don't understand much.
24 Q. Now, I asked you earlier and you

Page 27

1 probably heard me on the phone saying that --
2 Let me rephrase it.
3 Do you understand that if you gave
4 Chase your cell phone number, Chase is
5 allowed to call you under the TCPA?
6 A. That's what you're telling me.
7 Q. Well, do you understand that? If
8 you don't understand it, you can say no.
9 A. No, I don't understand that.
10 Q. Now I'm going to ask you to assume
11 I'm right, all right. That if I am correct,
12 that if you gave Chase your phone number, you
13 don't have a claim under the TCPA. And in
14 that case, what do you think the value of
15 your claim should be?
16 A. Rephrase the question, please.
17 Q. Sure. If you gave Chase your phone
18 number, they called you based on that, how
19 much do you think you should get out of the
20 settlement?
21 A. So they called me for either not
22 having a loan or the robo call that you're
23 not supposed to do? Is that what you're
24 saying to me?

Page 28

1 Q. If you gave them your cell phone
2 number to call, yes.
3 MR. HOWARD: I'm going to object as to
4 incomplete hypothetical. You can answer.
5 THE WITNESS: Well, my understanding
6 from -- First of all, they're not allowed to
7 do these robo calls in the first place, from
8 my understanding, and I don't believe I even
9 had a loan with Chase, and the only way -- I
10 don't know how they would have gotten my
11 phone number associated to call for a loan if
12 I didn't have a loan. So it's all
13 hypotheticals, right?
14 BY MR. KEOGH:
15 Q. You don't sound certain about
16 whether you had a loan or not with Chase.
17 A. I don't think I had a loan.
18 Q. Putting aside whether you had a
19 loan or not, that you gave Chase your cell
20 phone number to call and they used a robo
21 dialing system to call you, what do you
22 believe the value of that claim is?
23 MR. HOWARD: Objection. Calls for
24 speculation, incomplete hypothetical.

Page 29

1 THE WITNESS: The biggest issue, you
2 know, with the dollar amount is $45, $55.
3 You asked me earlier how many phone calls did
4 I get. That's really the heart of it. I got
5 12 calls, you got one call, you got 50 calls.
6 Why are we all getting the same? It doesn't
7 make sense.
8 BY MR. KEOGH:
9 Q. But what if everyone got around the
10 average same number of calls?
11 A. Now we're really talking
12 hypothetical.
13 Q. Why do you say that?
14 A. Because you're saying that somebody
15 didn't answer the phone to respond versus
16 others who just let them keep calling and
17 ringing the phone off the hook. That's a
18 real stretch. That's just common sense.
19 Q. Are you aware of any Chase policies
20 or procedures of number of calls they make?
21 A. Zero.
22 Q. They make zero calls?
23 A. No. I'm aware of zero policies
24 except for right now that I got a bunch of

Page 34

1  You shouldn't have lost, right? Different
2  circumstances here.
3      Q. If there was risk in these cases,
4  as opposed to -- would that change your
5  opinion on the value of the settlement?
6      A. There's always risk. It's just
7  what percentage of risk.
8      Q. Were you aware when settlement was
9  being negotiated, there was petitions pending
10 in front of the FCC to eviscerate the TCPA?
11     A. No.
12     Q. Were aware that the lawyers
13 involved in this case met personally with the
14 FCC on six or seven occasions before this
15 case was settled to discuss those risks?
16     A. No.
17     Q. And are you aware that the ruling
18 by the FCC related to the TCPA are being
19 appealed in the D.C. circuit?
20     A. No.
21     Q. Are you aware there's a case in the
22 Supreme Court arguing that statutory damage
23 claims against the TCPA are unconstitutional?
24     A. No.

Page 35

1      Q. If you were aware of all those
2  things, would you consider those risks?
3      MR. HOWARD: Objection; calls for
4  speculation.
5      THE WITNESS: Everything has a risk.
6  BY MR. KEOGH:
7      Q. Do you believe those are relevant
8  risks that are outside the control of the
9  parties?
10     MR. HOWARD: Objection; calls for
11 speculation.
12     THE WITNESS: Risk is usually outside
13 the party's control unless you live in a box.
14 BY MR. KEOGH:
15     Q. Are you aware that the TCPA is not
16 fee shifting?
17     A. What do you mean by that?
18     Q. Certain consumer statutes provide
19 that if you prevail the other side pays your
20 attorney's fees. And I tell you the TCPA
21 does not. Does that make a difference in
22 your opinion?
23     A. So who is paying your fees?
24     Q. Do you understand that if it's not

Page 36

1  fee shifting, the fees have to come out of
2  the recovery?
3      A. Oh, I understand that.
4      Q. As opposed to if a consumer statute
5  has fees, the fees can be allocated versus an
6  hourly rate.
7      A. I understand what you're saying
8  now.
9      Q. So in your case if you wanted to
10 bring a lawsuit under the TCPA against Chase,
11 you would have to either pay someone hourly
12 or they'd have to be willing to take a
13 percentage of your 12 calls, right?
14     A. Right. Obviously, that's risk/
15 reward. If I wanted to hire an attorney for
16 $200 to $700 an hour to try to claim a few
17 thousand buck or whatever the dollar amount
18 would be.
19     Q. You wouldn't do it? Would you pay
20 an attorney hourly to collect your $6,000 for
21 12 calls?
22     A. No. That's why you do class
23 action. That doesn't mean you should have
24 frivolous law fees. What did you guys

Page 37

1  actually bill out, a 10th of that?
2      Q. Did you ever call class counsel or
3  Chase prior to your objection to discuss your
4  concerns?
5      A. No.
6      Q. Did you ever review any phone
7  records, your own phone records, to see how
8  many times Chase called you?
9      A. No.
10     Q. Why not?
11     A. It wasn't a concern.
12     Q. It wasn't a concern how many times
13 they called you?
14     A. No.
15     Q. Well, earlier you said that one of
16 the problems you have with the settlement is
17 that they don't provide a per call recovery,
18 right?
19     A. Correct. You just answered your
20 own question. So what's the point?
21     Q. What if you had a claim that had
22 1,000 calls, wouldn't you want to know that?
23     A. Well, if I had a 1,000 calls, I
24 think I'd know that.

Page 66

1  MR. HOWARD: Why don't we take a
2  five-minute break while you look at your
3  notes.
4      (A recess was taken.)
5  MR. KEOGH: I have no further questions.
6  I don't know if Chase does.
7  MR. STEPANYAN: I'll let you know.
8  MR KEOGH: We are at the end.
9  MR. STEPANYAN: Are you finished asking
10 yours?
11 MR. KEOGH: I am.
12 MR. STEPANYAN: One moment, please.
13     I actually do have a couple very
14 quick questions for you.
15 THE WITNESS: Okay.
16             EXAMINATION
17 BY MR. STEPANYAN:
18     Q. Do you recall ever reading,
19 reviewing or signing a contract with Chase
20 that included an arbitration agreement?
21     A. I'm not sure what that means.
22     Q. An arbitration agreement is
23 essentially when you agree to arbitrate as
24 opposed to taking a claim to court. An

Page 67

1  arbitration is an alternative process to
2  resolve a dispute.
3      A. I don't recall signing something.
4  That doesn't mean I haven't in the past, but
5  I don't recall.
6      MR. STEPANYAN: In that case, that
7  concludes my questions. Thank you.
8      THE WITNESS: Thank you.
9      MR. HOWARD: I have no questions.
10     MR. KEOGH: Reserve signature?
11     MR. HOWARD: We'll waive signature.
12     MR. KEOGH: Can I get an E-Tran,
13 please?
14     (Whereupon the deposition
15     proceedings were concluded at 2:35 p.m.)

Page 68

1  NORTHERN DISTRICT OF ILLINOIS )
   EASTERN DIVISION              )
2  STATE OF ILLINOIS             )
                                 ) SS:
3  COUNTY OF COOK                )
4      I, Aneesha L. Williams, Certified
5  Shorthand Reporter, in and for the County of
6  Cook, State of Illinois, do hereby certify
7  that on the 30th day of September, A.D.,
8  2015, the deposition of witness, ROBERT
9  BURACK, called by the Plaintiff, was taken
10 before me, reported stenographically and was
11 thereafter reduced to typewriting through
12 computer-aided transcription.
13     The said witness, ROBERT BURACK, was
14 first duly sworn to tell the truth, the whole
15 truth, and nothing but the truth, and was
16 then examined upon oral interrogatories.
17     I further certify that the foregoing is
18 a true, accurate and complete record of the
19 questions asked of and answers made by the
20 said witness, at the time and place
21 hereinabove referred to.
22     The signature of the witness was waived
23 by agreement.
24     The undersigned is not interested in the

Page 69

1  within case, nor of kin or counsel to any of
2  the parties.
3      Witness my official signature as a
4  Certified Shorthand Reporter, in and for Cook
5  County, Illinois on this 6th day of October,
6  A.D., 2015.

            _____
            Aneesha L. Williams, CSR
            License No. 084-004443

18 (Pages 66 to 69)