# EXCERPTED EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEILA ALLEN, | ) Case No. 13-CV-08285 |
| | ) |
| | ) Honorable |
| Plaintiff, | ) Rebecca R. Pallmeyer |
| | ) |
| v. | ) |
| | ) Magistrate |
| JP MORGAN CHASE BANK, | ) Judge Schenkier |
| N.A., | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

- - -

DEPOSITION OF ENZO A. SBERNA
September 24, 2015

- - -

Deposition of ENZO A. SBERNA, as if upon Cross-Examination before Ann Wirick, a Notary Public in and for the State of Ohio, on Thursday, the 24th day of September, 2015, at 5075 Taylor Road, Suite 1, Cleveland, Ohio, commencing at 2:00 p.m. and ending at 5:28 p.m.

- - -

Page 2

```
 1            APPEARANCES
 2
 3   On Behalf of the Plaintiff:
 4      MICHAEL HILICKI, ESQ.
 5      Keogh Law, Ltd.
 6      55 West Monroe Street, Suite 3390
 7      Chicago, Illinois 60603
 8      (866) 726-1092
 9      mhilicki@keoghlaw.com
10
11   On Behalf of the Defendant:
12      HAKOP STEPHANYAN, ESQ.
13      Stroock & Stroock & Lavan, LLP.
14      2029 Century Park East, 16th Floor
15      Los Angeles, California 90067
16      (310) 556-5842
17      hstephanyan@stroock.com
18
19   On Behalf of the Witness:
20      MAUREEN CONNORS, ESQ.
21      Maureen Connors, Attorney At Law
22      6625 Pearl Road
23      Parma Heights, Ohio 44130
24      (216) 640-9860
25      maureenconnors@maureenconnorslaw.com
```

Page 3

```
 1              I N D E X
 2   Witness                          Page
 3   ENZO A. SBERNA
 4      Cross-Examination by Mr. Hilicki. . . . 4
 5
 6
 7   Objections                       Page
 8   By Ms. Connors. . . . . . . . . . 6, 17, 18, 20,
 9                                    21, 22, 23, 24,
10                                    31, 32, 33, 34,
11                                    35, 36, 37, 39,
12                                    40, 41, 42, 43,
13                                    49, 51, 53, 54,
14                                    58, 59, 61, 62,
15                                    75, 76, 87, 95,
16                                    97, 98, 99, 100,
17                                    101, 105, 106, 108,
18                                    109, 143
19
20              E X H I B I T S
21                               Page
22   Exhibit 1 . . . . . . . . . . . . . . 103
23   Exhibit 2 . . . . . . . . . . . . . . 124
24   Exhibit 3 . . . . . . . . . . . . . . 124
25   Exhibit 1.5 . . . . . . . . . . . . . 151
```

Page 4

```
 1
 2                ENZO A. SBERNA,
 3   called by the Plaintiff for the purpose
 4   of Cross-Examination, as provided by the Federal
 5   Rules of Civil Procedure, being by me first duly
 6   sworn, as hereinafter certified, deposes and says
 7   as follows:
 8                      - - -
 9              CROSS-EXAMINATION
10   BY MR. HILICKI:
11      Q.  Could you please state your full name
12   for me.  I mean, I know who you are because we just
13   introduced one another, but can you -- so now that
14   we're taking stuff down, can you state your full
15   name for the record and spell it out, please.
16      A.  Enzo Sberna, E-n-z-o, S-b-e-r-n-a.
17      Q.  Okay.  Do you have a middle name,
18   Mr. Sberna?
19      A.  Yes.
20      Q.  What is it?
21      A.  Anthony.
22      Q.  Okay.  A-n-t-h-o-n-y?
23      A.  Correct.
24      Q.  All right.  This is the deposition of
25   Enzo Anthony Sberna taken pursuant to notice of the
```

Page 5

```
 1   Federal Rules of Civil Procedure and all other
 2   applicable rules.
 3      Mr. Sberna, have you given a deposition before
 4   today?
 5         MR. STEPHANYAN:  I'm sorry to
 6   interrupt.  I just joined also.
 7         MR. HILICKI:  Oh, okay.  Sorry.
 8   Well, we've only just gotten through --
 9   well, go ahead and identify yourself
10   for the record.
11         MR. STEPHANYAN:  My name is Hakop
12   Stephanyan.  I'm with Stroock &
13   Stroock & Lavan, and I'm on behalf
14   of JP Morgan Chase, N.A.
15         MR. HILICKI:  Got you.  Sorry
16   about that.
17         MR. STEPHANYAN:  No worries.
18         MR. HILICKI:  Yeah.
19   Fortunately for you, all you've missed
20   is that we've established that
21   Mr. Sberna has a middle name.
22         MR. STEPHANYAN:  Okay.
23         MR. HILICKI:  And the spelling
24   of his name.
25      Q.  (BY MR. HILICKI) So, Mr. Sberna, have
```

Page 74

1  Coming in from an unknown number.
2     Q.  Did you receive the -- well, what number
3  did the -- what number were you receiving the phone
4  calls at?
5     A.  (440) 823-5534, number of record.
6     Q.  So all of the calls that you received
7  from JP Morgan Chase during the time period that you
8  described -- well, first of all, over what time
9  period would you receive those calls?
10    A.  Over -- the echo is terrible. I'm
11 sorry. One more time.
12    Q.  No problem. Over what time period did
13 you receive the phone calls from JP Morgan Chase
14 that you described?
15    A.  Between March 2012 to January 2014.
16    Q.  Okay. So the same time period as the
17 loan?
18    A.  Correct.
19    Q.  Were all the calls made to the
20 (440) 823-5534 number?
21    A.  Correct.
22    Q.  Were any of the calls made on the --
23 to your current cell phone?
24        THE COURT REPORTER: Can you
25    repeat that, please?

Page 75

1         MR. HILICKI: Sure.
2     Q.  (BY MR. HILICKI) Were any calls made
3  to your current cell phone?
4     A.  All of them.
5     Q.  How long have you had your current
6  phone?
7         MS. CONNORS: Objection. Asked
8     and answered about an hour ago. But
9     you can answer again.
10    A.  Eight years, approximately.
11    Q.  (BY MR. HILICKI) So you had the phone
12 and the phone number for eight years?
13        MS. CONNORS: Could you repeat
14    that?
15        MR. HILICKI: Sure.
16    Q.  (BY MR. HILICKI) An hour ago I asked
17 him how long he had his phone number. This time
18 I'm asking how long he's had the phone.
19    A.  The phone?
20    Q.  Yes, the phone.
21    A.  This phone? Three months.
22    Q.  Yes. Three months. What kind of phone
23 is it?
24    A.  An Android phone.
25    Q.  Model? What model?

Page 76

1     A.  Don't know.
2     Q.  Do you have it handy?
3     A.  I do.
4     Q.  Can you pull it out and show it to me?
5         MS. CONNORS: Objection. Go
6     ahead.
7     A.  (Indicating.)
8     Q.  (BY MR. HILICKI) So -- wait a minute.
9  What's it say on the back?
10    A.  OtterBox.
11    Q.  Got you. Okay. So before you had this
12 phone, what kind of phone did you have?
13    A.  The same exact phone.
14    Q.  Okay. What happened to the call log
15 from the prior phone?
16    A.  It takes up space. I delete it. Are
17 you seriously asking if I kept the call log for the
18 phone for the last three years?
19    Q.  How many times has JP Morgan Chase
20 called you between March 31 of 2012 and January of
21 2014?
22    A.  I'd be speculating to even guess.
23 Probably more than 50 times.
24    Q.  When you took out your car loan, did you
25 give JP Morgan Chase your phone number in

Page 77

1  connection with the loan paperwork?
2     A.  One more time.
3     Q.  I'll rephrase the question. How did JP
4  Morgan Chase get your phone number?
5     A.  They requested a contact number.
6     Q.  In connection with your loan?
7     A.  Correct. I believe --
8     Q.  And you gave it to them?
9     A.  -- it's standard procedure.
10    Q.  Sure. But you gave them the phone
11 number?
12    A.  Right. Not to badger and harass me,
13 though.
14    Q.  Of course not.
15        MR. STEPHANYAN: I'm sorry.
16    How did they request that phone
17    number?
18        THE WITNESS: We can't hear
19    you.
20        MS. CONNORS: Could you repeat
21    that, please? I'm sorry.
22        THE COURT REPORTER: What was the
23    question you asked?
24        MR. STEPHANYAN: Mr. Hilicki
25    asked him about how JP Morgan requested

Page 78

1  his phone number. Would you mind
2  repeating how that request was made?
3      THE WITNESS: Verbally.
4      MR. STEPHANYAN: Verbally.
5  Okay. You can continue, Mr. Hilicki.
6      MR. HILICKI: Thank you.
7      Q. (BY MR. HILICKI) When you got the car
8  loan from JP Morgan Chase, did you go to the bank
9  and fill out the paperwork or how did that come
10 about?
11     A. All done at the dealer.
12     Q. Okay. When did JP Morgan request your
13 phone number?
14     A. It was part of their paperwork.
15     Q. Okay. It's in the loan documents then?
16     A. For sure it is.
17     Q. All right. You gave them the phone
18 number as part of the loan paperwork at the
19 dealership?
20     A. Correct. And then also it was asked to
21 be verified when you set it up for auto-pay.
22     Q. So JP Morgan asked you to verify your
23 phone number when you set up the auto-pay on the
24 loan?
25     A. Correct.

Page 79

1      Q. When did that occur?
2      A. Probably either prior to or very close
3  to the first payment.
4      Q. Okay. And how did they request your
5  phone -- how was that request for your phone number
6  made?
7      A. It's part of their software program
8  that requests you to verify your e-mail address,
9  your phone number, probably even date of birth,
10 Social Security number. There may be several
11 other questions involved with that that I just
12 don't recall. Could be quality control questions.
13 Could be standardized questions. Probably even --
14     Q. And -- I'm sorry. Go ahead.
15     A. Possibly the first pet's name was a
16 request on there.
17     Q. I'm sorry. So those questions were
18 asked of you as part of setting up your auto-pay?
19     A. Correct.
20     Q. Online?
21     A. Correct. They asked to reaffirm the
22 existing phone number that they had that was
23 required, I'm sure, as part of the original loan
24 documents. But I don't have Chase's profile or
25 a copy of their procedures to see how that is

Page 80

1  structured.
2      Q. Do you have any documents showing when
3  JP Morgan Chase made the phone calls to you?
4      A. Currently with me? No.
5      Q. Well, anywhere?
6      A. I'm sure if it behooved me, I could
7  probably attempt to locate something.
8      Q. Okay. What would you attempt to locate?
9      A. I'm sorry?
10     Q. Like what?
11     A. Be specific.
12     Q. Well, you said you could attempt to
13 locate something showing when the calls were made.
14 What would that be?
15     A. Well, you'd almost -- probably the
16 easiest thing to do is just subpoena JP Morgan's
17 phone records and subpoena my phone records.
18     Q. Do you have access to your phone records
19 online?
20     A. Not for the last three years, I don't.
21     Q. Why not?
22     A. Because their policy and procedure is
23 not to hold that type of data. You might want to
24 contact them and ask them why don't -- why they
25 delete their call log after a couple years.

Page 81

1      Q. Well, I guess what I'm asking -- who is
2  your current phone company?
3      A. Verizon.
4      Q. And how long have you had Verizon as
5  your phone company?
6      A. Eight years.
7      Q. So I'm saying, couldn't you get your
8  phone records from Verizon?
9      A. Verizon's policy is there'd have to be a
10 subpoena.
11     Q. Did you try to get your phone records
12 from Verizon?
13     A. I don't have a reason to try to get my
14 phone records from Verizon.
15     Q. Okay. So you have not tried getting
16 your phone records from Verizon in connection with
17 this lawsuit?
18     A. I have not. I didn't realize it was a
19 prerequisite.
20     Q. The auto loan with JP Morgan Chase --
21 never mind. Did you -- aside from giving JP Morgan
22 your phone number in connection with the auto loan
23 when you filled out the paperwork and when you set
24 up the auto-pay, have you ever given your phone
25 number to JP Morgan Chase in connection with any

21 (Pages 78 to 81)

Maxene Weinberg Agency
(800) 640-1949

Page 102

1  of the rest for you or for me. I don't know how it
2  would behoove you. I don't know how it would
3  behoove your client. They probably wouldn't be
4  happy about that.
5  Q. Do you know if there's an arbitration
6  agreement in your car auto loan contract with
7  JP Morgan Chase?
8  A. It would be fair to say that nobody ever
9  discussed that with me, if there was.
10 Q. So you don't know?
11 A. Don't know.
12 Q. Do you know if there's an arbitration
13 agreement in your bank account agreement with
14 JP Morgan Chase?
15 A. I don't know.
16 Q. I'm sorry. Did you provide your phone
17 number to JP Morgan Chase in connection with your
18 bank account at JP Morgan?
19 A. I would have to assume that they follow
20 the same policies and procedures. So they would
21 definitely request a phone number, but I think that
22 would have more to do with the Patriot Act than
23 with their internal policies and procedures.
24 Q. All right.
25 A. Are you familiar with the Patriot Act?

Page 103

1  Q. Am I familiar with it?
2  A. Yes, sir.
3  Q. I've heard of it.
4  A. Okay.
5  Q. Why don't we get out --
6     MR. HILICKI: Ann, let's get
7     out a copy of the objection. I think
8     Ann has a copy as well. Let's mark
9     this Exhibit 1.
10    - - -
11    (Exhibit 1 was marked for identification
12    purposes.)
13    - - -
14    MR. HILICKI: Has it been
15    marked, Ann?
16    THE COURT REPORTER: Yes.
17    MR. HILICKI: Okay.
18 Q. (BY MR. HILICKI) Mr. Sberna, I'm
19 handing you what has been marked as Exhibit 1. It
20 should be a 12-page document with two pieces of
21 paper attached to it. It's 14 pages total. Is that
22 what you have in front of you?
23 A. Correct.
24 Q. Okay. Have you seen this document
25 before?

Page 104

1  A. Yes.
2  Q. What is it?
3  A. Exactly what I read to you at the start
4  of our deposition. It's a Class Member, Enzo Sberna,
5  Objection to Propose Class Action Settlement and
6  Notice of Intent to Appear at Fairness Hearing.
7  Q. Okay. So this is the objection filed in
8  this case on your behalf?
9  A. Correct.
10 Q. Okay. So obviously you showed me a copy
11 that you brought with you. When was the first time
12 you saw this document?
13 A. On or before September 4th or the 3rd.
14 Q. Did you write it?
15 A. I'm surprised she's not objecting, but I
16 would object. I'm not an attorney. How could I be
17 -- you think I wrote 14 pages? I would be
18 impressed, if I could. But no, I did not.
19 Q. Who wrote it?
20 A. That, I'd have to speculate on that,
21 because I'm not involved inside the inner workings
22 of the law firm. I would have to -- again, this is
23 an assumption. I would have to assume it is either
24 John Fortman, John Cress, or Steve Miller, or a
25 paralegal, or somebody involved with the firm.

Page 105

1  Q. When -- have you seen any drafts of it
2  or prior -- earlier drafts of it?
3     MS. CONNORS: Objection. You
4     can answer, if you know.
5  A. I would assume I had to have seen a
6  draft of it before I agreed to sign it.
7  Q. So you signed it?
8  A. Well, signing it, I'm saying as a
9  blanket statement that I agreed to it, otherwise, it
10 wouldn't be filed on my behalf.
11 Q. So you didn't sign it?
12 A. Mike, I'm looking at the document, my
13 signature's not on there. He's in Chicago or in
14 Missouri. You're in Chicago, correct?
15 Q. Yes.
16 A. Okay.
17 Q. So you're saying you did see a draft of
18 it before it was filed?
19 A. Correct.
20 Q. And when was that?
21 A. On or about September 3rd or 4th.
22 Q. What did you do with the draft?
23 A. Read it over.
24 Q. Did you read it cover to cover?
25 A. That would be fair to say.

Page 150

1 Q. All right. I have no further questions
2 at this time.
3     MR. HILICKI: Although, I will
4 note for the record that a number of
5 our questions were not answered, we
6 do not believe on legitimate grounds,
7 and therefore, we reserve the right to
8 recall this witness to answer them at
9 a later time if the court permits it.
10     MS. CONNORS: Thank you.
11     MR. HILICKI: And that's it.
12     MS. CONNORS: He will not waive
13 his right to read if the transcript
14 gets ordered.
15     MR. HILICKI: Okay.
16     THE COURT REPORTER: Is anyone
17 ordering at this time?
18     MR. HILICKI: We are not, but I
19 will confer with my co-counsel, and
20 we will see.
21     THE COURT REPORTER: Okay.
22     MR. HILICKI: We have your --
23 we can reach you through Jeanette,
24 right?
25     THE COURT REPORTER: Yes.

Page 151

1     MR. HILICKI: Okay. I guess we
2 are off the record.
3         - - - -
4 (Whereupon, the deposition was concluded at 5:28 p.m.)
5         - - - -
6     (Exhibit 1.5 was marked for
7     Purposes of identification.)

Page 152

DECLARATION UNDER PENALTY OF PERJURY

I hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony was contained herein, as corrected, is true and correct

DATED this _____ day of _____, 2015, at _____, Ohio.

_____
ENZO A. SBERNA

Page 153

CERTIFICATE

I, ANN WIRICK, a Notary Public, within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness ENZO A. SBERNA, was by me first duly sworn to testify the truth in the cause aforesaid; that the testimony then given by him was by me reduced to Stenotype in the presence of said witness, afterwards prepared and produced by means of Computer-Aided Transcription and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.
    I do further certify that this deposition was taken at the time and place in the foregoing captioned specified, and was completed without adjournment.
    I do further certify that I am not a relative, employee of or for any party or counsel, or otherwise financially interested in this action.
    I do further certify that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).
    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office on this 2nd day of October, 2015.

_____
Ann Wirick, Notary Public
My Commission Expires 3-26-19