# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHEN DISTRICT OF ILLINOIS
EASTERN DIVISION

*In re Capital One Telephone Consumer Protection Act Litigation*

*Case No. 1:12-cv-10064*
*MDL No. 2416*

## DECLARATION OF BRIAN T. FITZPATRICK

I, Brian T. Fitzpatrick, declare under penalty of perjury under the laws of the United States as follows:

I.  Background and qualifications

1.      I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000. After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.      My teaching and research at Vanderbilt and New York University have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, and the Vanderbilt Law Review.  My work has been cited by numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today, and the Wall Street

Journal. I am also frequently invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011 and the ABA Annual Meeting in 2012. Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.

3.      In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study"). This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published. Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007. *See id*. at 812-13. As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 79 from the Seventh Circuit alone. *See id*. at 817. I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010. This study has been relied upon by a number of courts, scholars, and testifying experts. *See*, *e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Tennille v. W. Union Co.*, 2014 WL 4723805, at *3 (D. Colo. Sept. 23, 2014) (same); *In re Colgate-*

*Palmolive Co. Erisa Litig.*, 2014 WL 3292415, at *4 (S.D.N.Y. July 8, 2014); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2014 WL 92465, at *5-*6 & n.8 (E.D.N.Y. Jan. 10, 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 2013 WL 6383000, *11-*12 (D.D.C. Dec. 6, 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4.      I have been asked by class counsel to opine on whether the attorneys' fees they have requested are consistent with the Seventh Circuit's market-based approach to awarding fees in class actions.  In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I list these documents (and how I refer to them herein) in Exhibit 2.  As I explain, based on my study of settlements across the country and in the Seventh Circuit in particular, I believe the request here is consistent with the market for legal services.  Specifically, my opinions are these:

- The percentage method, rather than the lodestar, method best approximates the market for legal services.

- Although the Seventh Circuit has not yet squarely addressed whether courts should use a lodestar "crosscheck" along with the percentage method, it seems clear that the lodestar crosscheck is antithetical to its market-based approach.

- The fee percentage requested here is consistent with the market for legal services.

- The fee should be calculated as a percentage of the entire common fund rather than only part of it.

II. Case background

5.      These lawsuits were brought on behalf of customers for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A).  Plaintiffs allege that the defendants called them on their cell phones with automated dialing systems and prerecorded messages and without their consent.  These lawsuits were filed between August 2011 and February 2012 in various courts across the country, and, in December 2012, they were all transferred to this court by direction of the Judicial Panel on Multidistrict Litigation.  The parties have now reached a settlement, and they have asked the court to certify a settlement class and approve the settlement.  The Court preliminarily did so on July 29, 2014.

6.      The settlement requires the defendants to pay the class $75,455,098.74.  *See* Settlement ¶ 2.42.  These monies will be distributed to class members who file claim forms on an equal, *pro rata* basis; no monies will revert back to the defendants.[1]  *See id.* at ¶¶ 4.02, 4.04.  The settlement agreement also memorializes various business practices the defendants adopted after this lawsuit was filed in order to prevent future violations of the TCPA.  *See id.* at ¶ 4.01.

_____

[1] Uncashed checks will be redistributed *pro rata* to class members.  *See* Settlement ¶ 9.03.

7.      Class counsel have now moved the court for an award of fees equaling 30% of the $75,455,098.74 settlement fund.  In my opinion, granting the fee request would be consistent with the Seventh Circuit's market-based approach to awarding fees in class actions.

III. Assessment of the reasonableness of the request for attorneys' fees

8.      The Seventh Circuit is unique among federal circuits in that it requires district courts to simulate a market for legal services when it sets fees in class actions.  *See, e.g.*, *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys.").  As the Seventh Circuit has recognized, when it is difficult for plaintiffs to monitor the work of their lawyers, they usually choose contracts that align the incentives of their lawyers with their own—that is, they opt for contingency-fee contracts that pay their lawyers a percentage of any recovery as opposed to an hourly rate.  *See In re Synthroid Marketing Litigation*, 325 F.3d 974, 979 (7th Cir. 2003) ("In re Synthroid II") ("Contingent-fee arrangements are used when it is difficult to monitor counsel closely; otherwise some different arrangement, such as hourly rates, is superior.").  It is therefore unsurprising that the vast majority of courts in the Seventh Circuit use the "percentage" method rather than the "lodestar" method to set fees in common fund class actions.[2]   Indeed, in my empirical study, I found that courts in the Seventh Circuit used the lodestar method in only 21% of class action cases (usually in fee-shifting cases or cases consisting largely of non-cash relief).

---

[2] The lodestar method used as an equitable exception to the American Rule on attorneys' fees in common fund cases should not be confused, as one objector did, *see* Collins Motion p. 11, with the lodestar method used pursuant to fee-shifting statutes.  *See Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) ("[T]he district court misapplied the principles that govern fee shifting cases to the common fund case before it.").  Under fee-shifting statutes, lodestar multipliers are discouraged, whereas, in common fund cases, they are routine.  *Compare Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) *with* Fitzpatrick, *Empirical Study*, *supra*, at 834.

*See also* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements nationwide). Because consumers like the class members here are usually not sophisticated enough to monitor their lawyers, it is my opinion that the percentage method better simulates the market for legal services in cases like this one.

9.      Under the percentage method, courts select a percentage that they believe is appropriate, multiply the settlement amount by that percentage, and then award class counsel the resulting product. Courts in other circuits usually examine a laundry list of factors when deciding what to award class counsel under the percentage method. *See id.* But, in the Seventh Circuit, this multifactor approach has been rejected. *See In re Synthroid Marketing Litigation*, 264 F.3d 712, 719 (7th Cir. 2001) ("In re Synthroid I*) ("The Second Circuit's consider-everything approach, by contrast, lacks a benchmark; a list of factors without a rule of decision is just a chopped salad."). Instead, courts in this Circuit are directed to consider only "the terms that would have been agreed to *ex ante*, had negotiations occurred." *Id.*

10.      It is difficult to approximate precisely the terms that would have been agreed to *ex ante* in small-stakes consumer class actions like this one because none of the indicia of market rates that have been endorsed by the Seventh Circuit—*see id.* ("fee contracts [large-stakes class members] signed with their attorneys; data from large common-pool cases where fees were privately negotiated; and information on class-counsel auctions")—usually exist in such cases. When these indicia are absent, the Seventh Circuit has indicated that it is appropriate to use microeconomics to model what rational plaintiffs would have agreed to at the outset of the case. For example, the Seventh Circuit has rejected the practice followed in other circuits to reduce fee percentages in so-called "megafund" cases because "[p]rivate parties would never contract for such an arrangement" as it would make class counsel indifferent between taking a big or small

settlement.  *See id.* at 718 (showing that this practice "eliminate[s] counsel's incentive to press for more . . . from the defendants.").[3]

11.     Although the Seventh Circuit has not likewise squarely confronted the practice also alive in other circuits of "crosschecking" (i.e., capping) class counsel's fee percentage at some multiple of class counsel's lodestar,[4] I believe it is clear that rational plaintiffs unable to monitor their lawyers would not enter into an agreement to cap their lawyers' fees at some multiple of their lawyers' lodestar for the very same reasons they would not want reduced fee percentages in megafund cases: the lodestar crosscheck "eliminate[s] counsel's incentive to press for more . . . from the defendants."  *Id.*  Consider the following example.  Suppose plaintiffs entered into a contract with their attorneys that said the attorneys would receive 30% of any recovery or three times the attorneys' lodestar, whichever is lesser.  Under such an arrangement, attorneys are completely indifferent between settling a case for three times their lodestar and *any* amount greater than that.  For example, once attorneys have incurred $1 million in lodestar, they would be completely indifferent between settling a case for $10 million and settling it for $30 million.[5]  As the Seventh Circuit explained with regard to the megafund practice, "[p]rivate

---

[3] For this reason, I think objectors are quite wrong to urge the Court to follow this practice from other circuits (which many of them noted I documented in my empirical study) by awarding a lower fee percentage because this is a bigger settlement.  *See* Nykaza Objection p.5; Carrasco Objection p.7; Van Wieren Objection p.10; Tweed Objection p.6.

[4] I say the Seventh Circuit has not "squarely" considered the lodestar crosscheck, but it came very close to squarely rejecting it in *Williams*.  *See* 658 F.3d at 636 ("The Adamski Objectors' lodestar argument—that any percentage fee award exceeding a certain lodestar multiplier is excessive—echoes the 'megafund' cap we rejected in *Synthroid*.").  Technically, however, *Williams* held only that the district court did not err by *refusing to reduce* a fee percentage on account of the lodestar crosscheck; it did not have occasion to rule on whether a district court erred by *reducing* a fee percentage on account of the lodestar crosscheck.

[5] Indeed, it is for this very reason—*i.e.*, that it blunts the incentives of class counsel to fight for the biggest possible settlement—that scholars have urged courts nationwide to abandon the lodestar crosscheck.  *See, e.g.*, Myriam Gilles & Gary Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L. Rev. 103, 140-45 (2006).

parties would never contract for such an arrangement." *Id.* Accordingly, it is my opinion that the lodestar crosscheck is antithetical to the Seventh Circuit's market-based approach and that courts in this Circuit should use what is known as a "pure" percentage approach. *See Williams*, 658 F.3d at 636 ("The Adamski Objectors' lodestar argument—that any percentage fee award exceeding a certain lodestar multiplier is excessive—echoes the 'megafund' cap we rejected in *Synthroid*.").[6]

12.      This leaves us with the question of what percentage the market would have selected *ex ante*. It is my opinion that rational plaintiffs would have agreed *ex ante* to pay class counsel 30% (or perhaps even more). I say this for several reasons. To begin with, when applying the market-based approach, other district courts in the Seventh Circuit have routinely found that plaintiffs would have agreed to fees of 30% in class action cases. This can be seen from Figure 1, which shows the distribution of all Seventh Circuit percentage-method fee awards in my study. In particular, the figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis). As the figure shows, *over forty percent* (i.e., 0.4) of all settlements led to fee awards at or above 30%. The mean was 27.4% and the median of 29%—a single percentage point from the request here. *See* Fitzpatrick, *Empirical*

---

[6] It should go without saying that, if rational plaintiffs like the class members here would not agree *ex ante* to cap their lawyers' compensation at some multiple of the lodestar in this case, then they also would not want to cap their lawyers' compensation at some multiple of the lodestars *in other cases* (or to some proportion to their allocations of the fees *in other cases*). As such, I struggle to see the relevance of the discovery requested by objector Collins. I gather objector Collins is trying to determine what class counsel's profit margin has been in TCPA cases in order to argue that class counsel's fees in this case should be capped at the lodestar multiplied by some number that is based on the risk of loss and profits in other cases. I gather the theory here is that, in a competitive market for class representation, the fees charged by class action lawyers would be bid down to their lodestar multiplied by a risk premium. I think there is some appeal to this theory in markets where clients are sophisticated and can monitor their lawyers' time and settlement decisions, but, as I explained above (and as I noted the Seventh Circuit has said in similar contexts), unsophisticated clients (like those here) who cannot monitor their lawyers would never enter into such arrangements because they would lead their lawyers to have terrible incentives that could not be contained.

*Study, supra,* at 836.[7]  In other words, when other district courts sought to assess what the market rates were in class actions, they very often came to the same or even bigger numbers than class counsel have requested here.

---

[7] The findings of the other two large-scale studies of class action fee awards are largely consistent with my own.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27 (2008); Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248 (2010) ("Attorneys Fees II").  Although the mean and median percentages found in these studies are slightly lower than the ones I found, *see* Eisenberg & Miller, *Attorneys Fees II, supra* at 260 (26% and 24%, respectively), the lower numbers can be explained by two factors.  First, these studies were based on settlements dating back to 1993, and, as such, their data are older than mine.  Second, these studies examined only a small fraction of the settlements over this period, and the fraction examined was not designed to be representative of the whole.  *See id*. at 253 ("[O]ur data include only opinions that were published in some readily available form.  Obviously, therefore, we have not included the full universe of cases . . . .  [P]ublished opinions are not necessarily representative of the universe of all cases.").  Indeed, these studies oversampled larger cases, where, as I noted above, the fee percentages awarded are often smaller than in other cases (a practice, again, rejected by the Seventh Circuit).  *See* Fitzpatrick, *Empirical Study, supra*, at 829 (discussing the unrepresentative sampling in the Eisenberg-Miller studies).

**Figure 1: Percentage-method fee awards in the Seventh Circuit, 2006-2007**



13.     Although the fee request here is slightly higher than the average and median found under the market-based approach in the Seventh Circuit, I believe that rational plaintiffs would have agreed *ex ante* to higher fee percentages in this case than in the average and median cases.   I take this view because, unlike most cases in the market for legal representation, plaintiffs in TCPA actions have suffered virtually no damages, and, therefore, have no interest in obtaining compensation for them.[8]   Rather, plaintiffs in TCPA actions are awarded statutory

---

[8] Plaintiffs do have an interest in recovering their statutory damages, but there is, at the very least, a serious question whether plaintiffs *in class actions* would ever be permitted to recover full statutory damages because the magnitude of such damages may have been intended for individual cases, and, when aggregated, may present unintended (and potentially ruinous) liability for defendants.  *See* Fitzpatrick, *Class Action Lawyers, infra*, at 2072.  For example, a class comprised of one million class members who each received ten unlawful calls would be entitled to $15 billion under the literal terms of the statute.  The objectors who complain that the settlement is only a small fraction of this theoretical recovery, *see* Collins Objection p.7 (calling

damages not to compensate them, but to induce enough of them to sue so that defendants are deterred from violating the statute in the first place. That is, even more so than other small-stakes consumer class actions (where class members have usually suffered *some* damages), TCPA actions are all about deterrence. And the way to maximize deterrence against future wrongdoing is to maximize the incentives that class action lawyers have to bring these lawsuits and to settle them for the highest dollar—i.e., to maximize the percentage that class action lawyers will receive. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2069-2070, 2079 (2010) ("Class Action Lawyers"). In other words, because rational plaintiffs would want to maximize deterrence in TCPA class actions and because maximizing the fee percentages that class action lawyers receive from class action settlements gives those lawyers the best incentives to do so, microeconomic modeling suggests that rational plaintiffs would agree to pay class counsel even more than the 30% they have requested here. For this reason, I am unsurprised that, as class counsel reported in their request for fees, courts in this district usually award fees equal to 33% in TCPA class action settlements. *See* Fee Memorandum pp. 13-14.[9]

14.     It is also for this reason that I see no grounds to force class counsel into an arrangement where their fee percentage declines with each additional dollar of settlement, as some objectors urged, *see* Collins Objection pp. 6-7; Nykaza Objection pp. 2-4. Although the Seventh Circuit has adopted such arrangements in the past, *see In re Synthroid II*, 325 F.3d at 908, none of the available indicia of market rates—retainer agreements of lead plaintiffs,

this a "nuisance settlement"), do not appreciate this point. Indeed, as I explain in note 10, *infra*, I think the concern in statutory damages class actions is that they settle for too *much*, not that they settle for too little.

[9] Although some objectors to class counsel's fee request cited lower TCPA fee awards outside the Seventh Circuit, because other circuits do not follow the Seventh Circuit's market-based approach, these other cases are simply not probative.

findings of market rates in other TCPA cases, or microeconomic modeling—support such an arrangement here, *see In re Synthroid I*, 264 F.3d at 721 ("This is not to say that systems with declining marginal percentages are always best."). As such, it is my opinion that the request here is more than consistent with the market for legal representation in TCPA cases.[10]

15.      I would like to address two final matters. First, some uncertainty has been created in the Seventh Circuit recently over what monies paid by the defendant should be included in the amount of the settlement from which fees are calculated. In *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014), the Seventh Circuit held that the expenses paid by the defendant to notify the class and administer the settlement could not be included. *See id.* at 630. The fee there was measured against what is known as a "hypothetical" common fund, where the defendant agreed to pay the class and class counsel separately (as well as to pay the notice and administration expenses), *see id*. at 628-29, and, as is customary in such cases,[11] the district court added together all the monies the defendant agreed to pay separately to assess whether the attorneys' fees constituted a fair percentage of the whole. The Seventh Circuit held that only the monies "received" by the class could be included in the hypothetical common fund, and thereby excluded notice and administration expenses. *Id*. at 630. Some objectors urged the court here to

---

[10] The only hesitation I had in rendering this opinion is my general concern, for the reasons stated in note 8, *supra*, that statutory damages class actions can lead not just to deterrence, but to over-deterrence. Although, as I noted, there is a serious question whether TCPA class action plaintiffs could ever recover full statutory damages, plaintiffs in these cases (including this one) take the position that they can. If defendants settle in the shadow of the possibility that plaintiffs might be right, then, in theory, these class actions may be deterring defendants too much. In theory, this might be a reason to slash attorneys' fees in statutory damages class actions— although, there are obviously better ways to solve this problem. *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2072. Nevertheless, because defendants appear to violate this statute with such regularity, it appears that any concern with over-deterrence is more one of theory than reality at the present time. As such, I render my opinion here without reservation.

[11] *See* Manual for Complex Litigation § 21.7 (4th ed. 2004) ("If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses . . . the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class . . . .").

extend *Redman* to true common fund settlements like the one in this case (where the defendant has agreed to one lump sum and everything is to be paid out of it). *See* Collins Objection pp.10-11. In my opinion, however, it should not be extended. The *Redman* court did not consider that, although the defendant's agreement to pay notice and administration expenses might not have contributed to the compensatory end of that lawsuit, it did contribute to its deterrent end: every penny defendants pay out—no matter to whom—contributes to deterrence. Because deterrence is undoubtedly an important goal of class action litigation (indeed, some would say that in many cases it is the most important goal of class action litigation, *see* Fitzpatrick, *Class Action Lawyers, supra*, at 2068), I believe *Redman* should not be extended. But, whatever the merits of extending it to run-of-the-mill common fund cases, it certainly should not be extended to TCPA cases, which, as I have explained above, are really *only* about deterrence. As such, it is my opinion that class counsel's fee should be calculated as a percentage of the entire common fund here, not part of it.

16. Finally, I wish to observe that, even though the pure percentage method better aligns the interest of class counsel and the class than either the lodestar method or the percentage method with a lodestar crosscheck, it is still possible that class counsel could "sell out" the class by asking the defendant to pay a larger fee award in exchange for a smaller overall settlement. *See, e.g.*, John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 371–72 (2000). In my view, courts are wise to guard against this possibility, but I want the court to know (because it is important to me as well in my role as an expert) that I have seen nothing in this case that suggests any such collusion. Although, as is common, the defendants have agreed not to oppose class counsel's fee request (and, indeed, it is unclear what standing the defendants would have to do so anyway

given that the fee does not affect their payouts), as is customary, class counsel and the defendants did not discuss fees until agreement over the other terms of the settlement had been reached. *See* Dkt. No. 177 at ¶ 24. As such, the defendants' position on fees could not have affected the size of the settlement and I see no reason to worry about collusion here.

Nashville, TN

November 18, 2014

Brian T. Fitzpatrick

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *FedEx Research Professor*, 2014 to present
- *Professor*, 2012-present; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*The End of Class Actions?*, 57 Ariz. L. Rev. (forthcoming 2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)


## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, forthcoming 2014)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, forthcoming 2014)


## ACADEMIC PRESENTATIONS

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, Florida (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (panelist) (Apr. 13, 2014)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

1206420.1

1206476.1

# EXHIBIT 2

Fitzpatrick Exhibit List-Capital One

| Docket No. | Document |
|---|---|
| 19 | Amended Class Action Complaint |
| 129 | Plaintiffs' Amended Memorandum in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement |
| 131 | Amended Declaration of Jonathan D. Selbin in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement |
| 131-1 | Exhibit 1 to Amended Declaration of Jonathan D. Selbin in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (Amended Settlement Agreement and Release) ("Settlement") |
| 137 | Order (1) Conditionally Certifying a Settlement Class, (2) Preliminarily Approving Class Action Settlement, (3) Approving Notice Plan, (4) Setting Final Approval Hearing |
| 176 | Memorandum in Support of Class Counsel's Motion for Award of Attorneys' Fees and For Service Awards to the Class Representatives ("Fee Memorandum") |
| 177 | Declaration of Jonathan D. Selbin in Support of Class Counsel's Motion for Attorneys' Fees and For Service Awards to the Class Representatives ("Declaration") |
| 191 | Objector Jeffrey T. Collins' Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support ("Collins Motion") |
| 191-1 | Objector Collins' Proposed First Set of Interrogatories to Plaintiffs |
| 195 | Objection of Krystal L. Nygaza ("Nygaza Objection") |
| 195-1 | Exhibit A to Objection of Krystal L. Nygaza |
| 195-2 | Exhibit B to Objection of Krystal L. Nygaza |
| 195-3 | Exhibit C to Objection of Krystal L. Nygaza |
| 196 | Objection of Antonia Carrasco ("Carrasco Objection") |
| 197 | Objection to Proposed Settlement of Jeffrey T. Collins ("Collins Objection") |
| 202 | Objections of Vanessa Van Wieren to Proposed Settlement and Intent to Appear ("Van Wieren Objection") |
| 205 | Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay |
| 206 | Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay |
| 206-1 | Exhibit A to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In re Deepwater Horizon-Appeals of the Medical Benefits Class Action Settlement,* 13-30221, Appellant-Objectors' FRAP 42(b) Joint Motion to Dismiss |
| 206-2 | Exhibit B to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In re HP Inkjet Printer Litigation*, C-05-3580, Theodore H. Frank, Kimberly Schratwieser, and Adrian Monza's Objection to Proposed Settlement) |
| 206-3 | Exhibit C to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' |

| | |
|---|---|
| | Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In re Classmates.com Consolidated Litig.,* 09-00045, Objection of Michael I. Krauss to Proposed Settlement and Proposed Attorneys' Fee Award) |
| 206-4 | Exhibit D to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In Re Online DVD Rental Antitrust Litigation*, 09-md-2029, Theodore H. Frank's Objection to Proposed Settlement) |
| 206-5 | Exhibit E to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*Steinfeld v. Discover*, 12-CV-01118, Michael Barton's Objection to Settlement and Fee Request) |
| 206-6 | Exhibit F to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay, (2014-02-13 E-mail from Ted Frank to Jonathan Selbin re *Steinfeld v. Discover*) |
| 206-7 | Exhibit G to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*Steinfeld v. Discover*, 12-CV-01118, Local Rule 7-12 Stipulation and Order) |
| 208 | Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-1 | Exhibit 1 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-2 | Exhibit 2 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-3 | Exhibit 3 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-4 | Exhibit 4 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-5 | Exhibit 5 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-6 | Exhibit 6 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 227 | Objection of Mary Smith Tweed ("Tweed Objection") |
| 345-2 | *Harris v. ComScore, Inc.* - Class Action Settlement Agreement |
| 358 | *Harris v. ComScore, Inc.* - Plaintiffs' Memorandum of Law in Support of Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award |
| 369 | *Harris v. ComScore, Inc.* - Plaintiffs' Final Judgment and Order of Dismissal With Prejudice |
| - | 2014-10-30 Transcript of Proceedings (*In re Capital One TCPA Litigation* 12-cv-10064*)* |
| - | *In re Capital One TCPA Litigation* Weekly Settlement Statistics Report as of November 2, 2014 |
| - | 2014-11-17 Letter from Melissa Holyoak to Plaintiffs' Counsel re Production |
| - | 2014-11-17 Letter from Daniel Hutchinson to Melissa Holyoak re Production |