# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE<br>CAPITAL ONE TELEPHONE<br>CONSUMER PROTECTION ACT<br>LITIGATION | ) )<br>)<br>)<br>)<br>) | Master Docket No. 1:12-cv-10064<br>MDL No. 2416 |
| This document relates to:<br><br>BRIDGETT AMADECK, et al.,<br><br>    v.<br><br>CAPITAL ONE FINANCIAL<br>CORPORATION, and CAPITAL ONE<br>BANK (USA), N.A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:12-cv-10135 |
| This document relates to:<br><br>NICHOLAS MARTIN, et al.,<br><br>    v.<br><br>LEADING EDGE RECOVERY<br>SOLUTIONS, LLC, and CAPITAL ONE<br>BANK (USA), N.A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:11-cv-05886 |
| This document relates to:<br><br>CHARLES C. PATTERSON,<br><br>    v.<br><br>CAPITAL MANAGEMENT<br>SERVICES, L.P. and CAPITAL ONE<br>BANK (USA), N.A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:12-cv-01061 |

**<u>DECLARATION OF DAVID ROSENBERG</u>**

1.      My name is David Rosenberg.  I am the Lee S. Kreindler Professor of Law at

Harvard Law School.  I have prepared this report at the request of class counsel in the above

captioned class action.  Class counsel have asked me to address certain general questions relating

to their motion before this Court seeking the award of attorney fees from the common fund they

created by successfully prosecuting and settling the class claim to secure $75,455,098.74

recovery from defendants Capital One Bank (USA), N.A., Capital One, N.A., Capital One

Financial Corporation, Capital One Services, LLC, Capital One Services II, LLC  (together,

"Capital One") and Capital Management Services, LP ("CMS"); Leading Edge Recovery

Solutions, LLC ("Leading Edge"); and AllianceOne Receivables Management, Inc.

("AllianceOne").

2.      This report presents my opinion and supporting analysis regarding when and how

best to use the percentage method in determining class counsel's compensation.  In particular,

responding to class counsel's questions, I consider whether the percentage method should be

(1) replaced or subject to cross-checking by the lodestar method; (2) delineated by a "sliding

scale" that reduces class counsel's percentage of the recovery as the amount they recover

increases; and (3) applied to the total value of the common fund class counsel extracted from

defendant or only a portion net of payouts from the fund  for settlement costs (e.g., costs of

notifying and administering distribution of the fund to class members).

3.      In responding to these questions, I draw on my knowledge and experience gained

from decades-long practice, study, teaching, and writing in the substantive and procedural fields

involved in complex litigation.  This work includes pioneering contributions to understanding

and effectuating the use of class actions as a means of law enforcement aimed at deterring and

redressing violations of constitutional, statutory, and common law and relatedly the fee-structure

and other means of motivating class counsel to optimally invest in prosecuting the class claim. My qualifications are set forth in the curriculum vitae attached as Exhibit A.

4.     I have also reviewed relevant case law from the Seventh Circuit and other federal courts; leading commentary and studies; and portions of the record, including objections to class counsel's fee-award request, in this and other Telephone Consumer Protection Act (TCPA) class actions. A complete list of the materials I reviewed for this action is attached as Exhibit B.

5.     My opinions represent or reflect the general consensus expressed in these sources. Although I have not been asked and do not intend to evaluate the merits of class counsel's fee request, I will refer to related record and other contextual aspects of this and other TCPA cases for illustrative purposes.

6.     In summary, my central conclusions are as follows

a.     In cases like this, involving a "true" common fund, i.e. one comprised of a non-reversionary cash amount for the benefit of the Class, the percentage method should generally be used; it is far and away superior to use of the lodestar method either alone or as a cross-check.

b.     The sliding-scale percentage fee is very costly to employ both because of the complexity of reliably determining not only how much but also at what point to peg the marginal percentage reduction, and because the risk of error can entail undercutting class members' potential recovery and doing substantial harm to the public interest by diminishing the deterrence benefits from class action enforcement of the law.

c.     Class counsel's percentage fee should be applied to the total amount of money recovered from the defendant regardless whether the fund is subject to outstanding or anticipated bills for payment of notice and settlement administration costs and other services

rendered or goods supplied that have been reasonably incurred by class counsel in furtherance of maximizing the net value of the class claim at trial or in settlement.

## II.    Summary of Analysis Supporting Opinion

### A.    Basic criterion for choice of rule:

1.    Maximizing Social Welfare by Minimizing the Total Social Cost of Law Enforcement.  Each of the questions I have been asked to address presents a choice between rules: percentage versus lodestar method; undifferentiated versus sliding scale percentage; percentage applied to common fund as a whole or to fund net of settlement and other costs.  The premise of my opinion regarding these questions is to prefer the rule that minimizes the sum of the social costs, most notably the costs of distorted incentives, error, and administration (including litigation). The rule that achieves that result best promotes the primary goal of maximizing social welfare.  In short, the less waste the more resources available for use in improving everyone's lives and well-being.

2.    Promoting Optimal (Cost-Effective) Deterrence and Compensation As a Means of Minimizing Total Law Enforcement Costs.  I further assume that class actions promote social welfare by deterring and compensating harmful violations of constitutional, statutory, and common law.  It follows that the rules should be chosen to facilitate class counsel's pursuit of maximum net recovery from the defendant by making the optimal aggregate investment in developing the best case for the class claim of liability and damages at trial.  I emphasize the deterrence function of class actions, especially in disputes over class counsel's fee award in common fund cases when it is natural, but mistaken to focus on compensating harm and to overlook or subordinate the question of how best to prevent the illegally harmful conduct from occurring again in the future.  Disregarding the deterrence benefits of class counsel's work and achievements jeopardizes social welfare because everyone is better off when class actions

prevent the occurrence of violations rather than serve only or primarily to compensate illegally inflicted harms after the fact. Therefore in applying the criterion of minimizing total social costs, it is important to assess the rule that best promotes deterrence as well as compensation.

3.     This proposition has particular relevance to awarding class counsel's fee from a common fund, where that fee is paid out of the fund and therefore reduces the final amount available to distribute to the class.  In such cases, as here, objectors sometimes argue that class counsel's fee recovery is too large relative to the share distributed to compensate class members. That comparison is fallacious, however, to the extent it disregards, as it often does, the deterrence benefits achieved by class counsel.

4.     <u>Promoting Optimal Deterrence and Compensation  Is Achieved by Giving Class Counsel the Incentive to Invest Optimally in Pursuit of Maximum net Recovery from the Class Claim</u>.  For example, it is crucially important to deterrence that, as in this case, the class settlement secures the defendant's agreement to "walk away" from the full amount of the fund. Such a feature maximizes deterrence by ensuring that regardless of the number of class members ultimately recovering from claiming on the fund – in this case the entire fund (net of costs and fees) is distributed pro rata to claiming class members – the defendant pays the full social cost of its wrongdoing. Another deterrence benefit results when class counsel obtains, as they have in this case, defendant's agreement to institutional and practice reforms that can, more directly and specifically than incentives created by imposing damages, established proven safeguards against the recurrence of illegal conduct.

5.     Finally, I state at the outset my critical view of using contingent fee awards to provide class counsel with the incentive for making the optimal investment that maximizes the net expected recovery from the class claim, and that would thus best promote the social

objectives of deterrence and compensation. The contingent fee can never (except by sheer happenstance) achieve the socially desired result, however much its design coheres with my opinion offered in this report. The basic, well-known reason is that use of the contingent fee places class counsel at a major investment disadvantage to the defendant. Essentially the defendant has the incentive to greatly outspend to gain the upper hand against class counsel in developing their respective cases on the common questions. The defendant's "biasing" advantage is due not to its relative wealth. Rather it results from the fact that the defendant invests as the "owner" who receives a 100% return from a successful common defense while class counsel's return on investment is capped at a fractional percentage of recovery from successfully prosecuting the class claim for liability. On the realistic assumption that the amount spent on variable-cost litigation needs, such as experts and discovery, correlates with the quality of the litigant's ensuing case and hence prospects at trial, the defendant's greater investment incentives enables it to wield superior, and possibly dominating, litigation power that will skew adjudicative outcomes in its favor and thus undermine deterrence and compensation objectives

## B. Percentage versus Lodestar or Lodestar Cross-check

1. My opinion on this question is, in short, that the percentage method is far superior to the lodestar method. In cases like the present one involving a common fund comprised of non-reversionary cash, fully and finally recovered from the defendant, the percentage method lowers social costs across all dimensions – incentives, administration, and error – reducing the total more by a longshot relative to the lodestar method and thus best promotes the social objectives of conserving scarce judicial and other legal resources, maximizing net recovery by class members, and deterring violations of law.

2.      I present this opinion as applying to use of the lodestar method whether as a substitute for, or cross-check of, the percentage method.  Both lodestar uses suffer basically from the same deficiencies.

## 1.      **Distortion of Incentives**

1.      I agree with the general consensus that the percentage method's distinctive and virtually dispositive virtue is in perfectly aligning class counsel's investment incentives with the interests of class members and society. In contrast, the lodestar creates a substantial risk that class counsel will pursue interests of his or her own in conflict with those of the class and society.  This potential conflict is effectively intrinsic to the lodestar method, because of the prohibitive costs of detecting its realization.

## b.      **Percentage Method:**

1.      The predominant, shared interest of the class and society is in class counsel investing optimally (given above-noted investment constraints imposed by the contingent fee arrangement) to maximize the net expected recovery on the class claim whether at trial or in settlement.  The predominant interest of class counsel is to maximize net return on his or her litigation investment.  (Because of its potential benefits, class counsel's interest is shared by the class and society before the investment is made, but disputed post-investment when the benefits have accrued and payment is due.) The percentage method automatically aligns the interest of class counsel and those of the class and society.  Vesting class counsel with a percentage stake in the recovery provides the lawyer with the incentive to make the optimal investment that will maximize the net recovery; the bigger the recovery pie, the bigger will be class counsel's share of it.  Importantly for comparison with the lodestar method, the percentage method leads class counsel to invest efficiently, without skimping or wasting, maximizing the net marginal benefit

from each unit of time, effort, and money up to but not beyond the point of negative marginal

return in increased probability of success at trial.

### c.     Lodestar Method

1.     The incentive problem with the lodestar method and any other hourly fee

arrangement is well recognized.  Paying class counsel by the hour, as with any other lawyer,

creates a risk, at best, of diluting incentives to invest optimally and efficiently, and, at worst, of

outright fraudulent overbilling or churning.

2.     This risk of distorting class counsel's incentives can be checked by close, well-

informed monitoring of the investment decisions.  Of course, with the exception of very large

stakeholders in cases such as securities class actions, class representatives rarely have the

incentives, expertise, and resources to effectively monitor class counsel.  Monitoring of class

counsel is usually done by the court ex post reviewing the reasonableness of hourly work

records.  As discussed below the cost of such monitoring is high both in consumption of judicial

(and lawyer) time and resources and in the potential for error.

3.     The lodestar can distort class counsel's incentives to settle as well as to prepare

for trial.  The method has well-recognized incentive-distorting effects on the decision to move

forward with or upon a settlement offer in an efficient, timely way. Finding the hourly-based

lodestar for an early settlement unattractive, possibly because the "multiplier" may be

misapplied, as discussed below, class counsel may prolong negotiations or the underlying

litigation.

a.     But it is very difficult, probably close to impossible, for the court to detect

this type of opportunistic behavior because the conduct in question is equally attributable to

reasonable (even if mistaken) negotiating tactics aimed at pressuring the defendant to increase

the offer.  To distinguish between churning and pressuring, the court would have to step into the

shoes of the class and decide, counterfactually, whether it would have accepted the early reasonable offer or held out for a better one.

b.　　It should be noted that this quandary also invites gaming by the defendant, who could use the threat of early, low ball offers and low hourly fee awards to discourage high caliber lawyers from serving as class counsel. For example, suppose the court capped the lodestar award, say at 2 x $1.5 million lodestar, and class counsel's investment reached the $1.5 million lodestar cap. If the defendant offered a low ball settlement offer, say $10 million, class counsel would have no incentive to test defendant's willingness to pay more than $10 million or risk investing further resources because from a pure financial incentive perspective, class counsel are indifferent between a $10 million settlement and a $50 million settlement: either way, their fees are capped at $3 million. That is true even if, as here, the defendant if pressed would be willing to pay tens of millions more to the class to settle.

### 2.　Administration:

#### a.　Percentage method:

1.　　Generally to derive class counsel's fee by percentage, the court need only consult and import the going percentage rate charged for similar cases in the relevant contingent-fee marketplace, and then simply apply that market generated percentage to the common fund.

2.　　The percentage method also enables the court to specify the terms of class counsel's compensation ex ante, thereby avoiding the costs – intrinsic to the lodestar method – of ex post fee-setting. These costs include

• answering such counterfactual questions as what amount of return, which in
lodestar terms translates as what amount of multiplied hours at a given rate would
class counsel ex ante require and have expected to receive as sufficient incentive

for making the optimal investment that maximizes the net recovery from the class

claim at trial;

• second-guessing class counsel's decision-making on the basis of incomplete if

any appreciation of the substantive and strategic options and information that

motivated key judgments made during the course of litigation such as when and

for how much to create or pursue settlement opportunities; and

• the risk of undermining the independence of class counsel, who, having already

gone deeply into debt to invest in prosecuting the class claim, is critically

dependent for compensation on the court's nearly unreviewable exercise of its

discretion.

### b.     **Lodestar method:**

1.     By comparison to the percentage method, the administrative costs of the lodestar

method are exceedingly high.  The court's job in applying the lodestar method is typically but

deceptively stated in concise, straightforward terms: just multiply the reasonable hourly rate by

the number of hours reasonably expended.  Unpacking this statement reveals the true burden –

but only *in part*:

• First the court must determine the prevailing hourly rate charged by lawyers,

who possess reasonably comparable skill, experience, and reputation to that of

class counsel in the relevant legal services market (spanning in many cases

multiple local, regional, and national markets).

• Second, the court must determine the reasonable number of hours class counsel

devoted to the matter; in short, was class counsel's time reasonably well spent.

But the court must do much more than this.  In calculating the lodestar the court must determine

the reasonableness of class counsel's investment of not only time, but also cash. Of course,

courts customarily make the latter determination. However, I include it within the lodestar calculation because outlays of money as well as time should be subject to the court's other major decision (discussed below): determining the reasonable "multiplier" that adjusts the lodestar award according to a number of fee-optimizing factors, most critically, the factor by which the lodestar fee should be enhanced to offset the inherent contingent-fee risk of non-recovery, or, stated more accurately, risk of recovering an insufficient return to motivate the optimal, class claim maximizing investment.

2.      In general, just acquiring relevant information entails high costs. To make reliable decisions the court must obtain a great deal of information regarding class counsel's handling of the case. Typically this involves class counsel keeping and providing the court with voluminous, minutely detailed records specifying how each lawyer (including paralegal and other supporting personnel) involved spent his or her time – itemizing the number of hours worked and the nature and relevance of the work performed during each hour. Complicating matters further, these documents may contain confidential, privileged, and competitive "trade secrets" that may constrain their use by the court and limit access by objectors.

3.      The expense borne to evaluate and decide the import of all of this information for the several major lodestar elements will surely eclipse the cost of producing it for the court to review.

a.      Some evaluative questions will simply present labor-intensive, time-consuming, more-or-less expert-dependent inquires. For example, this may be true for most comparative assessments required to determine the prevailing hourly rate for different levels of attorney competence and experience in the relevant market for fee-for-service representation. However, even this relatively straightforward matter may be complicated in cases like the

present one where the litigation is part of a national campaign, prosecuted collaboratively by attorneys from several firms, with varying specialties as well as expertise, performing different types of work in different markets across the country.

b.  To some degree high costs are also the expectable price for attempting to reliably make elusive and uncertain qualitative assessments of reasonableness, a standard that implies a marginal benefit-cost analysis aimed at determining the point in the course of litigation investment that the cost of spending the next unit of time (and/or money) on a given task would exceed the corresponding benefit in increased probability of success at trial.  Notably, the reasonableness evaluation usually involves two discrete determinations: first, estimating the optimal benchmark, for example, how much time class counsel should reasonably devote to the particular task, and second, comparing the benchmark against the reported time, judging whether the actual time spent was excessive or deficient by an unreasonable degree.

4.  Three generally accepted, pervasively operative axioms of litigation investment economics not only point to further compounding complexity and hence costs in making reliable lodestar reasonableness assessments, but more fundamentally challenge the method's functional premises.  Essentially, the lodestar method purports to involve a straightaway if expensive inquiry.  Presumably courts can directly evaluate class counsel's time and work decisions as if made unilaterally and abstracted from the particular forces and conditions in the particular litigation context, and readily mimic the market to derive price and performance benchmarks. These assumptions are false.  Class counsel's investment decisions must be evaluated with reference to the particular litigation context of existing and potential strategic and substantive forces and conditions, most importantly those created by the defendant's investment decisions. Similarly, in referring to the market for legal services the court must hurdle the basic differences

in the nature and purposes of investments between privately-contracted cases – contingent as well as fee-for-service – and class actions.  More particularly,

     • No reliable assessment of the reasonableness of time spent on a given task or phase of the proceedings can be made unless the court takes account of the strategic interplay of the parties' litigation expenditures.  Because one party's investment necessarily affects the other party's trial prospects (usually negatively), each party will choose how and how much to invest based on estimates of the amount and impact of the other party's expenditures.  In short, the interactive nature of litigation investment precludes reliable reasonableness assessments of class counsel's investment decision, for example, to spend some amount of time on discovery, without first finding and figuring out the relevance of that expenditure to offsetting, countering, preempting, or overcoming an anticipated or prior expenditure by the defendant.   Litigation is grand master chess, and then some.

     • It is axiomatic and empirically validated that the greater the amount at stake, the more a party will spend on enhancing the quality of his or her case to achieve a corresponding increase in the probability of success at trial.  Because of the aggregate stake in a class action, class counsel naturally is motivated to invest far greater – probably by many orders of magnitude – amounts of time, money and effort to develop the common question case for liability than he or she would spend to develop the same common questions in prosecuting the claim for an individual plaintiff (or any fraction of the class members) in a separate action. Indeed, the *qualitative* benefits of collectively litigating common question claims

for the class are not merely cumulative. They are synergistic. The whole of the potential aggregate investment and resulting aggregate net recovery from prosecuting all claims by class action exceeds the sum of the parts, the potential separate action investments for and resulting separate net recoveries from prosecuting each of the claims individually as solo actions. The upshot is that the court cannot directly and reliably extrapolate from what it might determine to be the reasonable, optimal investment on the identical common questions in a non-class action to what would be the reasonable optimal investment in a class action.

• Class actions are essential to civil liability serving as an effective and efficient means of enforcing the public policy objectives of deterring as well as compensating harm from violations of the law, such as the TCPA. Class counsel are appropriately assigned the law enforcement role of "private attorneys general," and history records their hard, and in many cases noble, work and achievements for the good of society. In class actions, as this case exemplifies, the deterrence benefit dominates. Despite the best notice and use of simplified claims process, the fact is that ultimately only some fraction of the class will find it rationally worthwhile to seek recovery from the common fund. As a result, most class members will not receive payments from the common fund. But this is not a social cost where, as here, class counsel performed their private attorneys general role to effectuate deterrence objectives by securing agreement from defendant precluding it from clawing back any of the fund, all of which will be paid out to claiming class members. This has the beneficial effect of ensuring deterrence regardless of the number of claiming class members.

The key point is that the private market for legal services, whether compensated on an hourly or contingent fee basis, will rarely involve the hiring and payment of a lawyer to provide the public good of deterrence. The public good of deterrence damages adds greatly to the class action stakes, to class counsel's investment incentives, and hence to the sufficient return need to motivate the optimizing investment. Because the private market generally does not supply that public good, it cannot provide a direct, reliable basis – certainly not without applying an appropriate multiplier factor to reflect the public good of deterrence – for judging class counsel's investments even when private parties are prosecuting and optimally funding prosecution of the same or similar claims.

5.      Determining the appropriate "multiplier" is a major, crucially important requisite for using the lodestar method, and certainly rivals and probably exceeds the costs of calculating the reasonable amount of time.

a.      Although the "multiplier" is at times considered a reward for counsel's diligent and productive services, its vital role is to provide class counsel ex ante with the necessary incentive to invest optimally in maximizing the net recovery of the class claim at trial. Class counsel's risk of failing to gain the expected sufficient, optimizing return on his or her investment directly relates to this purpose. The other factors typically considered in setting the multiplier, such as novelty and difficulty of the questions involved, skill requisite to perform the legal services properly, and preclusion of other employment by the attorney due to acceptance of the case, serve as proxies for gauging the risk of inadequate return on investment.

b.      Cost of calculating the multiplier is not a matter of deciding chances of non-recovery per se. Non-recovery is the pole point on the spectrum of potential outcomes. Given that increasing the level of investment increases the return but with diminishing

probability and the optimal net recovery investment lies along this spectrum, the object for the court is to choose the reciprocal of the probability that correlates with the maximizing level of investment. Compounding the complexity of this decision, as noted, the court must estimate the risk of failing to gain the optimizing return in light of the effects on that probability created by the defendant's countering, asymmetrically biasing investment.

      c.    This is not to suggest that non-recovery is an outside chance. Far from it. In class actions generally, including cases like this one, the chance of non-recovery is very high as a super majority of cases fail to be certified for class action treatment and few if any of the claims involved promise sufficient expected recovery to warrant prosecuting them as separate actions. The risk associated with class certification is greatly increased when it is conditioned on discovery and trial of central merits questions. Because FRCP Rule 23(b)(3) class certification can fail for any number of reasons, including the potential for exceptionally high damages or for a large number of mini-trials on damages, there is a substantial probability that class counsel will lose a very substantial investment on the merits questions, even though the class claim on those issues may well have prevailed at post-certification trial.

      d.    Thus the fact of recovery of a common fund in a pre- or post-certification settlement-only class action should not be counted directly in offsetting the risks of failing to recover the optimizing return. Without an appropriate multiplier – usually calculated as the reciprocal of the chance of recovering the optimizing return – to offset the risk of failing to win class certification, class counsel will have insufficient incentive to make the maximizing net investment, and consequently will likely discount the settlement demand accordingly.

      e.    The multiplier factor relating to forgoing other employment to prosecute the class action deserves particular attention in light of the defendant's incentives to game the

system..  A multiplier is required to blunt defendant's strategy of making an early low-ball offer that will result in an insufficiently compensatory lodestar fee.  If this strategy were left unchecked, defendants could use it to discourage high caliber lawyers from taking on class action work.

      3.      <u>Error:</u>

           a.      <u>Percentage method</u>

1.      Setting the percentage too low will undermine class counsel's incentive to invest optimally, defeating both society's interest in deterrence and the class interest in compensation.

2.      Setting the percentage too high may reduce compensation for the class.  But this depends on whether the resulting increased incentive to optimally invest in maximizing net recovery more than offsets the amount reallocated from the class to class counsel. It is purely an empirical question.  But setting the percentage too high will have nothing but positive results for society's deterrence objective.

           b.      <u>Lodestar method</u>

1.      Setting the lodestar and/or multiplier too low will undermine class counsel's incentive to invest optimally or, in many cases, to invest at all, thereby defeating both society's interest in deterrence and the class interest in compensation.

2.      Setting the lodestar and/or multiplier too high will probably result in a windfall for class counsel at the expense of the class.  No offsetting deterrence benefits should be expected as class counsel lacks the percentage fee incentive to invest the surplus return to enhance the probability of a class victory at trial, and will simply pocket the lodestar overpayment.

### c.      Undifferentiated versus Sliding Scale Percentage

1.      My opinion is that the undifferentiated percentage on the entire fund generally best minimizes the sum of social costs, notably error and administration, and is therefore preferable to using a sliding scale.  In this analysis, I assume that class counsel can make a number of marginal investments that correspondingly increase the marginal recovery but do so with decreasing probability of success.  The undifferentiated percentage applies across all marginal investments and returns; the sliding scale pegs different, decreasing percentages to particular points on the marginal investment spectrum

### 4.      Error costs

#### a.      Undifferentiated Percentage:

1.      Setting an undifferentiated percentage too low or high will have the same consequences as those noted above for error in using the percentage method generally.

#### b.      Sliding scale percentage:

1.      The main problem with the sliding scale percentage arises when it is set too low or at too low of a point on the spectrum of marginal investments. This error will discourage class counsel from making the optimal, net-recovery maximizing expenditures, resulting in diminished deterrence and compensation.

2.      Setting the sliding scale too high probably will not have any adverse effects for the reasons noted above relating to error in applying the percentage method generally. The main cost will be administrative; court and counsel will likely waste time and resources.

#### c.      Administrative costs

1.      Undifferentiated Percentage: The administrative costs of setting an undifferentiated percentage are obviously far lower than determining a sliding scale.

### d.   Sliding scale:

1.      It is well recognized that using this approach entails high administrative costs. The sliding scale must be set so that it does not diminish class counsel's overall incentive to invest optimally in maximizing net recovery from trial of the class claim. This requires the court to acquire knowledge of class counsel's investment options and decisions, and the huge amount of inside information that informs those judgments. In particular, to avoid error that undercuts those incentives, the court must possess a basic understanding of the salient points for accurately pegging and correctly calculating marginal percentages that will promise class counsel sufficient return to motivate making the optimal marginal investments.

2.      There is a generally unrecognized administrative cost. The main reason that marginal investments increase but at a declining rate and the marginal return is increasing but also at a declining rate is that the probability of winning marginally higher recovery is decreasing. Thus, in order to set a marginal percentage that promotes the social and class objectives through class counsel's optimizing investment, the court must apply and determine a marginal multiplier at each relevant point on the sliding scale to offset the corresponding decreased probability of recovering sufficient return to motive the optimal marginal investment and hence the optimal investment overall.

### C.   Applying the Percentage to the Total Common Fund including Notice and Settlement Administration Costs

1.      It is my opinion that the percentage awarded to class counsel as fees should be based on the entire common fund, including, rather than net of costs necessary for effecting reasonable notice and claims administration.

2.      Securing defendant's payment of reasonable notice and claims administration serves not only the compensation objective but also deterrence. These settlement and other

litigation costs are social costs attributable to the defendant's wrongdoing and it should be held responsible in damages for deterrence and compensation purposes. In addition, notice satisfying the requirements of due process can exert direct deterrence benefits by publicizing the defendant's wrongdoing with consequent effects on its reputation in the marketplace. Effective and efficient settlement notice and administration can also gain public support and legitimacy for the legal system and use of class actions as a means of enforcing the law. Class counsel should be compensated for producing these along with all of the other benefits from prosecuting the class claim.

3.      There are two basic reasons for not excluding notice and settlement administration costs from the common fund against which the percentage fee will be levied.

a.      Exclusion of notice and settlement administration costs which have been or will be paid from the common fund will undercut class counsel's incentive to invest optimally in maximizing the net recovery of damages from defendant at trial and hence in settlement. It would work a paradoxical result to thus undermine the class recovery (as well as society's deterrence objective) in the name of increasing it.

b.      Exclusion of such costs would also remove class counsel's percentage driven incentive to maximize return by most efficiently deploying available resources. Indeed, hiving off the settlement costs could create perverse incentives for class counsel to increase the share of the fund paying his or her fee by cutting to the bone expenditures on notice and claim administration. The consequence would be to put the full burden on the court to monitor and evaluate the reasonableness of class counsel's incurring common fund obligations to pay settlement and other expenses.

I declare under penalty of perjury under the laws of the State of Massachusetts that the foregoing is true and correct.

EXECUTED in Cambridge, Massachusetts on November 18, 2014.

David Rosenberg

# EXHIBIT A

Michael David Rosenberg
Lee S. Kreindler Professor of Law
1575 Massachusetts Ave. (Hauser Hall 500)
Cambridge MA 02138
Tel. 617-495-4558
Fax 617-496-6166
Email MDR@law.harvard.edu

**Bar Membership**: Massachusetts and New York, federal and state; Supreme Court of the United States

**Practice and Teaching Specialties**: tort law, labor law, constitutional law, federal jurisdiction, legal profession, civil procedure, and complex federal litigation

**Education**: New York University School of Law, N.Y.C., NY (J.D. 1967); American University, Washington D.C. (B.A. 1964)

**Professional Experience**:

*Employment*: Associate, Rabinowitz, Boudin & Standard, N.Y.C., NY (1967-1971); Teaching Fellow, Harvard Law School (1971-1974); Single legal practice, Boston, MA (1971-1974); Lecturer, Harvard Law School (1974-1979); Partner, Rosenberg, Baker & Fine, Cambridge, MA (1974-1979); Assistant Professor, Harvard Law School (1979-1983); Professor, Harvard Law School (1983- )

*Practice in major cases*:

As or with counsel of record—Bond v. Floyd, 385 U.S. 116 (1967);[1] O'Callahan v. Parker, 395 U.S. 258 (1969); United States v. Spock, 416 F.2d 165 (1st Cir. 1969); United States v. Ellsberg (1971); In re Stolar, 401 U.S. 23 (1971); Law Students Civil Rights Research Council v. Wadmond, 401 U.S. 154 (1971); Mandel v. Mitchell, 408 U.S. 753 (1972); Robison v. Johnson, 415 U.S. 361 (1974); Commonwealth v. Edelin, 359 N.E.2d 4 (Mass. 1976); Payton v. Abbott Laboratories, 83 F.R.D. 382 (D.Mass. 1979); National Coordinating Counsel for Plaintiffs in the DES litigation; Sindell v. Abbott Laboratories, 607 P.2d 924 (Cal. 1980); Richmond Newspapers v. Virginia, 448 U.S. 555 (1980); Grendel's Den v. Larkin, 459 U.S. 116 (1982); Hawaii Housing Authority v. Midkiff, 463 U.S. 1323 (1982); Cipollone v. Liggett Group, 112 S.Ct. 2608 (1992); Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786 (1992)

As expert consultant or witness—Walker v. Liggett Group, Inc. Civ. Act. No. 2:97-0102 (S.D. W. Va. (1997); Cox v. Shell Oil Company (Chan. Ct., Tenn. 1995); Price v. Ciba-Geigy Corporation (S.D. Ala. 1994); In the Matter of the Exxon Valdez (FERC 1994); Georgine v. Amchem Products, Inc., 157 F.R.D. 246 (E.D. Pa. 1994), and in Amchem Products, Inc. v. Windsor, 117 S.Ct. 2231 (1997); Bowling v. Pfizer, Inc., 143

---

[1] Pre-bar admission.

F.R.D. 141 (S.D. Ohio 1992); Manville Trust Reorganization (E.D.N.Y., AFL-CIO panel); Dairyland Ins. Co. v. Pfizer, Inc., Case No. 718166 (Super. Ct. Cal. 1993)

*Books, journal articles, and other scholarly publications:*

On Torts, Civil Liability Generally, Civil Process, and Related Topics—

40. (with Kathryn Spier) A Contest Model of Separate Action versus Class Action Litigation (forthcoming Journal of Legal Analysis)

39. (with Andrew English and Huaou Yan, A New Regulatory Funciton for E-prescriptions: Linking the FDA to Physicians and Patient Records, in compendium of papers presented at Petrie-Flom Conference on FDA in 21st Century (forthcoming Colum. U. Press 2014)

38. (with Kathryn Spier) On Structural Bias in the Litigation of Common Question Claims, available at http://ssrn.com/abstract=1950196

37. A Sampling-Based System of Civil Liability, 15 Theoretical Inquiries in Law 635 (2014)

36. (with David Korn) Concepcion's Pro-defendant Biasing of the Arbitration Process: The Class Counsel Solution, 46 U. Mich. J. L. Reform 1151 (2013)

35. (with Bruce Hay, Christopher Rendall-Jackson) Litigating BP's Contribution Claims in Publicly Subsidized Courts: Should Contracting Parties Pay Their Own Way?, 64 Vanderbilt L. Rev. 1919 (2011)

34. (with Kenneth Reinker) Improve Medical Malpractice Law by Letting Health Care Insurers Take Charge, 39 J. L. Med. & Ethics 3 (2011)

33. (with Luke McCloud) A Solution to the Choice-of-Law Problem of Differing State Laws in Class Actions: Average Law, 79 G.W. L. Rev. 374 (2011)

32. Collectivising Private Enforcement of Antitrust Law: A Reform Proposal for the United States and Possibly Beyond, 3 Global Competition Litigation Review 11 (2010)

31. (with Jaime Dodge) Collective Adjudication of Financial Services and Other Cross-Border Mass Injury Cases, 2010 European Journal of Consumer Law, pp. 141-177

30. (with Kenneth S. Reinker) Improving Medical Malpractice Liability by Allowing Insurers in Charge, 36 J. Legal Studies 261 (2007)

29. (with Robert J. Jackson, Jr.) A New Model of Administrative Enforcement, 93 Va. L. Rev. 1983 (2007)

28. The Judicial Posner on Negligence Versus Strict Liability: Indiana Harbor Belt Railroad Co. v. American Cyanamid Co., 120 Harv. L. Rev. 1210 (2007)

27. (with James Sullivan) Coordinating Private Class Action and Public Agency Enforcement of Antitrust Law, 2 J. Competition L. & Econ. 159 (2006) (also published in Canadian Class Action Review (2006); and Litigating Conspiracy: An Analysis of Competition Class Actions (Steven Pitel & Tom Telfer eds. 2006))

26. (with Steven Shavell), A Solution to the Problem of Nuisance Suits: The Option to Have the Court Bar Settlement, 26 Internat. Rev. L. & Econ. 42 (2006)

25. (with Steven Shavell) A Simple Proposal to Halve Litigation Costs in the United States, 91 VA. L. REV. 1721 (2005)

24. (with John Scanlon), Class Actions in Mississippi: To Be or Not to B(3), 26 Miss. College L. Rev. 153 (2005)

23. (with Randy Kozel), Solving the Nuisance-Value Settlement Problem: Mandatory Summary Judgment, 90 Va. L. Rev. 1849 (2004)

22. (with Charles Fried) MAKING TORT LAW: WHAT SHOULD BE DONE AND WHO SHOULD DO IT (2003)

21. Adding a Second Opt-Out to Rule 23(b)(3) Class Action: Cost Without Benefit, (2003 U. Chi. Legal Forum 19)

20. (published remarks) Symposium: Judge Jack B. Weinstein, Tort Litigation, and the Public Good, 12 J. Law & Pub. Policy 149 (2003)

19. Decoupling Deterrence and Compensation Functions in Mass Tort Class Actions for Future Loss, 88 Va. L. Rev. 1871 (2002)

18. Mandatory-Litigation Class Action: The Only Option for Mass Tort Cases, 115 Harv. L. Rev. 831 (2002);

17. The Regulatory Advantage of Mass Tort Class Action, in REGULATION BY LITIGATION (W. Kip Viscusi ed., 2002);

16. Mass Tort Class Action: A Social Welfare Perspective (Boston Bar Association, CLE 2001)

15. (published remarks) Symposium: Tort Liability, the Structural Constitution, and the States, 31 Seton Hall L. Rev. 563 (2001)

14. Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't, 37 Harv. J. Legis. 393 (2000)

13. (with Bruce Hay), Sweetheart and Blackmail Settlements in Class Actions: Reality and Remedy, 75 Notre Dame L. Rev. 1377 (2000)

12. Individual Justice and Risk-Based Claims in Mass Exposure Cases, 71 N.Y.U. L.Rev. 210 (1996)

11. THE HIDDEN HOLMES: HIS THEORY OF TORTS IN HISTORY (Harvard University Press, 1995)

10. Mass Torts and Collective Judicial Procedure, in ALI Reporters' Study, ENTERPRISE RESPONSIBILITY FOR PERSONAL INJURY: APPROACHES TO LEGAL AND INSTITUTIONAL CHANGE (1991)

9. Damage Scheduling in Mass Exposure Cases, 1 Courts, Health Science, and the Law 335 (1991)

8. Of End Games and Openings in Mass Tort Cases: lessons from a Special Master, 69 B.U. L. Rev. 695 (1989)

7. Class Actions for Mass Torts: Doing Individual Justice by Collective Means, 62 Ind.L.J.561 (1987)

6. Toxic Tort Crisis, 24 Houston L. Rev. 183 (1987)

5. Joint and Several Liability for Toxic Torts, 15 J. Hazardous Mat. 219 (1987)

4. The Uncertainties of Assigned Shares Tort Compensation: What We Don't Know Can Hurt Us, 6 Risk Analysis 363 (1986)

3. Book Review, The Dusting of America: A Story of Asbestos -- Carnage, Cover-up and Litigation, 99 Harv. L. Rev. 1693 (1986)

2. (with Steven Shavell), A Model in Which Suits are Brought for their Nuisance Value, 5 Int. Rev. L. & Eco. 3 (1985)

1. The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System, 97 Harv. L. Rev. 849 (1984)

   On other subjects—

5. "The Path Not Taken," in *The Path of the Law* After One Hundred Years, 110 Harv. L.Rev. 1044 (1997)

4. "Litigating Civil Rights and Liberties in the United States: A Vital but Flawed Enterprise," in LITIGATING THE VALUES OF A NATION: THE CANADIAN CHARTER OF RIGHTS AND FREEDOMS, 357 (J. Weiler & R. Elliot eds., 1986)

3. (with C. Nesson & J. Travaline), DISTRICT COURT TRIAL MANUAL, MASSACHUSETTS DEFENDERS COMMITTEE (1975)

2. A Form Book for Enjoining Undeclared Wars, (Book Review), 8 Harv. Civ. Rts.-Civ. Lib. L. Rev. 223 (1973)

1. Constitutional Limitations on the Process of Admission to the Bar, 23 N.Y.U. Intramural L. Rev. 135 (1968)

*Work in progress:*

24. (with Andrew English and Huaou Yan) A New Regulatory Function for E-Prescriptions: Linking the FDA to Physicians and Patient Records Available at SSRN: http://ssrn.com/abstract=2282701 or http://dx.doi.org/10.2139/ssrn.2282701

23. (with Kathy Spier) ON STRUCTURAL BIAS IN THE LITIGATION OF COMMON QUESTION CLAIMS" (2011) available at http://ssrn.com/abstract=1950196.

22. Private Enforcement of Antitrust Law by Collectivized Action (2009)

21. Recent Challenges to Antitrust Class Challenges to Antitrust Class Certification and Proposal for Overcoming Them by Returning to the Basics of Deterrence (2008)

20. A New Sampling Method for Reducing the Cost of Resolving Differing Claims against a Defendant (2008)

19. Collectivizing Adjudication of European Cross-Border Mass Injury Cases (2008)

18. Overcoming the Choice of Law Barrier to Multi-state Class Actions: A New Method of Sampling (2007)

17. Book Project: Doing Individual Justice by Collective Means: A General Theory and Model for Collectivized Adjudication of Mass Tort (and other Civil Liability Claims against Business and Government)

16. The Advantage of Random Adjudication of Defendant Liability on Multiple Claims

15. (with Jack Goldberg) A Heuristic View Point on the Making and Choice of Law in Mass Tort Cases

5

14. A New Method of Sampling to Eliminate Non-Common Question Barriers to Class Action Certification

13. Ex ante versus Ex Post Compensation in Civil Liability Cases

12. (with Matthew Macdonald) Why Courts Should Charge a User Fee for Adjudicating Business Disputes

11. (with Charlene Choi and Jonathan Krop) A Revamped System for Enforcing Securities Law

10. Optimizing Inter-generational Welfare-transfers Through the Market in Bond Financing

9. Real Contract Cases in Tort: How Courts Should Recognize and Resolve Them

8. Private and Public Financing of Election Campaigns By Means of Anonymous Individual Contributions

7. "Search Me": Selective Waiver of Fourth Amendment Restraints on National Security Investigations

6. On Mandatory Unionization

5. (with Andrew Oldham) The Scalar Dimension of Law Enforcement

4. Mass Production Goods, Torts, and Justice; The Problem of Opt-Out (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=354120, posted 2003)

3. Avoiding Duplicative Litigation of Similar Claims: The Superiority of Class Action vs. Collateral Estoppel vs. Standard Claims Market (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=354100, posted 2002)

2. Deregulating Insurance Subrogation: Towards an Ex Ante Market in Tort Claims (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=350940, posted 2002);

1.5 (with Bruce Hay), THE INDIVIDUAL JUSTICE OF AVERAGING (Harvard John M. Olin Discussion Paper Series No. 285, 2000) available at: http://ssrn.com/abstract=11336;

1. What Distributional Difference Can Rule Changes Make? (1989).

# EXHIBIT B

## Rosenberg Exhibit List-Capital One

| Docket No. | Document |
|---|---|
| 19 | Consolidated Master Class Action Complaint |
| 129 | Plaintiffs' Amended Memorandum in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement |
| 131 | Amended Declaration of Jonathan D. Selbin in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement |
| 131-1 | Exhibit 1 to Amended Declaration of Jonathan D. Selbin in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (Amended Settlement Agreement and Release) ("Settlement") |
| 137 | Order (1) Conditionally Certifying a Settlement Class, (2) Preliminarily Approving Class Action Settlement, (3) Approving Notice Plan, (4) Setting Final Approval Hearing |
| 176 | Memorandum in Support of Award of Attorneys' Fees and for Service Awards ("Fee Memorandum") |
| 176-1 | Memorandum in Support of Award of Attorneys' Fees and for Service Awards |
| 177 | Declaration of Jonathan D. Selbin in Support of Class Counsel's Motion for Attorneys' Fees and For Service Awards to the Class Representatives ("Declaration") |
| 191 | Objector Jeffrey T. Collins' Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support ("Collins Motion") |
| 191-1 | Objector Collins' Proposed First Set of Interrogatories to Plaintiffs |
| 195 | Objection of Krystal L. Nygaza ("Nygaza Objection") |
| 195-1 | Exhibit A to Objection of Krystal L. Nygaza |
| 195-2 | Exhibit B to Objection of Krystal L. Nygaza |
| 195-3 | Exhibit C to Objection of Krystal L. Nygaza |
| 196 | Objection of Antonia Carrasco ("Carrasco Objection") |
| 196-1 | Exhibit A to Objection of Antonia Carrasco |
| 196-2 | Exhibit B to Objection of Antonia Carrasco |
| 196-3 | Exhibit C to Objection of Antonia Carrasco |
| 197 | Objection of Jeffrey T. Collins to Proposed Settlement ("Collins Objection") |
| 202 | Objections of Vanessa Van Wieren to Proposed Settlement and Intent to Appear ("Van Wieren Objection") |
| 205 | Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay |
| 206 | Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay |
| 206-1 | Exhibit A to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In re Deepwater Horizon-Appeals of the Medical Benefits Class Action Settlement,* 13-30221, Appellant-Objectors' FRAP 42(b) Joint Motion to Dismiss |

| 206-2 | Exhibit B to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In re HP Inkjet Printer Litigation*, C-05-3580, Theodore H. Frank, Kimberly Schratwieser, and Adrian Monza's Objection to Proposed Settlement) |
|---|---|
| 206-3 | Exhibit C to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In re Classmates.com Consolidated Litig.*, 09-00045, Objection of Michael I. Krauss to Proposed Settlement and Proposed Attorneys' Fee Award) |
| 206-4 | Exhibit D to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*In Re Online DVD Rental Antitrust Litigation*, 09-md-2029, Theodore H. Frank's Objection to Proposed Settlement) |
| 206-5 | Exhibit E to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*Steinfeld v. Discover*, 12-CV-01118, Michael Barton's Objection to Settlement and Fee Request) |
| 206-6 | Exhibit F to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay, (2014-02-13 E-mail from Ted Frank to Jonathan Selbin re *Steinfeld v. Discover*) |
| 206-7 | Exhibit G to Declaration of Daniel M. Hutchinson in Support of Plaintiffs' Opposition to Objector Jeffrey T. Collins' Motion to Lift Stay (*Steinfeld v. Discover*, 12-CV-01118, Local Rule 7-12 Stipulation and Order) |
| 208 | Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-1 | Exhibit 1 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-2 | Exhibit 2 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-3 | Exhibit 3 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-4 | Exhibit 4 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-5 | Exhibit 5 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| 208-6 | Exhibit 6 to Objector Jeffrey T. Collins' Reply in Support of Motion to Lift Stay for Limited Discovery and Memorandum of Law in Support |
| - | 2014-10-30 Transcript of Proceedings |
| - | *In re Capital One TCPA Litigation* Weekly Settlement Statistics Report as of November 2, 2014 |
| 227 | Objection of Mary Smith Tweed ("Tweed Objection") |
| 345-2 | *Harris v. ComScore, Inc.* - Class Action Settlement Agreement |
| 358 | *Harris v. ComScore, Inc.* - Plaintiffs' Memorandum of Law in Support of Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award |
| 369 | *Harris v. ComScore, Inc.* - Plaintiffs' Final Judgment and Order of Dismissal With Prejudice |