**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHEILA ALLEN, individually and on behalf of all others similarly situated, | Case No. 13-cv-08285 |
| Plaintiff, | Assigned to the Honorable Rebecca R. Pallmeyer |
| v. | |
| JP MORGAN CHASE BANK, N.A., | Magistrate Judge Schenkier |
| Defendant. | |

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM OF LAW**

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF THE FACTS ........................................................................ 2

     A.    Procedural Background ........................................................................ 3

     B.    Discovery ............................................................................................. 4

     C.    The Parties' Mediation ....................................................................... 5

     D.    The Proposed Settlement .................................................................... 6

          1.    The Settlement Class............................................................... 6

          2.    Monetary Relief for Settlement Class Members.................... 6

          3.    *Cy Pres* Distributions ........................................................... 7

          4.    Class Release .......................................................................... 8

          5.    Class Representative Service Award ...................................... 8

          6.    Attorneys' Fees and Costs ..................................................... 9

          7.    Administration and Notice ................................................... 10

III.   FINAL APPROVAL IS WARRANTED.......................................................... 11

     A.    The Settlement Approval Process ..................................................... 11

     B.    Settlement is Fair, Reasonable, and Adequate, and Should be Approved........................................................................................... 12

          1.    The Strength of Plaintiff's Case............................................ 13

          2.    Continued Litigation is Likely to be Complex, Lengthy, and Expensive ...................................................................... 18

          3.    The Class Response Is Positive.............................................. 19

          4.    Class Counsel Strongly Endorse the Settlement.......................... 19

          5.    The Stage of the Proceedings and the Amount of Discovery Completed Supports Final Approval ........................................... 20

IV.   CONCLUSION.................................................................................................. 21

**Cases**

*Adams v. AllianceOne Receivables Mgmt.*
   No. 08-cv-248 (S.D. Cal. Sept. 28, 2012) ................................................................. 15

*Aliano v. Joe Caputo & Sons - Algonquin, Inc.*
   No. 09 C 910, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ..................... 17

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*
   616 F.2d 305 (7th Cir. 1980) .................................................................... 11, 13, 14

*Arthur v. Sallie Mae*
   No. C10-198, 2012 U.S. Dist. LEXIS 3313 (W.D. Wash. Jan. 10, 2012) ................. 15

*Boggess v. Hogan*
   410 F. Supp. 433, 438 (N.D. Ill. 1975) ..................................................................... 11

*Chapman v. First Index, Inc.*,
   No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556 (N.D. Ill. March 4, 2014) ............... 17

*Connor v. JPMorgan Chase Bank, N.A.,*
   No. 10 CV 01284 GPC BGS (S.D. Cal. Feb. 5, 2015) ............................................. 14

*Felzen v. Andreas*
   134 F.3d 873 (7th Cir. 1998) ..................................................................................... 11

*G.M. Sign, Inc. v. Brinks Manufacturing Co.*
   No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084 (N.D. Ill. March 4, 2014) ................. 17

*Goldsmith v. Technology Solutions Co.*
   No. 92 C 4374, 1995 U.S. Dist. LEXIS 15093, (N.D. Ill. Oct. 10, 1995) ................ 11

*Higginbotham v. Hollins*
   No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) ............... 16

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*
   270 F.R.D. 330 (N.D. Ill. 2010) ................................................................................ 13

*In re Cap. One*
   80 F. Supp. 3d 781 (N.D. Ill 2015) ............................................................................. 9

*In re Enhanced Recovery Co.*
   13-md-2398-RBD-GJK (M.D. Fla. July 29, 2014) .................................................... 15

*In re Mexico Money Transfer Litig.*
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) ...................................................................... 20

*In re Southwest Airlines Voucher Litig.* ...........................................................................................

    No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735 (N.D. Ill. Dec. 6, 2013) .............................. 19

*Isby v. Bayh,*

    75 F.3d 1191 (7th Cir. 1996) .................................................................................... 11, 13, 19

*Kramer v. Autobytel*

    No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) ........................ 14

*Malta v. Fed. Home Loan Mortg. Corp.*

    No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) ............................. 14

*McKinnie v. JP Morgan Chase Bank, N.A.*

    678 F. Supp. 2d 806 (E.D. Wis. 2009) .................................................................................. 20

*Phillips Randolph Enters., LLC v. Rice Fields*

    No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027 (N.D. Ill. Jan. 11, 2007) .................................. 18

*Savanna Group, Inc. v. Trynex, Inc.,*

    No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013) .................................. 17

*Schulte v. Fifth Third Bank,*

    805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................................................... 19

*Spokeo v Thomas Robbins*

    11-56843 (9th Cir. 2014) ...................................................................................................... 18

*Steinfeld v. Discover Fin. Svcs.*

    12-cv-01118 (N.D. Cal.) ...................................................................................................... 15

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.,*

    463 F.3d 646 (7th Cir. 2006) ............................................................................................... 13

**Statutes**

Telephone Consumer Protection Act,

    47 U.S.C. § 227(b)(1)(A) ........................................................................................................ 1

**Other Authorities**

Fed. R. Civ. P. 23(e)(2) ............................................................................................................. 12

*Petition for Rulemaking of ACA International*, CG Docket. No. 02-278

    dated January 31, 2014 ......................................................................................................... 16

*Petition of United Healthcare Services, Inc. for Expedited Declaratory Ruling*

    CG Docket No. 02-278, dated January 16, 2014 .................................................................. 16

**Rules**

Michael O'Rielly, FCC Commissioner, <u>TCPA: It is Time to Provide Clarity</u>,
  FCC Blog (Mar. 25, 2014)....................................................................................... 16

**Treatises**

4 *Newberg on Class Actions* §§ 11.25 and 11.41 (4th ed. 2002).......................................... 11, 12

*Manual for Complex Litig.*,
  at §§ 13.14, 21.312, 21.632, and 21.633 (Fourth) (2004)......................................... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff respectfully moves the Court for Final approval of the nationwide class action settlement ("Settlement") reached between Plaintiff Sheila Allen ("Plaintiff" or "Allen") and Defendant JPMorgan Chase Bank, N.A ("Defendant" or "Chase").  The proposed Settlement would resolve all claims in the above-entitled action.  Plaintiff alleges that Defendant called Plaintiff and Class Members on their cell phones by using an automatic telephone dialing system or an artificial or prerecorded voice without Plaintiff's or Class Members' prior express consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A).

Under the Settlement Agreement, Defendant is required to pay $10,200,000 into a settlement fund ("Fund"), an amount that is on par with recently approved similar class settlements involving claims under TCPA, and to which Chase itself is a party.  Eligible Class Members who file qualified claims will receive a pro rata cash payment from this Fund.  Not a single penny of the Fund will revert back to Defendant.

On May 19, 2015, the Court granted preliminary approval of the Settlement.  Dkt. No. 58. Per the Court-approved notice plan, direct individual notice of the Settlement was disseminated to 99.98% of Class Members.  *See* Declaration of Jeffrey Gyomber Concerning Claims, Opt-Outs, and Objections, ¶ 6, Dkt. 81 ("Gyomber Decl.").  In addition to the Court-approved plan, an additional email reminder was sent to 866,819 Class members near the end of the claims period. *Id,* at ¶¶11, 17.  A state-of-the-art, user-friendly claims process allowed Class Members to file claims through a simple claim form or an internet website, or a toll-free phone number.  To date over 84,000 persons have submitted claims forms, while just 40 persons have timely asked to be

excluded, and only 4 timely objected (two of which have since withdrawn their objections)[1]. *Id* at ¶¶ 20, 22; *see also* Dkt. 63, 66, 68, 75, 80. In other words, even including the two withdrawn objection, only 4 out of 2,078,559 persons objected, which is .000192% of the class. Plaintiff respectfully submits that the robust number of claims speaks to the effectiveness of the notice plan, and the ease and efficiency of the claims administration plan negotiated by Class counsel.

The overwhelmingly positive reaction from Class Members also underscores the value the Class places on the Settlement obtained. As the Court knows, the Settlement includes not just monetary relief, but also practice changes to prevent the conduct that gave rise to this case from recurring. It requires Defendant to stop the automated calls at the heart of this litigation to ensure compliance with the TCPA. In addition, Defendant will pay the total sum of $10,200,000 into a non-reversionary cash fund out of which claiming Class Members will be paid. Upon final approval, the net proceeds of the Settlement Fund will be distributed pro rata to every claimant; no money will revert back to Defendant. Plaintiff respectfully submit that this result is outstanding, particularly in view of the risks and delays involved in litigating the substantive merits of these claims, and the difficulties inherent in pursuing these claims individually for the overwhelming majority of Class Members.

For the foregoing reasons, and as detailed below, the Settlement meets the standards for final approval, and should therefore be approved.

## II.     STATEMENT OF THE FACTS

The Settlement must evaluated in light of the difficulties faced by the class at the time the Settlement was reached. This action involves sharply opposing positions on many issues, including

---

[1] The objections of the two withdraw objectors will still be addressed. In addition, two class members just sent in a note stating they object, but failed to file it as required.

three critical ones.  First, the parties disagreed whether the Federal Communications Commission (the "FCC") rulings for previous pending petitions on the definition of an autodialer, and whether there is a safe harbor for calls to reassigned numbers, would entirely foreclose Plaintiff's and Class Members' TCPA claims.

Second, the parties disagreed on whether the claims of certain Class Members are subject to arbitration agreements that Chase maintains would extinguish Class Members' ability to pursue their TCPA claims outside of the arbitration process. Finally, the parties also disagreed as to whether a class can be certified because of what Chase maintains are inherently individual issues among Class Members.  Despite these disagreements, the parties reached settlement after participating in a formal mediation before the Honorable Wayne R. Andersen (Ret.) of JAMS, as well as subsequent settlement discussions.

## A.    __Procedural Background__

On November 19, 2013, Plaintiff filed an amended class action complaint against Chase, JP Morgan Chase & Co., and Chase Auto Finance Corp.  Dkt. No. 5. Allen alleged that defendants made approximately 80 calls to her cell phone in under three months using an automatic dialing system or an artificial or prerecorded voice.  Dkt. No. 5, ¶ 10.  On May 12, 2014, after dismissal of two defendants, Allen filed her Second Amended Class Action Complaint (SAC) naming Chase as the sole defendant.  Dkt. No. 26-1.

On June 4, 2014, Chase filed its Answer and Affirmative Defenses to Allen's Second Amended Complaint. Dkt. No. 35.  Therein, Chase asserted defenses including that it had "prior express consent" within the meaning of the TCPA for all calls allegedly placed to Allen and the putative class, and it also asserted a constitutional challenge that TCPA damages violate the due process clause.  Dkt No. 35, p. 14-15

On July 21, 2014, Chase filed a motion to stay this case under the primary jurisdiction doctrine pending resolution of petitions currently before the Federal Communications Commission. Dkt. No. 36. This motion was denied. Dkt. No. 40.

On July 23, 2014, Judge Grady ordered Chase to provide Plaintiff with outstanding discovery about the class and set an evidentiary hearing on the matter for October 8, 2014, requiring Chase to provide a witness to testify as to any difficulties in providing the discovery. *Id.*

On September 16, 2014, this case was assigned to Judge Tharp who struck the evidentiary hearing and ordered a status report to be filed. As explained below, the evidentiary hearing was not needed at the time as Chase was supplementing its discovery responses as set forth below.

**B.    Discovery**

The Parties undertook extensive discovery, beginning with the exchange of initial disclosures pursuant to Fed. R. Civ. P. 26(a). Thereafter, the Court ordered that discovery be bifurcated and the parties concentrated on class discovery. Dkt. No. 23.

Plaintiff promulgated written discovery requests to Chase, including interrogatories and requests for production of documents. Throughout the discovery process, Counsel held several discovery conferences with Chase's counsel related to discovery and other issues. The discussions were thorough and, at many points, contentious, as the parties addressed all facets of discovery as well as their respective views on class certification and of Plaintiff's class TCPA claims.[2] On July 23, 2014, the Court ordered defendant to produce certain discovery information requested by Plaintiff. Dkt. No. 40. Chase responded to written discovery and produced thousands of pages of

---

[2] *See* Declaration of Keith J. Keogh at DKT. 59-1, ¶ 25 ("Keogh Decl."); *see also* Declaration of Alejandro Caffarelli at DKT 59-2, ¶¶ 11-12 ("Caffarelli Decl.").

relevant documents. Over a six-month period, Chase produced, and Plaintiff analyzed, the thousands of pages of documents requested.

In addition to the substantial written discovery, Plaintiff noticed the deposition of individuals designated by Chase under Fed. R. Civ. P. 30(b)(6). Plaintiff took the out-of-town depositions of several individuals employed by Chase who were knowledgeable about the actions underlying the Second Amended Complaint, including Chase's practices and procedures related to its telephone call campaigns. .

### C. The Parties' Mediation

On January 21, 2015, the parties participated in an in-person mediation session before the Honorable Wayne R. Andersen (Ret.) of JAMS.[3] Prior to the mediation, Chase and Plaintiff submitted detailed mediation briefs to Judge Andersen, setting forth their respective views on the strengths of their cases.[4] In connection with its mediation memorandum, Plaintiff's counsel obtained and submitted the expert report of Robert Biggerstaff relating to the methodology of analyzing and searching Chase's database in relation to the Class.[5] At mediation, the parties discussed their relative views of the law and the facts and potential relief for the proposed Class.[6]

Counsel exchanged counterproposals on key aspects of the Settlement. At all times, the settlement negotiations were highly adversarial, non-collusive, and at arm's length.[7] Although the mediation was very productive, it ended without a resolution. It was not until after a month of

---

[3] *Id.* ¶ 23.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *See Id.* ¶¶ 22-25.

additional negotiations that the parties reached an agreement in principal on February 19, 2015.[8]

The parties spent the next two and half months negotiating the details of the settlement agreement.[9]

### D. The Proposed Settlement

The Settlement's details are contained in the Agreement signed by the parties, a copy of which is attached as Exhibit 1. (Agreement).  The following summarizes the Agreement's terms:

#### 1. The Settlement Class

The Settlement Class is defined as follows:

> All persons within the United States who received a non-emergency telephone call from Chase's auto subline of business to the called party's cellular telephone, made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, on or after November 18, 2009 through and including the date of entry of the Preliminary Approval Order.

Agreement § II.A.26.[10]  Chase represents that the Class is comprised of approximately 2,250,154 people throughout the United States.

#### 2. Monetary Relief for Settlement Class Members

The Settlement requires Chase to create a non-reversionary Settlement Fund of $10,200,000.  Agreement § III.C.1.  Out of this Fund, eligible Settlement Class Members who file a qualified claim will receive a Cash Award in the form of a cash payment.  *Id.* § III.F.1.  The amount of each Class Member's Award will be based on a *pro rata* distribution, depending on the number of valid and timely claims.  *Id.* §§ III.F.1; II.F.2.  No amount of the Settlement Fund will revert to Defendant.  *Id.* § III.G.3.  The notice advised an estimate award per claim in the range of $45 to $55.  Based on the number of claimants, Class Counsel estimates that each claimant will be

---

[8] *Id.*, ¶ 24.

[9] *Id.*

[10] Excluded from the Settlement Class are the Judge to whom the Action is assigned and any member of the Judge's staff and immediate family. *Id.*

paid $70.25 after deductions for Court-approved attorneys' fees and costs, Court-approved incentive awards to the Plaintiff, and costs of notice and claims administration.

Checks for Cash Awards will be mailed within 45 days of the Effective Date[11] and will be valid for 120 days from the date of the check. *Id.* § III.G.1. If, after the expiration date of the settlement checks to Class Members, there remains enough money in the Settlement Fund to pay at least $10 to each Settlement Class Member who cashed his or her original check, a Second Distribution shall be made to those Settlement Class Members on a pro-rata basis. *Id*. § III.G.2. The Second Distribution checks shall be mailed within 90 days after expiration of the original checks and shall be valid for 120 days. *Id*.

### 3. *Cy Pres* **Distributions**

Plaintiff does not anticipate any *cy pres* because the Settlement provides that any uncashed checks will be redistributed to the class members who cashed their checks provided it is feasible to do so. However, if a nominal amount remains in the fund, it will be distributed *cy pres* to a charity approved by this Court. *Id.* § III.G.3. Accordingly, no amount of the Settlement Fund will revert to Defendants. *Id.* §§ III.C.1; III.G.3.

The parties were not able to agree on a *cy pres* recipient. If the Court believes a recipient should be selected now, Plaintiff suggests the National Consumer Law Center, and that the funds be earmarked for work associated with the FCC to protect consumer protections under the TCPA. In the last year alone, NCLC lead a coalition of consumer groups and argued against petitions filed by the banker's associations and debt collectors to weaken consumer protections. Plaintiff submits that money earmarked for this purpose is directly aligned with the class' interests, which is what a

---

[11] The Effective Date is the fifth business day after 1) the execution of the agreement; 2) the Court enters the Final Approval Order, without material change; and 3) final disposition of any related appeals. Agreement § II.A.11.

*cy pres* distribution is supposed to be. A letter from NCLC describing its work with the FCC and the TCPA is attached as *Exhibit 2*.

### 4. <u>Class Release</u>

In exchange for the benefits allowed under the Settlement, Class Members who do not opt out are deemed to have released claims concerning the practices at issue in this case. Specifically, they will release all claims "(a) that arise out of or are related in any way to the use by the Released Parties or anyone on their behalf of an "automatic telephone dialing system" and/or "an artificial or prerecorded voice" to make "calls" to cellular telephones… in connection with efforts to contact Settlement Class Members and/or (b) that arise out of or relate in any way to the administration of the Settlement." *Exhibit 1*. § III.H.

### 5. <u>Class Representative Service Award</u>

The parties did not agree on an service award for Plaintiff. Instead, the Settlement Agreement provides that Plaintiff will petition the Court for an service award. *Id.* § III.J. The Service Award shall be paid out of the Settlement Fund and is subject to this Court's approval. *Id.* Because Plaintiff allegedly received over 50 calls to her cellular telephone, was not a customer of Chase, and received calls after Chase was informed that it was calling the wrong number, and because Plaintiff passed on an individual offer to settle her case in favor of continuing to try to secure a recovery for the class, Plaintiff has requested an incentive award of $25,000.00. The class notice advised the class of Plaintiff's request. It is important to note that contrary to one of the objectors, who insinuated that Plaintiff may have been tempted to settle for herself at the expense of the class, the parties did not agree to any payment to Plaintiff, and Plaintiff actually declined the opportunity to settle for herself when she rejected Chase's prior offer. Additional briefing on this point is contained in Plaintiff's response to the objectors.

6.      **Attorneys' Fees and Costs**

The parties also did not agree on an attorney fees for Plaintiff's counsel. Prior to the Final Approval hearing and notice being sent out, Class Counsel applied to the Court for an award of attorneys' fees and costs. *Id*. § III.I. As was addressed in Class Counsel's motion for attorneys' fees, courts in this district commonly award 33% in common fund TCPA class settlements and it is appropriate to compensate Class Counsel in this amount here for the work they performed in procuring a settlement for the Class, as well as the work remaining to be performed in documenting the settlement, securing Court approval of the settlement, overseeing settlement implementation and administration, assisting Class Members, and obtaining dismissal.

It also should be noted that the enforceability of the Settlement is not contingent on Court approval of an award of attorneys' fees or costs. *Id*. Further, the notice to the class informed class members that Plaintiff's counsel will seek *up to* 33% of the class benefit and the motion attorney for fees noted that the exact amount would not be known until the costs of settlement administration were determined and deducted from the Settlement Fund. In other words, Class Counsel has never sought a fee award that included administration costs as a "benefit" to the class. In any event, the requested fee is well less than the 36% that Judge Holderman found appropriate in TCPA class actions of this size. *See In re Cap. One,* 80 F. Supp. 3d 781 at 807 (N.D. Ill 2015). Here, *after* deducting the notice and administration costs of $800,000 the requested fee of one third after administration costs equals $3,102,000 inclusive of class counsels costs. This is consistent with *Redman v. Radioshack Corp*., No. 14-1470, 2014 U.S. App. LEXIS 18181 (7th Cir. 2014). Additional briefing on the objections to the attorney fees is contained in Plaintiff's response to the objectors as well as their motion for attorney fees that was previously filed as well as posted on the settlement website.

7.    **Administration and Notice**

All costs of notice and claims administration has been advanced by Chase and credited against the Settlement Fund. *Exhibit 1*. §§ I.E; II.A.28; III.C.1. Pursuant to the Preliminary Approval Order, the Claims Administrator, Kurtzman Carson Consultants ("KCC") (1) issued Class Notice and claim forms; (2) set up and maintained the settlement website; (3) accepted and processed claim forms; (4) will issue settlement payments (if the settlement is granted final approval). *Id.* §§ II.A.4; III.D; III.E.1; III.E.2. Pursuant to the Agreement, Chase agreed to cooperate with the Claims Administrator to ensure that it has all of the information it needs to perform these tasks. *Id.* § III.D. Chase also agreed to be responsible for timely compliance with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715(b). *Id*. §§ II.A.1; III.E.3.

Chase timely provided the Class List to the Claims Administrator. *Id.* § III.D*; see also DKT 81* Gyomber Decl. ¶ 4. By July 6, 2015, the Claims Administrator issued the Class Notice via mail or email to all Class Members for whom Chase provided contact information. *Id.* § III.B.1; *see also* Gyomber Decl. ¶¶ 4-6, 9-12. Direct individual notice of the Settlement was disseminated to 99.98% of Class Members! *Id*. ¶ 6. In addition to the Court-approved plan, an email reminder was sent to 866,819 Class members near the end of the claims period. *Id,* at ¶¶11, 17. The Claims Administrator established and maintained a Settlement Website. *Id.* § III.E; Gyomber Decl. Dkt. 81, ¶ 8. The Settlement Website provided for online submission of claims and also included general information such as the Settlement Agreement, Website Notice, the Preliminary Approval motion and Order, the Claim Form (for anyone wanting to print a hard copy of and mail in the Claim Form); the operative Complaint; and Plaintiff's motion for attorney fees. *Id*. §§ II.A. 30-31; III.E.1-2. Gyomber Decl. ¶ 8.

## III.   FINAL APPROVAL IS WARRANTED

### A.   The Settlement Approval Process

Under Fed. R. Civ. P. 23(e)(1)(C), a court may approve a class action settlement if it is "fair, adequate, and reasonable, and not a product of collusion" There is usually a presumption of fairness when a proposed class settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experiences." H. Newberg, A. Conte, Newberg on Class Actions § 11.41 (4th ed. 2002); *Goldsmith v. Technology Solutions Co.*, No. 92 C 4374, 1995 U.S. Dist. LEXIS 15093, at \*10 n.2 (N.D. Ill. Oct. 10, 1995); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975).

As the Seventh Circuit has recognized, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases). The traditional means for handling claims like those at issue here—individual litigation—would unduly tax the court system, require a massive expenditure of public and private resources and, given the relatively small value of the claims of the individual Class

Members, would be impracticable. Thus, the proposed Settlement is the best vehicle for Class

Members to receive relief to which they are entitled in a prompt and efficient manner.

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step

procedure for approval of class action settlements:

> (1) Preliminary approval of the proposed settlement at an informal hearing;
>
> (2) Dissemination of mailed and/or published notice of the settlement to all affected class members; and
>
> (3) A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

This procedure, used by courts in this Circuit and endorsed by class action commentator Professor

Newberg, safeguards class members' due process rights and enables the Court to fulfill its role as

the guardian of class interests. 4 *Newberg* § 11.25.

The first two steps in this process have occurred. With this motion, Plaintiff respectfully

request that the Court take the third and final step in the process by granting final approval of the

Settlement.

> **B.**      **Settlement is Fair, Reasonable, and Adequate, and Should be Approved**

A proposed class action settlement should be approved if the Court, after allowing absent

class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and

adequate." Fed. R. Civ. P. 23(e)(2). When determining whether a settlement is ultimately fair,

reasonable and adequate at the final approval stage, courts in this Circuit consider the following

factors:

> (1) the strength of plaintiff's case compared to the terms of the proposed settlement;

(2) the likely complexity, length, and expense of continued litigation;

(3) the amount of opposition to settlement among affected parties;

(4) the opinion of competent counsel; and

(5) the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199. In reviewing these factors, courts view the facts "in a light most favorable to the settlement." *Isby*, 75 F.3d at 1199. In addition, courts "should not substitute [their] own judgment as to the best outcomes for litigants and their counsel." *Armstrong*, 616 F.2d at 315).

## 1.    The Strength of Plaintiff's Case

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

The Settlement requires Defendant to pay $10,200,000 into a Settlement Fund. Out of this Fund, all eligible Class Members will receive their *pro rata* share of cash payments. Agreement § III.F.1; III.F.2. The Settlement Fund is non-reversionary, ensuring that all or nearly all monetary benefits will go to Class Members—none of the Settlement Fund will return to Defendants. The Settlement Fund created by this Settlement is comparable to similar TCPA settlements, including one to which Chase is a party that was given final approval. Furthermore, the monetary amount achieved by the Settlement is an outstanding result for Class Members, particularly because TCPA

damages are purely statutory damages in that Class Members have hard to quantify out-of-pocket losses or other economic harm.

Class Counsel acknowledge that the $10,200,000 Fund does not constitute the full measure of statutory damages potentially available to the Class. This fact alone, however, should not weigh against final approval. "Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong*, 616 F.2d at 315. The Settlement was reached after extensive factual investigation and discovery of the claims and issues and after taking into consideration the risks involved in the actions, after extensive arm's-length negotiations presided by an experienced mediator and former judge. Further, the Settlement compares favorably to other TCPA class actions settlements. Courts have approved other TCPA class action settlements involving similarly large putative classes that achieved much smaller *pro rata* monetary recoveries.[12]

Indeed, courts have found similar TCPA class action settlements to meet the standards for preliminary approval and, as well as final approval. *Connor v. JPMorgan Chase Bank, N.A.*, No. 10 CV 01284 GPC BGS (S.D. Cal. Feb. 5, 2015)[13] (entering final approval of settlement

---

[12] *See, e.g., Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) (approving $12.2 million settlement to benefit 47 million class members); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving $17.1 million settlement to 5,887,508 class members; final approval granted at Dkt. No. 91); *Adams v. AllianceOne Receivables Mgmt. Inc.,* No. 08-cv-00248, Dkt. Nos. 116 & 137 (S.D. Cal. Sept. 28, 2012) (approving $9 million settlement to benefit 6,696,743 class members); *Palmer v. Sprint Nextel Corp.*, No. 09-cv-01211, Dkt. Nos. 84 & 91 (W.D. Wash. Oct. 21, 2011) (approving $5.5 million settlement to benefit 18.1 million class members).

[13] *Connor v. JPMorgan Chase Bank, N.A.*, No. 10 CV 01284 GPC BGS, Final Judgment and Order of Dismissal, Dkt No. 160 (S.D. Cal. Feb. 5, 2015)

providing slightly less than 2.5 million accounts for $11,268,058); *In re Capital One TCPA Litigation*, 12-cv-10064 (MDL No. 2416) (N.D. Ill. Holderman J.) (February 12, 2015 granting final approval were each class member would be awarded $39.66); S*teinfeld v. Discover Fin. Svcs*. 12-cv-01118 (N.D. Cal.) (Final Approval of $46.98 to each claimant); In fact, the relief available to each Settlement Class Member here easily surpasses the potential per-class-member benefit conferred in other TCPA class settlements that have received final approval. *See In re Enhanced Recovery Co.*, 13-md-2398-RBD-GJK (M.D. Fla. July 29, 2014) at DE 123, p. 1 (only injunctive relief for class) and ECF No. 124 (settlement granted final approval)[14].

The key here is that the Settlement provides class members with real monetary relief, despite the fact that this is a purely statutory damages case in which class members incurred nominal economic damages or whose actual damages (such as to the invasion of their privacy) are difficult or impossible to quantify.

For all of the above reasons, the monetary amount recovered through the Settlement—on par or exceeding many other TCPA settlements found to be fair, adequate, and reasonable—is an excellent result for the Class.

Plaintiff continues to believe that her claims against Defendant have merit and that she would make a compelling case if her claims were tried. Nevertheless, Plaintiff and the Class faced a number of difficult challenges if the litigation were to continue.

---

[14] *Grant v. Capital Mgmt. Servs.*, No. 10-cv-2471, 2014 U.S. Dist. LEXIS 29836 at *10 (S.D. Cal. Mar. 5, 2014) (injunctive relief only – no monetary relief to the class); *Spillman v. RPM Pizza, LLC*, No. 10-349, 2013 U.S. Dist. LEXIS 72947 at *2, *9 (M.D. La. May 23, 2013) ($9,750,000 to cover claims of over 1,400,000 class members); *Arthur v. Sallie Mae*, No. C10-198, 2012 U.S. Dist. LEXIS 3313 at *10, *20 (W.D. Wash. Jan. 10, 2012) (preliminarily approving settlement of $24,150,000 for class of 8,000,000 members), final approval granted at 2012 U.S. Dist. LEXIS 132413 (W.D. Wash Sept. 17, 2012); *Adams v. AllianceOne Receivables Mgmt.*, No. 08-cv-248 (S.D. Cal. Sept. 28, 2012) ($9 million for 6,079,411 class members, see DE 109 at 10, 116 at 6, and 137).

First, at the time the settlement was reached, the parties disagreed about the likelihood that the forthcoming FCC rulings on various petitions[15] would entirely foreclose Plaintiff's and Class Members' TCPA claims regarding calls made to a wrong party, or modify the definition of the term autodialer in a way that would exempt Chase's system. *See, e.g., Higginbotham v. Hollins*, No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) (staying litigation pending FCC's consideration of and rulings on TCPA petitions and citing cases granting similar stays); s*ee also* Michael O'Rielly, FCC Commissioner, TCPA: It is Time to Provide Clarity, FCC Blog (Mar. 25, 2014) (*available at* http://www.fcc.gov/blog/tcpa-it-time-provide-clarity) (asserting that "the FCC needs to address this inventory of petitions as soon as possible" as it has the "opportunity to answer important questions and much needed guidance on a variety of TCPA issues, including . . . whether consent can be inferred from consumer behavior or social norms . . . ."). The FCC did rule after preliminary approval and mostly took Plaintiff's position. However, that ruling is presently on appeal before the D.C. Circuit with a large number of industry groups and large businesses joining the appeal. As such, the ultimate resolution is far from certain.[16]

Second, Chase maintains that certain individuals within the class are Chase customers who are bound by arbitration agreements. Chase maintains that such agreements extinguish these individuals' ability to pursue their TCPA claims outside of the arbitration process.

Third, the parties also disagree as to whether a class can be certified because of what Chase maintains are inherently individual issues among Class Members. This includes whether certification would be appropriate in the face of issues relating to arbitration agreements and prior

---

[15] *See Petition of United Healthcare Services, Inc. for Expedited Declaratory Ruling*, CG Docket No. 02-278, dated January 16, 2014; *Petition for Rulemaking of ACA International*, CG Docket. No. 02-278, dated January 31, 2014
[16] Keogh Decl. ¶¶ 30-34; Caffarelli Decl. ¶¶ 17-18, 24-27.

express consent. While Plaintiff continue to believe that class certification would be achievable, Chase asserted that class certification would be inappropriate due to the question of whether Class Members consented to the calls at issue. "Courts are split on whether the issue of individualized consent renders a TCPA class uncertifiable on predominance and ascertainability grounds, with the outcome depending on the specific facts of each case." *Chapman v. First Index, Inc*., No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556, at *6-7 (N.D. Ill. March 4, 2014) (citing cases). For example, in *Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, at *49 (N.D. Ill. Jan. 4, 2013), the court granted class certification and rejected the defendant's argument that questions of consent caused individual issues to predominate, noting that the defendant had not offered evidence tending to show that any particular class member consented to the faxes at issue, whereas in *G.M. Sign, Inc. v. Brinks Manufacturing Company*, No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084, at *7-10 (N.D. Ill. March 4, 2014), the court declined to certify a class, finding that the defendant offered evidence illustrating that consent could not be shown with common proof. If Chase were able to present convincing facts to support its position, there is a risk that the Court would decline to certify the class, leaving only the named Plaintiff to pursue her individual claims.

Fourth, even if the class were to litigate the case to judgment, there is no guarantee that they would recover the full statutory damages permitted by the TCPA. At least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards—even after a plaintiff has prevailed on the merits—on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons - Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323, *13 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's

due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *but see Phillips Randolph Enters., LLC v. Rice Fields*, No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027, *7-8 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.").

Finally, there remains a risk of losing a jury trial. And, even if Plaintiff did prevail at trial, any judgment could be reversed on appeal[17].

Given these significant hurdles as compared against the settlement amount and comparable TCPA settlements described above that were granted final approval, the strength of case versus settlement about factor weighs in favor of final approval.

### 2. Continued Litigation is Likely to be Complex, Lengthy, and Expensive

Litigation would be lengthy and expensive if this action were to proceed. Although the parties engaged in significant discovery efforts, continued litigation would involve extensive motions practice, including Plaintiff's motion for class certification. In addition, Defendant might bring a motion for summary judgment. The parties might also further engage additional experts to analyze Chase's call data. It is likely to be more than a year before the case would proceed to trial. And any judgment in favor of Class Members could be further delayed by the appeal process. Instead of facing the uncertainty of a potential award (or loss) years from now, the Settlement allows Plaintiff and Class Members to receive immediate and certain relief. *See, e.g., Schulte v.*

---

[17] There is also a risk that the Supreme Court will hold that statutory damage class actions lack Article III standing. This issue is before the Court in *Spokeo v Thomas Robbins*, 11-56843 (9th Cir. 2014) (cert. granted April 27, 2015). Because there are concrete damages to calling a persons' cellular telephone, Plaintiff does not believe that an adverse ruling in *Spokeo* would impact TCPA cases, but it is possible.

*Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (citation omitted) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.") This factor weighs in favor of final approval.

### 3. The Class Response Is Positive

Class Members' response to the Settlement has been overwhelmingly positive. The deadline for Class Members to submit claims was September 4, 2015. 84,727 persons have submitted claims and only 40 persons requested exclusion. (Gyomber Decl., Dkt¶¶ 20, 22.) Only 4-6 Class Members of the more than 2 million Class Members objected to the settlement. *Id. See also* Dkt. Dkt. 63, 66, 68, 75, 80. Many of these objections were submitted by so-called "professional" or "serial" objectors who regularly make objections to class action settlements for their own pecuniary gain. *See* Class Counsel's Response to Objections, filed concurrently herewith. This factor therefore favors final approval. *See, e.g., Isby* 75 F.3d at 1200 (affirming final approval of settlement where 13% of the class submitted written objections); *In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *21 (N.D. Ill. Dec. 6, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement"). Two of the objectors have since withdrawn their objections. Thus, only .00019 of the class objected. This weighs in favor of final approval.

### 4. Class Counsel Strongly Endorse the Settlement

Class Counsel and Plaintiff strongly endorse this Settlement.[18] Class Counsel's opinion on the Settlement is entitled to great weight, particularly because: (1) Class Counsel are competent and experienced in class action litigation (particularly in similar TCPA class action cases)[19]; (2)

---

[18] Keogh Decl. ¶ 37; Caffarelli ¶¶ 11-12, 30.
[19] *Id.* ¶¶ 1-21.

Class Counsel engaged in formal and informal discovery, and exhaustively evaluated the claims in the context of settlement negotiations[20]; and (3) the Settlement was reached after arm's-length negotiations between experienced counsel, and a robust mediation session before an experienced mediator and former federal judge.[21]  *See McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval."); *see also In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").  This factor therefore weighs in favor of final approval.

### 5. The Stage of the Proceedings and the Amount of Discovery Completed Supports Final Approval

The Settlement was informed by Class Counsel's thorough litigation and analysis of the factual and legal issues involved.  Before and throughout the mediation process, Chase also voluntarily provided Class Counsel with, and Class Counsel reviewed, the information relating to the Class and other information necessary to confirm that the Settlement is fair, reasonable, and adequate.[22]  Settlement negotiations were hard-fought, at arm's length and, once again, conducted under the supervision of Judge Andersen at JAMS. .[23]  Thereafter, the parties spent numerous hours negotiating the final settlement terms and drafting the Settlement Agreement.[24]

---

[20] *Id*. ¶ 22.
[21] *Id.* ¶¶ 23-24.
[22] *Id*. ¶ 25.
[23] *Id*. ¶ 23.
[24] *Id*. ¶ 24.

Accordingly, the final terms of Settlement were agreed to only after Class Counsel thoroughly vetted the claims and potential damages through the exchange of both informal and formal discovery and participated in lengthy arm's-length negotiations. This factor also weighs in favor of the final approval.

## IV.     CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully request that the Court enter an Order granting final approval of the Settlement.

Dated: October 7, 2015

Respectfully Submitted,

By: */s/ Keith J. Keogh*

Keith J. Keogh
Timothy Sostrin
Michael Hilicki
Keogh Law, Ltd.
55 W. Monroe St., Ste. 3390
Chicago, IL 60603
P: 312.726.1092

Alejandro Cafferelli, #06239078
Lorraine T. Peeters, #06290434
Caffarelli & Associates Ltd.
214 South Michigan Ave., Ste. 300
Chicago, IL 60604
Telephone: 312-763-6880
Email: alex@caffarelli.com