# EXHIBIT "A"

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HARRY DENNIS; JON KOZ, on behalf of themselves and all others similarly situated,<br>　　*Plaintiffs-Appellees,*<br>STEPHANIE BERG,<br>　　*Objector-Appellant,*<br>　　v.<br>KELLOGG COMPANY, a Delaware corporation,<br>　　*Defendant-Appellee.* | No. 11-55674<br>D.C. No.<br>3:09-cv-01786-<br>IEG-WMC |
| HARRY DENNIS; JON KOZ, on behalf of themselves and all others similarly situated,<br>　　*Plaintiffs-Appellees,*<br>OMAR RIVERO,<br>　　*Objector-Appellant,*<br>　　v.<br>KELLOGG COMPANY, a Delaware corporation,<br>　　*Defendant-Appellee.* | No. 11-55706<br>D.C. No.<br>3:09-cv-01786-<br>IEG-WMC<br>ORDER AND OPINION |

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted
June 7, 2012—Pasadena, California

10527

Filed September 4, 2012

Before: Stephen S. Trott and Sidney R. Thomas,
Circuit Judges, and Kevin Thomas Duffy, District Judge.*

Opinion by Judge Trott

---

*The Honorable Kevin Thomas Duffy, United States District Judge for the Southern District of New York, sitting by designation.

## COUNSEL

Joseph Darrell Palmer and Janine R. Menhennet, Law Offices of Darrell Palmer PC, Solana Beach, California, and Christopher A. Bandas, Bandas Law Firm, P.C., Corpus Christi, Texas, for the objectors-appellants.

Timothy G. Blood, Blood Hurst & O'Reardon LLP, San Diego, California, for the plaintiffs-appellees.

Kenneth K. Lee, Jenner & Block LLP, Los Angeles, California, and Richard P. Steinken, Jenner & Block LLP, Chicago, Illinois, for the defendant-appellee.

## ORDER

The Opinion filed July 13, 2012, slip op. 8109, and appearing at 2012 WL 2870128 (9th Cir. 2012), is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

With the Opinion withdrawn, the Plaintiffs-Appellees' petition for rehearing and petition for rehearing en banc are moot. The parties may file a petition for rehearing or a petition for rehearing en banc regarding the Opinion filed concurrently with this Order.

## OPINION

TROTT, Circuit Judge:

Most cases in our judicial system never make it to trial. Litigants often find it advantageous to secure a resolution more quickly by settling the case and negotiating a result the parties can tolerate, even though neither side can call it a total win.

Case: 1:13-cv-08285 Document #: 101-1 Filed: 11/10/15 Page 5 of 19 PageID #:1655
Case: 11-55706 09/04/2012 ID: 8308476 DktEntry: 53-1 Page: 4 of 18

DENNIS v. KELLOGG COMPANY 10531

Normally, that is the end of the story, and the parties walk away — not entirely happy, but not entirely unhappy either.

In a class action, however, any settlement must be approved by the court to ensure that class counsel and the named plaintiffs do not place their own interests above those of the absent class members. In this false advertising case, we confront a class action settlement, negotiated prior to class certification, that includes *cy pres* distributions of money and food to unidentified charities. It also includes $2 million in attorneys' fees while offering class members a sum of (at most) $15.

After carefully reviewing the class settlement, we conclude that it must be set aside. The district court did not apply the correct legal standards governing *cy pres* distributions and thus abused its discretion in approving the settlement. The settlement neither identifies the ultimate recipients of the product and cash *cy pres* awards nor sets forth any limiting restriction on those recipients, other than characterizing them as charities that feed the indigent. To the extent that we can meaningfully review such distributions where the parties fail to identify the recipients, we hold that both *cy pres* portions of the settlement are not sufficiently related to the plaintiff class or to the class's underlying false advertising claims. Moreover, the $5.5 million valuation the parties attach to the product *cy pres* distribution is, at best, questionable. We therefore reverse the district court's approval of the settlement, vacate the judgment and the award of attorneys' fees, and remand for further proceedings consistent with this opinion.

I

BACKGROUND

In January 2008, Kellogg Co., the maker of Frosted Mini-Wheats cereal, began a marketing campaign that claimed the cereal was scientifically proven to improve children's cogni-

10532　DENNIS v. KELLOGG COMPANY

tive functions for several hours after breakfast. Obviously aimed at parents of school-age children, Kellogg's advertisements allegedly included the following statements:

- "Does your child need to pay more attention in school? . . . A recent clinical study showed that a whole grain and fiber-filled breakfast of Frosted Mini-Wheats® helps improve children's attentiveness by nearly 20%."

- "Kellogg recently commissioned research to measure the effect on kids of eating a breakfast of Frosted Mini-Wheats® cereal. An independent research group conducted a series of standardized, cognitive tests on children ages 8 to 12 who ate either a breakfast of Frosted Mini-Wheats® cereal or water. The result? The children who ate a breakfast of Frosted Mini-Wheats® cereal had a nearly 20% improvement in attentiveness."

- "Based upon independent clinical research, kids who ate Kellogg's® Frosted Mini-Wheats® cereal for breakfast had up to 18% better attentiveness three hours after breakfast than kids who ate no breakfast."

According to a declaration submitted by lead counsel for the plaintiff class, counsel began investigating these marketing claims and, in April and May 2009, drafted a class action complaint on behalf of Ohio resident Jon Koz, alleging violations of Ohio consumer protection laws. Around the same time, another law firm was investigating the same marketing claims on behalf of California resident Harry Dennis. Although Mr. Koz never filed his Ohio complaint, Mr. Dennis filed suit in August 2009 against Kellogg in the United States District Court for the Southern District of California, alleging violations of that state's Unfair Competition Law (UCL) and asserting a claim of unjust enrichment.

Case: 1:13-cv-08285 Document #: 101-1 Filed: 11/10/15 Page 7 of 19 PageID #:1657
Case: 11-55706  09/04/2012  ID: 8308478  DktEntry: 53-1  Page: 6 of 18

DENNIS v. KELLOGG COMPANY                 10533

Sometime prior to January 2010, counsel for Koz and counsel for Dennis discovered they were involved in similar activities and decided to join forces. Because informal settlement attempts were unsuccessful, counsel for the consumers and for Kellogg participated in a day-long mediation session with Martin Quinn of JAMS, a well-established alternative dispute resolution firm. As a result of this mediation session and numerous other settlement discussions, the parties agreed, in principle, to settle the case.

Meanwhile, the Dennis lawsuit had been gathering dust. On June 22, 2010, the district court notified the parties of its intent to dismiss the case for lack of prosecution. Koz and Dennis immediately filed a joint amended class action complaint.

In their amended complaint, the named plaintiffs ("Plaintiffs") asserted that Kellogg's marketing claims regarding the effect of Frosted Mini-Wheats on children's attentiveness were false, that the study upon which these results were based did not support the company's claims, and that the study was not scientifically valid. The Plaintiffs asserted unjust enrichment, claims under the UCL and California's Consumer Legal Remedies Act (CLRA), and claims under "similar laws of other states."

Over the next three months, the parties continued to work out the details of their settlement. Ultimately, they agreed to settle the case on the following terms:

- Kellogg agreed to establish a $2.75 million settlement fund for distribution to class members on a claims-made basis. Class members submitting claims would receive $5 per box of cereal purchased, up to a maximum of $15. Any remaining funds would not revert to Kellogg, but would instead be donated to unidentified "charities chosen by the parties and approved by the Court pur-

Case: 1:13-cv-08285 Document #: 101-1 Filed: 11/10/15 Page 8 of 19 PageID #:1658
Case: 11-55706  09/04/2012  ID: 8308478  DktEntry: 53-1  Page: 7 of 18

10534　　　　DENNIS v. KELLOGG COMPANY

suant to the *cy pres* doctrine. . . . If the total amount of eligible claims exceeds the Settlement Fund, then each claim's award shall be proportionately reduced."

- Kellogg agreed to distribute, also pursuant to the *cy pres* doctrine, $5.5 million "worth" of specific Kellogg food items to charities that feed the indigent. The settlement does not specify the recipient charities, nor does it indicate how this $5.5 million in food will be valued — at cost, wholesale, retail, or by some other measure.

- Kellogg agreed that for three years, it would "refrain from using in its advertising and on its labeling for the Product any assertion to the effect that 'eating a bowl of Kellogg's® Frosted Mini-Wheats cereal for breakfast is clinically shown to improve attentiveness by nearly 20%.' " Kellogg would still be allowed to claim that "[c]linical studies have shown that kids who eat a filling breakfast like Frosted Mini-Wheats have an 11% better attentiveness in school than kids who skip breakfast."

- Kellogg agreed to pay class counsel's attorneys' fees and costs "not to exceed a total of $2 million." Class counsel eventually requested the full $2 million in fees and costs.[1]

- The Plaintiffs agreed to release all claims arising out of the challenged advertising.

Together with notice and administrative costs approximated at

---

[1] Although the district court's order listed the attorneys' fees as $2.4 million, all parties agree that the correct figure is $2 million.

$391,500, the parties value the settlement, or the constructive common fund, at $10,641,500.

The claims period has now closed. Although there is nothing in the record to indicate how many class members submitted claims, class counsel represented at oral argument that the claims submitted total approximately $800,000.

On the Plaintiffs' motion, the district court certified the class — defined as "[a]ll persons or entities in the United States who purchased the Product" during the settlement class period — granted preliminary approval of the settlement, and approved the proposed class notice. Because Kellogg sells its products to wholesalers, not directly to consumers, there was no way to identify each member of the class. Therefore, the class notice was published in *Parents* magazine and other "targeted sources based on market research about consumers who purchased the products," including 375 websites.

Two class members objected to the settlement: Stephanie Berg and Omar Rivero (Objectors). As relevant to this appeal, the Objectors argued that the settlement's use of *cy pres* relief was improper because "the only relationship between this lawsuit and feeding the indigent is that they both involve food in some way." They argued also that the *cy pres* distributions would benefit class counsel and Kellogg, but not the class members, because class members "have no idea how their funds might be used or in whose hands their monies will end up." Finally, the Objectors argued that the attorneys' fees — which represented approximately 19% of a common fund allegedly worth over $10.64 million — were excessive. The district court approved the class settlement and dismissed the case with prejudice. In doing so, however, the court did not address the Objectors' argument that the *cy pres* distributions were too remote from the class members and were not sufficiently related to their UCL and CLRA claims. The court also approved the requested attorneys' fees, stating that the fees were

fair and reasonable in light of the results achieved, the risks of litigation, the skill required and the quality of work, the contingent nature of the fee, the burdens carried by class counsel, and the awards made in similar cases. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). Accordingly, the objections are overruled.

The Objectors timely appealed.

## II

## STANDARD OF REVIEW

The settlement of a class action must be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). "We review a district court's approval of a proposed class action settlement, including a proposed *cy pres* settlement distribution, for abuse of discretion. A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) (internal citations omitted).

Appellate review of a settlement agreement is generally "extremely limited." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). But where, as here, class counsel negotiates a settlement agreement before the class is even certified, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). In such a case, settlement approval "requires a higher standard of fairness" and "a more probing inquiry than may normally be required under Rule 23(e)." *Hanlon*, 150 F.3d at 1026. "To survive appellate review, the district court must show it has explored comprehensively all factors," *id.*, and must give "a reasoned response" to all non-frivolous

objections, *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982).

## III

## DISCUSSION

### The *Cy Pres* Distributions of Food and Unclaimed Funds

#### A.

As a preliminary matter, Plaintiffs argue that we must refrain from addressing the validity of the *cy pres* doctrine with respect to the cash settlement fund. They assert that this issue will not be ripe until it is determined that available cash remains in that fund after the claims process has concluded. They rely on *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009), where we declined for this reason to take on this issue. However, *Rodriguez* is distinguishable for two reasons.

First, the deadline here for the submission of claims was June 3, 2011, a date long since past. The Declaration dated October 10, 2011 of Lance P. Blair, the claims administrator, advised the district court that money "will remain in the settlement fund for a *cy pres* distribution after the payment of all claims."

Second, as noted earlier, Plaintiffs' counsel represented during oral argument that the claims submitted totaled roughly $800,000, leaving almost $2 million in the settlement fund for *cy pres* distribution, plus any accumulated interest.

Accordingly, we deem this issue ripe for determination.

#### B.

[1] *Cy pres* is shorthand for the old equitable doctrine "*cy près comme possible*" — French for "as near as possible."

10538               DENNIS v. KELLOGG COMPANY

Although the doctrine originated in the area of wills as a way to effectuate the testator's intent in making charitable gifts, federal courts now frequently apply it in the settlement of class actions " 'where the proof of individual claims would be burdensome or distribution of damages costly.' " *Nachshin*, 663 F.3d at 1038 (quoting *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990)). Used in lieu of direct distribution of damages to silent class members, this alternative allows for "aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class." *Six Mexican Workers*, 904 F.2d at 1305. To ensure that the settlement retains some connection to the plaintiff class and the underlying claims, however, a *cy pres* award must qualify as "the next best distribution" to giving the funds directly to class members. *Id.* at 1308 (internal quotation marks omitted).

[2] Not just any worthy recipient can qualify as an appropriate *cy pres* beneficiary. To avoid the "many nascent dangers to the fairness of the distribution process," we require that there be "a driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Nachshin*, 663 F.3d at 1038. A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," *id.* at 1039, and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers*, 904 F.2d at 1308. Thus, in addition to asking "whether the *class settlement*, taken as a whole, is fair, reasonable, and adequate to all concerned," we must also determine "whether the *distribution* of the approved class settlement complies with our standards governing *cy pres* awards." *Nachshin*, 663 F.3d at 1040 (internal quotation marks omitted).

A review of our relevant precedent reveals that the settlement here fails to satisfy those standards. In *Six Mexican Workers v. Arizona Citrus Growers*, a class of undocumented Mexican farm workers sued various companies for violations of the Farm Labor Contractor Registration Act. 904 F.2d at

Case: 1:13-cv-08285 Document #: 101-1 Filed: 11/10/15 Page 13 of 19 PageID #:1663
Case: 11-55706  09/04/2012  ID: 8308478  DktEntry: 53-1  Page: 12 of 18

DENNIS v. KELLOGG COMPANY                 10539

1303. After a bench trial, the district court found the defendants liable for over $1.8 million, which we later reduced to $850,000, in statutory damages. *Id.* at 1303-04, 1310. The district court identified the Inter-American Fund, which provided humanitarian aid in Mexico, as the *cy pres* recipient of any unclaimed funds. *Id.* at 1304.

We held that the *cy pres* distribution was an abuse of discretion because there was "no reasonable certainty" that any class member would benefit from it, even though the money would go "to areas where the class members may live." *Id.* at 1308. The choice of charity and its relation to the class members and class claims — or lack thereof — figured heavily in our analysis. The purpose of the statute was to compensate victims of unscrupulous employers and to deter future violations, but the Inter-American Fund was "not an organization with a substantial record of service nor [was] it limited in its choice of projects," and any distribution would therefore have required court supervision "to ensure that the funds [were] distributed in accordance with the goals of the remedy." *Id.* at 1309. Because "the district court's application [of the cy pres doctrine] was inadequate to serve the goals of the statute and protect the interests of the silent class members," we reversed the *cy pres* distribution. *Id.* at 1312.

We recently came to a similar conclusion in *Nachshin v. AOL, LLC*. In that case, AOL was accused of violating a number of statutes, including the UCL and the CLRA, by wrongfully inserting commercial footers into the plaintiffs' outgoing emails. 663 F.3d at 1036. Because damages would be small and distribution to the class prohibitively expensive, AOL agreed, as part of a class settlement, to make substantial donations to three charities: the Legal Aid Foundation of Los Angeles, the Federal Judicial Center Foundation, and the Los Angeles and Santa Monica chapters of the Boys and Girls Club of America. *Id.* at 1037.

We held that the *cy pres* distribution "fail[ed] to target the plaintiff class, because it d[id] not account for the broad geo-

graphic distribution of the class." *Id.* at 1040. The class included over 66 million AOL users across the country, but two-thirds of the donations were slated for Los Angeles charities. Further, although the donation to the Federal Judicial Center Foundation "at least conceivably benefit[ed] a national organization," the Foundation "ha[d] no apparent relation to the objectives of the underlying statutes, and it [wa]s not clear how this organization would benefit the plaintiff class." *Id.* We noted, however, that it would not be difficult for the parties to come up with an appropriate charity if they wished to do so:

> It is clear that all members of the class share two things in common: (1) they use the internet, and (2) their claims against AOL arise from a purportedly unlawful advertising campaign that exploited users' outgoing e-mail messages. The parties should not have trouble selecting beneficiaries from any number of non-profit organizations that work to protect internet users from fraud, predation, and other forms of online malfeasance.

*Id.* at 1041. In approving the *cy pres* distribution to charities that had no relation to the class or to the underlying claims, the district court "applied the incorrect legal standard" and abused its discretion. *Id.* at 1040.

[3] The *cy pres* awards in the settlement here are likewise divorced from the concerns embodied in consumer protection laws such as the UCL and the CLRA. As California courts have stated, "[t]he UCL is designed to preserve fair competition among business competitors and protect the public from nefarious and unscrupulous business practices," *Wells v. One2One Learning Found.*, 10 Cal. Rptr. 3d 456, 463-64 (Ct. App. 2004), *rev'd in part on other grounds*, 141 P.3d 225 (Cal. 2006), and the purpose of the CLRA is similarly "to protect consumers against unfair and deceptive business practices," Cal. Civ. Code § 1760. Although there is no way to

identify either the product or the cash *cy pres* beneficiaries from this record, we do know that according to the settlement, any charity to receive a portion of the *cy pres* distributions will be one that feeds the indigent. This noble goal, however, has "little or nothing to do with the purposes of the underlying lawsuit or the class of plaintiffs involved." *Nachshin*, 663 F.3d at 1039.

[4] At oral argument, Kellogg's counsel frequently asserted that donating food to charities who feed the indigent relates to the underlying class claims because this case is about "the nutritional value of food." With respect, that is simply not true, and saying it repeatedly does not make it so. The complaint nowhere alleged that the cereal was unhealthy or lacked nutritional value. And no law allows a consumer to sue a company for selling cereal that does not improve attentiveness. The gravamen of this lawsuit is that Kellogg *advertised* that its cereal *did* improve attentiveness. Those alleged misrepresentations are what provided the Plaintiffs with a cause of action under the UCL and the CLRA, not the nutritional value of Frosted Mini-Wheats. Thus, appropriate *cy pres* recipients are not charities that feed the needy, but organizations dedicated to protecting consumers from, or redressing injuries caused by, false advertising. On the face of the settlement's language, "charities that provide food for the indigent" may not serve a single person within the plaintiff class of purchasers of Frosted Mini-Wheats.

Our concerns are not placated by the settlement provision that the charities will be identified at a later date and approved by the court — a decision from which the Objectors might again appeal. Our standards of review governing pre-certification settlement agreements require that we carefully review the entire settlement, paying special attention to "terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of the negotiations." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th

Cir. 2003). *Cy pres* distributions present a particular danger in this regard. "When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1039. This record leaves open the distinct possibility that the asserted $5.5 million value of the product *cy pres* award and the remaining cash *cy pres* award will only be of serendipitous value to the class purportedly protected by the settlement. The difficulty here is that, by failing to identify the *cy pres* recipients, the parties have restricted our ability to undertake the searching inquiry that our precedent requires. The *cy pres* problem presented in this case is of the parties' own making, and encouraging multiple costly appeals by punting down the line our review of the settlement agreement is no solution.

### C.

[5] On remand, the parties are free to negotiate a new settlement or proceed with litigation. If they again decide to settle, they must correct the additional serious deficiencies we find in this settlement agreement. Not only does the settlement fail to identify the *cy pres* recipients of the unclaimed money and food, but it is unacceptably vague and possibly misleading in other areas as well.

The settlement states only that Kellogg will donate "$5.5 million *worth*" of food. (emphasis added). But the settlement document gives no hint as to how that $5.5 million will be valued. Is it valued at Kellogg's cost? At wholesale value? At retail? The exact answer to this question has important ramifications relating to the accurate valuation of the constructive common fund and thereby the reasonableness of attorneys' fees. Kellogg stated at oral argument and in its briefs to the district court that it will value the food donation at wholesale, but the only legally-enforceable document — the settlement — says nothing of the sort. Additionally, the settlement fails

DENNIS v. KELLOGG COMPANY    10543

to include any restrictions on how Kellogg accounts for the *cy pres* distributions. Can Kellogg use the value of the distributions as tax deductions because they will go to charity? And given that Kellogg already donates both food and money to charities every year — which is unquestionably an admirable act — will the *cy pres* distributions be in addition to that which Kellogg has already obligated itself to donate, or can Kellogg use previously budgeted funds or surplus production to offset its settlement obligations? Again, the settlement is silent, and we have only Kellogg's statements as to its future intentions. All of this vagueness detracts from our ability to determine the true value of the constructive common fund.

Moreover, Plaintiffs' counsel tells us that settlements like this serve the purposes of "restitutionary disgorgement and deterrence." If the product *cy pres* distribution is form over substance and not worth nearly as much to Kellogg as the settlement claims, then these goals are not served. To the contrary, the settlement is a paper tiger.

This deficiency raises in turn serious issues about the alleged dollar value of the product *cy pres* award, an important number used to measure the appropriateness of attorneys' fees. For example, if the alleged $5.5 million value of the product *cy pres* distribution turns out on close examination to be an illusion and is subtracted from the alleged $10.64 million value of the common fund, the dollar value of the settlement fund plummets to $5.14 million, and the $2 million attorneys' fees award becomes 38.9% of the total, which is clearly excessive under our guidelines. This possibility gives us an additional reason to be vigilant regarding the particulars of this class action settlement: is it all that it appears to be? Are the assigned numbers real, or not? This issue is particularly critical with a *cy pres* product settlement that has a tenuous relationship to the class allegedly damaged by the conduct in question. The issue of the valuation of this aspect of a settlement must be examined with great care to eliminate the possibility that it serves only the "self-interests" of the attor-

neys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious.

Neither class counsel nor Kellogg offers any credible reason for the mysteries in the current settlement. To approve this settlement despite its opacity would be to abdicate our responsibility to be "particularly vigilant" of pre-certification class action settlements. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947.

### D.

[6] For the foregoing reasons, we conclude that the district court did not apply the correct legal standards for *cy pres* distributions as set forth in *Six Mexican Workers* and *Nachshin*. Therefore, the approval of the settlement was an abuse of discretion.

[7] We do not have the authority to strike down only the *cy pres* portions of the settlement. "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness," and we cannot "delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026 (internal quotation marks omitted). *See also Jeff D. v. Andrus*, 899 F.2d 753, 758 (9th Cir. 1989) ("[C]ourts are not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties."). Thus, we reverse the district court's order approving the settlement and dismissing the case, vacate the judgment and award of attorneys' fees,[2] and remand for further proceedings.

---

[2] Our decision on the merits of the settlement renders moot the attorneys' fees issue. *Waggoner v. C&D Pipeline Co.*, 601 F.2d 456, 459 (9th Cir. 1979).

## IV

## CONCLUSION

Class counsel and Kellogg ask us for the impossible — a verdict before the trial. They essentially say, "Just trust us. Uphold the settlement now, and we'll tell you what it is later." But that is not how appellate review works. The settlement provides no assurance that the charities to whom the money and food will be distributed will bear any nexus to the plaintiff class or to their false advertising claims and therefore violates our well-established standards governing *cy pres* awards. Moreover, the true value of the product *cy pres* initiative has yet to be determined, making it impossible to assess, and thus evaluate, the true value of the common fund.

**REVERSED, JUDGMENT VACATED, and CASE REMANDED.**