```
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4   SHEILA ALLEN, individually    )
     and on behalf of all others   )
 5   similarly situated,           )   Docket No. 13 C 8285
                                   )
 6                Plaintiff,       )
                                   )
 7        vs.                      )
                                   )
 8   JPMORGAN CHASE BANK, N.A.,    )   Chicago, Illinois
                                   )   October 21, 2015
 9                Defendant.       )   10:05 a.m.

10

11           TRANSCRIPT OF PROCEEDINGS - Hearing
        BEFORE THE HONORABLE REBECCA R. PALLMEYER

12

13   APPEARANCES:

14   For the Plaintiff:       CAFFARELLI & ASSOCIATES, LTD.
                              BY:  MR. ALEJANDRO CAFFARELLI
15                            224 South Michigan, Suite 300
                              Chicago, Illinois  60604
16
                              KEOGH LAW, LTD.
17                            BY:  MR. KEITH J. KEOGH
                              55 West Monroe, Suite 3390
18                            Chicago, Illinois  60603

19
     For the Defendant:       STROOCK & STROOCK & LAVAN, LLP
20                            BY:  MS. JULIA B. STRICKLAND
                                   MR. ARJUN P. RAO
21                            2029 Centruy Park East, Suite 1600
                              Los Angeles, California  90067
22

23   Court Reporter:          FRANCES WARD, CSR, RPR, RMR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Suite 2144A
                              Chicago, Illinois  60604
25                            (312) 435-5561
                              frances_ward@ilnd.uscourts.gov
```

1           THE CLERK:  13 C 8285, Allen versus JPMorgan Chase

2    Bank for final approval hearing.

3           MR. KEOGH:  Good morning, your Honor.

4           Keith Keogh on behalf of plaintiff and the class.

5           THE COURT:  Good morning, Mr. Keogh.

6           MR. CAFFARELLI:  Good morning, your Honor.

7           Alex Caffarelli on behalf of plaintiff and the

8    class.

9           THE COURT:  Good morning.

10          MS. STRICKLAND:  Good morning, your Honor.

11          Julia Strickland of Stroock & Stroock & Lavan on

12   behalf of Chase.

13          MR. RAO:  And good morning, your Honor.

14          Arjun Rao also on behalf of Chase.

15          THE COURT:  All right.  We are here on plaintiff's

16   motion for final approval of the class action settlement.  I

17   know there were objections, some of which have been

18   withdrawn.

19          I want to ask for the record, are there any

20   objectors or others related to this case, Allen versus Chase

21   Bank -- JPMorgan Chase Bank, a class action, who would like

22   to be heard?

23          MR. RHODES:  Good morning, your Honor.

24          My name is Mark Rhodes.  I am an objector to the

25   class action settlement.

1    THE COURT:  Are you an objector or counsel?

2    MR. RHODES:  I am an objector.  I also am a lawyer.

3    I am barred in the Commonwealth of Pennsylvania as well as

4    the state of New Jersey, but I am appearing as an objector --

5    as a member of the class today.

6    THE COURT:  Okay.  You are a class member.

7    MR. RHODES:  Correct, your Honor.

8    THE COURT:  All right.  Why don't I ask you to

9    remind me of the nature of your objections.

10    MR. RHODES:  My objections basically come down to

11    two main points.  One is that I have objected to the class

12    action fees because there has been no Lodestar cross-check

13    performed by the Court.

14    THE COURT:  Right.

15    MR. RHODES:  Although plaintiff's counsel suggests

16    that that's disfavored in this circuit, recent Seventh

17    Circuit opinions advise that a cross-check is appropriate in

18    certain cases.  I would submit this is one of those cases.

19    The second main objection is to the inclusion of a

20    $10 floor before a second distribution is made of the

21    settlement proceeds.

22    My belief, as I stated in my objection, was that it

23    would leave as much as a million dollars to go to an

24    undisclosed *cy-près* recipient.  But now, with the additional

25    information provided by counsel in terms of the amount of

1   money available for distribution, I have a chart that I can

2   hand up to your Honor and show that it's actually -- because

3   of the increased amount of the distribution, that the amount

4   is probably about three-quarters of a million dollars.  It's

5   around $700,000, if the 10 percent -- or the $10 floor is

6   maintained.

7           So my objection is to that, in terms of the class

8   settlement itself, and suggest that that should be lowered

9   significantly before -- as a prohibited -- prohibition before

10  a second distribution is made.

11          THE COURT:  Why don't I ask Mr. Keogh or

12  Mr. Caffarelli if you want to explain why the $10 figure was

13  chosen as a threshold for additional distribution.

14          MR. KEOGH:  Certainly, your Honor.

15          Take a step back.  We would also object.

16  Mr. Rhodes never filed his objection.  He mailed in defense

17  counsel.  Apparently he had my wrong address.  So we never

18  took discovery on Mr. Rhodes like we did the other objectors.

19  He is kind of coming out of left field here, which defeats

20  the whole purpose of filing an objection properly.

21          But to the merits of his question here, the

22  $10 floor was picked because, in order to write the checks

23  and to process the checks, there is expenses involved.  So

24  when you get anything less than that, it makes it not

25  feasible.  It doesn't make sense to send a $3 check when it

1    costs $2 to process that by administration costs.

2            Also, class members are less likely to cash smaller

3    checks.  The smaller the check, the more uncashed checks we

4    have.

5            Taking a further step back, the class -- everyone

6    claims it is a *pro rata* claim.  The only amount left over for

7    a second distribution is uncashed checks.  We are not going

8    to have a million dollars or three-quarters of a million

9    dollars left in uncashed checks.  It's -- I haven't -- that's

10   over 10 percent of the settlement.  That would be beyond

11   unusual, your Honor.

12           So we have people who forget to cash their checks.

13   And out of that small group, if it's more than $10, it makes

14   it economically feasible to then have the class administrator

15   reissue checks, put stop payments on the prior checks, do the

16   mailings, and then process everything.  That's why it's $10.

17   It's just an amount that makes it economically feasible to

18   process it.

19           THE COURT:  I have considered the submissions, both

20   originally made back in, I guess it was, April and now.  I am

21   prepared to approve the settlement as well as Mr. Keogh's

22   request for fees and his request for a modest but, I think,

23   significant incentive payment for the named plaintiff.

24           Let me explain why.  I have made some notes that I

25   think are worth just reviewing.

1          It's a settlement for more than $10 million for the

2   class.  The figure was reached, as I understand it, after a

3   day of negotiations with former Judge Andersen, known for his

4   ability to coax deals, but apparently unsuccessful in this

5   case, presumably because the parties negotiated at arm's

6   length and aggressively.

7          However, they were able to reach an agreement

8   sometime after that day-long session with Judge Andersen, and

9   that's the agreement that was presented to me.

10          The agreement notably does not include any blessing

11   on the part of defendant for plaintiff's fee requests.  So

12   there is no reason to believe that, at least from that

13   perspective alone, plaintiff was willing to sell the class

14   members' interest short in return for a very substantial

15   recovery -- plaintiff's counsel was willing to do that.

16          Ditto the $25,000 proposed incentive award for

17   Ms. Allen, who herself had a number of violations of this

18   statute in her own case and makes her an appropriate class

19   representative, also donated substantial time and attention

20   to the matter.

21          But again, there was no agreement, as I understand

22   it, on the part of the plaintiff -- plaintiff's counsel and

23   defense counsel that that -- that defendants would not object

24   or that they would otherwise bless that proposal.

25          The $10 million, when distributed to the class

1    members, results in a modest but a genuine recovery for class

2    members who are overwhelmingly unable to proceed

3    individually, not only because they suffered no actual

4    damages but because the statutory damages are not worth

5    recovering on an individual basis because there is no

6    fee-shifting provision, as I understand it.

7         So unless the class members themselves have

8    substantial actual damages, there would be no incentive for

9    them to bring their own private action.

10        The agreement that was reached is thus, on its

11   face, reasonable, and the Court did grant preliminary

12   approval some months ago.

13        There have now been a number of objections

14   asserted, including that of Mr. Rhodes, who did not file

15   anything that I am aware of but has stated his objections

16   here in court.  Why Mr. Rhodes, who is an attorney, didn't

17   submit those in writing, I am not sure, but it sounds as

18   though --

19        MR. RHODES:  Your Honor, I did.  I did.  I have a

20   copy for your Honor.  I mailed it to your Honor as well as

21   counsel, as required by the --

22        THE COURT:  By the notice?

23        MR. RHODES:  -- by the notice.  Yes, your Honor.

24        THE COURT:  All right.  I will withdraw that

25   observation.

1          The fact is, however, that only a handful of class

2     members did object.  In light of the very large number of

3     class members, many of whom, as I understand it, received

4     notice -- I would make an observation here that the effort to

5     notify them was comprehensive and effective -- it was -- less

6     than 1 percent of the class members have any objection.

7     There were some opt-outs as well.  But even that's a

8     comparatively small number in light of the overall size of

9     this class.

10          Objector Jabrani had some complaints about the

11    class proposal that I would like to address briefly.

12          He complains that text messages were not included

13    separately as a basis for recovery, although it's not clear

14    that Mr. Jabrani himself received any texts.

15          Objector Sberna believes that the 60-day time

16    period for a filing of a claim is insufficient.  He doesn't

17    say why, and he himself had no trouble meeting the deadline.

18          He also says a better approach is for class members

19    to recover based on the number of calls they received.  But,

20    number one, he doesn't say whether he himself received

21    multiple calls.  In any event, the Court's duty is not to

22    insist on the best approach, which is what Objector Sberna

23    appears to believe, but to determine whether the approach

24    that was adopted by counsel was reasonable and offers relief

25    to the class.

1    Sberna says, "Thus an exchange for a chance at
2    maybe $50, the class members have lost an opportunity to
3    collect for each and every phone call made by defendant, or
4    text message on each and every phone line.  The potential for
5    each class member is possibly thousands of dollars under the
6    TCPA."  That's the end of the quote.

7    This Court doubts that any class member could
8    realistically expect to recover thousands of dollars from
9    Chase for the violation alleged.

10   But let's assume that they are.  No class member
11   lost the opportunity.  They are all free to opt out, and some
12   did.  If any class member could collect thousands of dollars,
13   I would encourage that person to opt out.  They have lost
14   nothing as a result of the settlement.

15   To the extent Sberna somehow believes that Chase
16   would have agreed to a proposal in which each class member
17   would collect a substantial amount of money for every
18   message, he offers no evidence that Chase would have been
19   agreeable to that kind of proposal.  Given the hard-fought
20   negotiations in this case, I suspect that would not have
21   happened.

22   Sberna also says that a better approach would have
23   been to calculate the violations for each class member and
24   then attribute a value of $50 per violation then used as an
25   offset against what's alledgedly owed to the defendant.

1    He says, making the adjustment to each and every
2    class member's account assures that all class members receive
3    the benefit.  But to the contrary, I think what he is
4    proposing would create a subclass of persons who owed Chase
5    money.  Not everybody in this case owed Chase money, or at
6    least so it's alleged.

7    The plaintiff, I believe, Ms. Allen, believes she
8    didn't owe Chase any money.  So under Mr. Sberna's approach,
9    Ms. Allen herself doesn't get the relief that he thinks she
10   is entitled to.

11   For some debts maybe there are some class members
12   who do owe Chase some money.  But for some of those debts,
13   the statute of limitations may have run.  There is no reason
14   to voluntarily pay Chase for money that they would not
15   legally have been entitled to recover.

16   In any event, any class member who wishes to can do
17   precisely what Mr. Sberna has proposed; that is, any class
18   member who can take the $50 -- or actually it looks like it's
19   going to be closer to $70 -- and use that money to pay this
20   indebtedness or any other indebtedness or go to the casino,
21   it's his choice.  There is no reason to require this proposal
22   that Mr. Sberna has proposed.  And nothing about his proposal
23   suggests it would have been a better resolution for the
24   class.

25   Sberna also criticizes the *cy-près* award.  I know

1    that Mr. Rhodes criticizes that award as well.  But I think

2    that criticism ignores what I think is a pretty careful

3    effort to limit the *cy-près* recovery and maximize recovery to

4    the class.  There may be no substantial *cy-près* award.

5            And I would note that Mr. Keogh's explanation about

6    the $10 threshold is precisely what I would have assumed.

7    Writing checks, even for amounts as small as $10, can be

8    prohibitive.  I myself, were I to get a small check in the

9    mail, might very well not think it's worth the bother of

10   cashing it, with the result being that fewer people get

11   relief under the proposal that I adopt some standard other

12   than $10.

13           MR. KEOGH:  Your Honor --

14           THE COURT:  I do think Mr. Keogh is correct, that

15   the smaller the check, the more likely that class members

16   will leave them uncashed.

17           MR. RHODES:  Your Honor, I agree with that

18   sentiment exactly.  That's why I am suggesting that to have a

19   second distribution of a low sum is inappropriate.

20           THE COURT:  But it won't be necessary in this case.

21           MR. RHODES:  Your Honor, if I may?  I prepared a

22   chart.  If I could hand this up to your Honor?

23           THE COURT:  Sure.  Of course.

24           (Document tendered.)

25           MR. RHODES:  This shows, based upon the information

1    -- I have several for counsel, if they wish.

2              (Documents tendered.)

3              MR. RHODES:  This chart was based upon the

4    information provided by counsel in their final fee petition

5    and the response to the objections.

6              I created this chart based on the total submitted

7    claims of 84,727.  The estimated dollar amount per claim is

8    $70.25, showing total claim payments of almost $6 million.

9              I backwards-engineered this information to say,

10   okay, let's say it's a $10 -- $10 is available for a second

11   distribution.  That means $741,000 is available to be

12   distributed to the number of participating claimants who did

13   not -- who did cash the check.  That's the top line.  That

14   would mean 74,169 claimants cashed the check.  10,558 did

15   not.  So there would be a $10 distribution.

16             So the second-to-the-last column is the dollar

17   value of forfeiture to *cy-près*.  So at $10, there is no

18   forfeiture.

19             The next line down, highlighted in yellow, if there

20   is $9.99 left for distribution, $741,067 is forfeited to a

21   *cy-près* award.

22             My suggestion, if everybody agrees that small

23   checks are bad, let's lower the threshold for what the check

24   should be, and let's take it all the way down to $2.  If

25   everybody is saying that it's unlikely there is going to a

1    *cy-près* award in this case, what is the problem of reducing

2    it to a $2 floor?  That way, if there is a *cy-près*

3    forfeiture, it's only in the amount of $164,872.  That's the

4    second yellow line.

5           So if everybody is in agreement that there is no

6    reason to -- that there is no concern that a *cy-près* award

7    will be made, then what is the harm in reducing the floor to

8    $2?

9           THE COURT:  Well, the harm is precisely the one

10   Mr. Keogh mentioned, that it's expensive to cut checks for

11   very small amounts of money.

12          MR. RHODES:  Your Honor, according to their

13   submission, they have spent $800,000 so far in administrative

14   fees to make -- provide notice to 2 million people.  So there

15   has been no testimony on two things.

16          One, what is the projected number of uncashed

17   checks?  No one -- none of the claims administrators -- there

18   have been no affidavits, no declarations saying what the

19   anticipated amount of checks not cashed would be at a

20   $70 distribution.

21          I submit to you that most of the class members who

22   get a $70 check are going to cash it.

23          So why not reduce --

24          THE COURT:  I do as well.  I think that's right.

25          MR. RHODES:  Why not reduce the floor to $2 so that

1    if there is not enough money to make a distribution of $2 or

2    more, then the money resorts to a *cy-près*?  I still object to

3    a *cy-près* whatsoever.

4              THE COURT:  I thought we were talking about a

5    second distribution.

6              MR. RHODES:  We are, your Honor.

7              MR. KEOGH:  This is one thing where, since he

8    didn't file the objection, he wrote it in.  It was required

9    to be filed by the Court's order.  So it should be overruled

10   on that matter.

11             But there is nothing here saying qualifications of

12   counsel experienced in class actions to set forth this chart

13   and what the expected percentages are.

14             Now, if we took discovery, we could have asked him

15   that.  He is saying there is no administrator testimony.  He

16   is showing up at the last second with a chart.

17             This is why it's required to be filed, so we don't

18   have this kind of nonsense of someone coming in and making up

19   evidence.

20             MR. RHODES:  Two points, your Honor.

21             JPMorgan Chase's counsel addressed my objection in

22   their response to the objections.  If plaintiff's counsel

23   didn't choose to do that, that's their reason.

24             MR. KEOGH:  He didn't mail it to me.

25             MR. RHODES:  Second point, your Honor.

1      There is nothing here except math.  This is just

2   math.

3      THE COURT:  Yes, it is.  It's just math.

4      MR. RHODES:  Yes.

5      THE COURT:  It's just math.

6      One would have to set the line somewhere.  I don't

7   think it's -- the suggestion you are making is that things

8   could have been different.  Of course they could have.

9      MR. RHODES:  Your Honor, all you have to do is

10  change $10 to $2, and you kick into this settlement

11  $600,000 -- or $545,000.

12     THE COURT:  Much of which will never reach the

13  class members because they won't cash those checks.

14     MR. RHODES:  Why?

15     Your Honor, I am suggesting if you reduce the

16  dollar amount to $2, then the distribution to the class

17  members will go up.  It will be higher than $70, because you

18  don't have to hold back anything.

19     MR. KEOGH:  There is nothing being held back.  I

20  think that's where he is misunderstanding.

21     THE COURT:  I think so, too.

22     MR. KEOGH:  It's all going out, and only the

23  uncashed checks -- so it's not like we are budgeting and the

24  proration is less because of this budget.  It's all going

25  out.

1    THE COURT:  No amounts are being withheld.  We are

2    not withholding $10 per class member.

3    MR. RHODES:  I understand, your Honor.  I am not

4    suggesting that.  What would be withheld is, on the second

5    distribution, it would be withheld.

6    On the second distribution, if there is

7    $714,248 remaining, that money is not going out to the class.

8    That's the third line down.  That's at 958.

9    Or even better, if there is $741,067, that money is

10   not going out.  That's going to an undisclosed *cy-près*

11   recipient, the one of which, as suggested by plaintiff's

12   class action counsel, is objected to by the defense.

13   THE COURT:  Here is my understanding.

14   All the money is being paid out.  Some checks won't

15   be cashed.  That will leave money in the pot.  It doesn't

16   revert to the defendant.  The defendant doesn't get the money

17   back.

18   MR. RHODES:  I understand that, your Honor.

19   THE COURT:  So plaintiffs are proposing, we will

20   pay all the class members again, as long as there is enough

21   for each of them to get $10 or more.

22   MR. RHODES:  I understand that, your Honor.

23   My point -- my objection is that that's too high.

24   Why $10?  We don't have any testimony what the cost

25   is to stop the payment on checks and mail new checks.  Let's

1   say it's $2.  If it's $2, then --

2               MR. KEOGH:  Then they are actually getting zero.

3               MR. RHODES:  Then pick the $3 -- pick one of the

4   other lines here and say it's $3.

5               THE COURT:  Mr. Rhodes, you are correct that any

6   amount would be arbitrary.  That by itself is not a basis for

7   me to disapprove of this proposal, particularly where your

8   objection was mailed to defendants but not even filed with

9   the court.

10              I don't think it's appropriate for me to entertain

11  this detailed objection about a matter that's really largely

12  arbitrary at this stage.

13              So that objection is overruled.

14              MR. RHODES:  Your Honor, is my chart going to be

15  made a part of the record?

16              THE COURT:  I will certainly make your chart part

17  of the -- well, actually, I am not sure that I can.  You will

18  have to move for leave to do that, because you are just

19  handing it up right now and never properly filing it with the

20  court.  So I will ask, if you do want it to be part of the

21  record, that you do so.

22              I just want to make another couple of observations

23  about some of the other objections that were made.

24              There is a suggestion that the Court should

25  somehow -- I think Sberna made this suggestion as well or

1    maybe Burack -- that the Court should have -- should somehow

2    wait until after the *Spokeo* case is decided.  If anything,

3    that case presents danger to the class.  If it comes out the

4    wrong way for the plaintiffs, a very substantial amount of

5    money that would otherwise be available to them is going to

6    slip right through their fingers.

7            I don't think that would be effective carrying out

8    of fiduciary duties to the class members, to try to delay

9    things here.

10           The FCC has ruled in a way that's agreeable to the

11   plaintiff, but not even that determination is rock solid.  I

12   think it could very well be challenged.

13           Another observation is that many class members, it

14   appears, may be among those who are subject to a defense of

15   this claim as arbitrable.  I'm not sure about whether

16   Mr. Rhodes himself might fall into that category.

17           You are right, Mr. Keogh.  There was no discovery.

18           There is also the possibility that some class

19   members, including notably a couple of the objectors here,

20   could be found to have consented to the calls at issue

21   because they provided their phone number.  That, too, would

22   defeat recovery for a large swath of class members,

23   including, as I mentioned, two of the very people who are now

24   objecting to it.

25           I want to turn finally to the issue of fees.

19

1      This circuit is arguably unusual in leaning in

2   favor of the contingency recovery for class counsel.  But I

3   think that resolution is logical under the approach that was

4   explained pretty well by Professor Fitzpatrick in his

5   submission.

6      He explains why the percentage of recovery is a

7   better method of awarding fees than a Lodestar or a Lodestar

8   multiple, because it really does create incentives on the

9   part of plaintiff, not only to prevail but also to prevail at

10  the highest level for the class possible, because that

11  increases the counsel's own recovery.

12     Professor Henderson at the University of Chicago

13  suggested that there is some -- by looking at some other

14  cases, that plaintiff's counsel actually had a 64 percent

15  chance of prevailing.  I am not even sure that's true.

16     And plaintiff suggests that, if you read his

17  affidavit correctly, it has the effect of rewarding poor

18  performing lawyers.

19     But let's assume that Mr. Henderson's approach,

20  which has been rejected, I believe, by Judge Holderman in

21  another case, but he is still making the argument that

22  plaintiff's counsel is entitled to market rate.

23     There is ample basis to conclude that a contingency

24  recovery is what the market calls for, particularly in a case

25  like this, where I believe Mr. Keogh and his colleagues were

1  operating on a pure contingency basis as opposed to any fees

2  up front.

3         The recovery to the plaintiff's attorneys is

4  actually a little bit less than 33 percent of the award, when

5  you recognize that they had to advance the costs.  There was

6  a pure contingency.  This is not a case where there was zero

7  risk of recovery -- zero risk of nonrecovery.

8         It seems to me that counsel has -- counsel has

9  satisfied me that the fee award they are asking for is

10 reasonable under the circumstances; and for the reasons

11 mentioned earlier, that Ms. Allen, too, is entitled to the

12 $25,000 incentive fee for which she has moved.

13        I understand the defendants have not made an

14 objection to those requests, although they are certainly not

15 precluded from voicing one.

16        Is there any other issue that I have not addressed?

17        MS. STRICKLAND:  Not from us, your Honor.

18        THE COURT:  I believe you gave me a proposed final

19 order, but if not, if you could, do that.

20        MR. KEOGH:  We can e-mail it to your Honor, if you

21 would like.

22        THE COURT:  That would be great.  All right.

23        MR. KEOGH:  Thank you very much, your Honor.

24        MR. CAFFARELLI:  Thank you, your Honor.

25        MR. RHODES:  Thank you, your Honor.

1          (An adjournment was taken at 10:28 a.m.)

2                    *     *     *     *     *

3     I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
4

5     /s/ Frances Ward                        November 23, 2015.
      Official Court Reporter
6     F/j